UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEX HOLMES, JOSH NAVARRO, NICO TRAMONTANA, BITCOIN VENTURES 2020, LLC, YASAR CORPORATION and ONEPURPOSE LTD., | **COMPLAINT** |
| Plaintiffs. | **JURY TRIAL DEMANDED** |
| against- | Case No.: _____ |
| CHET MINING CO, LLC, CHET MINING CO CANADA LTD., and CHET STOJANOVICH, | |
| Defendants. | |

**TO THE ABOVE-NAMED DEFENDANTS:**

Plaintiffs Alex Holmes, Josh Navarro, Nico Tramontana, Bitcoin Ventures 2020, LLC, Yasar Corporation and OnePurpose Ltd. (hereinafter referred to as "plaintiffs"), by and through their attorneys, E. Stewart Jones Hacker Murphy LLP, as and for a complaint herein against the above-captioned defendants (hereinafter referred to as "defendants"), allege as follows:

**INTRODUCTION**

1.          This action asserts claims for, among other things, civil RICO violations, breach of contract, fraud, conversion and unjust enrichment. The defendants executed a fraudulent scheme to induce the plaintiffs to part with hundreds of thousands of dollars, based on the defendants' promises and representations that they would deliver cryptocurrency mining equipment and/or hosting services. The defendants perpetrated this scheme with numerous false and misleading text messages and emails, and accepted the proceeds of the fraud by electronic means, such as bank wires and cryptocurrency payments. The defendants have not delivered the goods or services they promised, and have not refunded plaintiffs' purchase money despite due demand. Moreover, the totality of the evidence shows that the defendants

*never intended* to provide the goods and services that the plaintiffs bargained for.  The consistency of the pattern is overwhelming.  In case after case, defendant Chet Stojanovich, acting for himself and the corporate defendants, described himself as having a cryptocurrency mining capacity that was fictitious, took money from the plaintiffs (and others) for goods and services he was incapable of producing, and then simply absconded (after a brief period of trying to mask his breaches with falsified reports of mining income, as discussed below).  For the reasons described below, the plaintiffs are entitled to judgment against the defendants.

## JURISDICTION AND VENUE

2.          This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §1331, because the plaintiffs assert a cause of action under the Racketeer Influencing & Corrupt Organizations Act, 18 U.S.C. §1962 *eq. seq*.

3.          Alternatively, the Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. §1332 because it is a dispute between the citizens or subjects of different states (and foreign states) and the amount in controversy exceeds $75,000.00.

4.          As set forth in more detail below, plaintiffs Alex Holmes is domiciled in Los Angeles, California, plaintiff Josh Navarro is domiciled in Miami Florida, Plaintiff Nico Tramontana is domiciled in Milleville, New Jersey, plaintiff Bitcoin Ventures 2020, LLC is a Virginia limited liability company domiciled (with a principal place of business) in Vienna, Virginia, plaintiff Yasar Corporation is a Nevada corporation with a principal place of business in Las Vegas, Nevada, and plaintiff OnePurpose Ltd. is a Hong Kong corporation with a principal place of business in Shenzhen, China.

5.          As set forth in more detail below, defendants Chet Mining Co, LLC ("CMC") and Chet Mining Co. Canada Ltd. ("CM Canada") are, upon information and belief, business entities formed under the laws of Wyoming and British Columbia, respectively.  Both businesses have their principal

2

places of business in New York, New York.  As set forth in more detail below, defendant Chet Stojanovich is a natural person domiciled in New York, New York.

6.          Accordingly, there is complete diversity among the parties plaintiff and defendant.

7.          Venue is proper within the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (2) as the subject transactions and occurrences took place in the Southern District of New York and the defendants are located in the Southern District of New York.

8.          This Court has jurisdiction over the defendants pursuant to NY CPLR §301 as the defendants are principally headquartered and reside in the State of New York, City of New York, and NY CPLR§ 302(a)(1) because the defendants regularly transact and do business in New York deriving substantial financial gain from the same.  Alternatively, the Court also has jurisdiction pursuant to NY CPLR §302(a)(1) because the defendants transacted business with the plaintiffs from New York including, without limitation, invoicing the plaintiffs for equipment and services from New York and accepting payment for same, and this action arises out of said transactions.  Alternatively, the Court has personal jurisdiction pursuant to NY CPLR §302(a)(2), because the defendants committed a tortious act within New York, causing harm to the plaintiffs therefrom (namely, the acts of fraud and conversion pled below).

**DEMAND FOR JURY**

9.   Plaintiffs hereby demands a jury trial.

**PARTIES**

10.          Plaintiff Alex Holmes is a natural person residing at 664 S, Mansfield Avenue, Los Angeles, California.

11.          Plaintiff Josh Navarro is a natural person residing at 2480 Lincoln Avenue, Miami, Florida.

12.         Plaintiff Nico Tramontana is a natural person residing at 716 Mallard Street, Millville, New Jersey.

13.         Plaintiff Bitcoin Ventures 2020, LLC ("Bitcoin Ventures") is a liability company organized under the laws of Virginia, with a principal place of business in Vienna, Virginia.

14.         Plaintiff Yasar Corporation is a Nevada corporation with a principal place of business at 3773 Howard Hughes Pkwy. Suite 500s, Las Vegas, NV 89169.

15.         Plaintiff OnePurpose Ltd. ("OnePurpose") is a corporation organized under the laws of Hong Kong with a principal place of business at Room C104, Xinkongqi Apartment, Shekou New Street Nanshan Dist., Shenzhen, 518067, China.

16.         Defendant CMC is a foreign limited liability company existing under the laws of the State of Wyoming, with principal place of business at 105 Duane Street, New York, New York 10007.

17.         Defendant CM Canada is purportedly a foreign corporation existing under the laws of British Columbia, Canada, with a principal place of business at 105 Duane Street, New York, New York 10007.

18.         Defendant Chet Stojanovich is a natural person residing in the State of New York, City of New York, with a current residential address of 105 Duane Street, Apartment 20F, New York, New York 10007.

19.         Upon information and belief, Chet Stojanovich is the sole member of CMC and sole shareholder/principal of CM Canada.

20.         Upon information and belief, Chet Stojanovich owns, operates, and otherwise formed multiple entities using his personal residence as their principal place of business, including CMC and CM Canada

21.	Upon information and belief, Chet Stojanovich, through CMC, purports to distribute and sell bitcoin mining equipment to the public, and to offer Bitcoin mining hosting services.

22.	Upon information and belief, Chet Stojanovich, through CMC and CM Canada, purports to provide Bitcoin mining hosting services to the public.

23.	Upon information and belief, Chet Stojanovich comingles the finances of his business entities, using the same for his personal use and benefit.

24.	Upon information and belief, Chet Stojanovich transfers money between his various entities rendering them undercapitalized and insolvent.

25.	Upon information and belief, Chet Stojanovich completely dominates and controls CMC and CM Canada, and uses those business entities to defraud his customers and hinder creditors, such as the plaintiffs herein.

26.	Upon information and belief Chet Stojanovich regularly fails to observe business formalities with regard to his management and operation of CMC and CM Canada.

27.	Upon information and belief, Chet Stojanovich used CMC and CM Canada to commit fraudulent and wrongful acts against plaintiff and other members of the public.

28.	As such, CMC and CM Canada are the alter egos of Chet Stojanovich and of each other.  Chet Stojanovich is personally liable for CMC and CM Canada's debts under a veil piercing or alter ego theory, and the two business entities are likewise liable for each other's debts to the plaintiffs under a veil piercing or alter ego theory.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

29.	At all relevant times, defendant Chet Stojanovich, individually and through his companies CMC and CMC Canada, held himself out as a seller of Bitcoin mining equipment and provider of Bitcoin mining hosting services.

30.         Bitcoin mining is a support service that facilitates cryptocurrency transactions. Cryptocurrency is, of course, a form of "virtual" currency used to make purchases over the internet. For convenience, security and privacy reasons, some consumers prefer to make online purchases with cryptocurrency rather than credit cards. In these transactions, the consumer uses "regular money" (i.e., U.S. Dollars or another sovereign currency) to purchase units of cryptocurrency (such as Bitcoins) from a cryptocurrency supplier. The consumer can then spend the Bitcoins to purchase goods and services from online retailers.

31.         Cryptocurrency miners are third parties that validate the consumer's Bitcoins for the seller. When a consumer offers Bitcoins to make a purchase, a Bitcoin mining business checks the coins against digital ledger (known as a blockchain) to confirm that the Bitcoins are legitimate. This is done nearly instantly, through the use of specialty computers commonly known as "miners." The Bitcoin mining business receives a fee for each transaction that it validates, usually equal to some percentage of the Bitcoins that the consumer pays to the seller in the underlying purchase.

32.         A Bitcoin mining business will usually run a number of these miner devices at the same time, close to twenty-four hours a day, to validate as many transactions as possible (and realize as much income as possible) as validation opportunities arise.

33.         Some Bitcoin mining operations will "host" miner devices owned by other parties. That is, in exchange for a fee, the mining business will assume custody of another person's miner device, plug it into the mining business's power supply, and run the device so that it can validate Bitcoin transactions and make money for its owner. A competent mining facility requires a high degree of access to electrical power, because running a large number of machines requires a lot of energy.

34.         The defendants purported to be a turnkey solution for persons interested in developing Bitcoin mining portfolios. In particular, the defendants offered to: (a) sell bitcoin mining

devices to interested purchasers; and (b) host those mining devices for the purchasers, purportedly at a mining facility owned or controlled by the defendants in Canada, so that the purchasers could realize income from their machines.

35.         Defendant Chet Stojanovich held himself out as a cryptocurrency mining savant. He also traded on the notoriety of his late father, Paul Stojanovich, who was a producer of reality television shows about law enforcement, such as *Cops* and *American Detective*.  As a result of his father's work, Chet Stojanovich represented to plaintiff Holmes and others that he (Stojanovich) had very substantial connections in law enforcement, which contributed to the defendants' veneer of security and legitimacy.

36.         The defendants' offerings were a fraudulent scheme.  Repeatedly, the defendants accepted payment from purchasers who had been promised and expected to receive Bitcoin mining devices and/or hosting services, but the defendants failed to deliver the devices and did not host them.  In effect, the defendants fraudulently induced outsiders, such as the plaintiffs, to invest in mining devices and hosting services, and simply took their money without supplying the goods or services that the defendants represented that they could or would supply (but, in fact, were incapable of supplying).

A.    **Plaintiff Alex Holmes**

37.         In spring and summer 2019, defendant Chet Stojanovich, acting for himself and for CMC and CM Canada, induced Alex Holmes to pay the defendants $497,092.71 for bitcoin mining equipment and hosting services that the defendants did not provide, and never intended to provide.

38.         Defendant Chet Stojanovich, acting for himself and for CMC and CM Canada, memorialized written offers for this equipment and hosting services, which he transmitted to Alex Holmes by email and/or text message, on at least the following dates:

7

      a.                On or about May 6, 2019, offering to sell twenty (20) Z11 miner devices and one hundred (100) L3+ miner devices, and provide six (6) months of hosting services at the defendants' purported mining facility, for a price of $67,252.50.

      b.                On or about May 16, 2019, offering to sell fifty (50) Antminer L3+ devices, for $19,293.75, also subject to the hosting services.

      c.                On or about May 21, 2019, offering to sell twenty (20) S9 and ninety (90) L3+ mining devices, for $52,984.50, also subject to the hosting services.

      d.                On or about May 21, 2019, offering to sell another order of sixty (60) S9 and two hundred seventy (27) L3+devices, for $158,953.50, with hosting services.

      e.                On or about May 21, 2019, offering to sell another order of ten (10) S9 and thirty (30) L3+ devices, for $20,312.25, also subject to the hosting services.

      f.                On or about July 18, 2019, offering to sell ten (10) S9 and twenty-six (26) L3+ devices $36,648.00, also subject to the hosting services.

39.         With respect to the foregoing offers, Holmes and Chet Stojanovich shared telephone conversations and text message correspondences, in which they further negotiated, resulting in some modifications to the terms of sale and quoted purchase prices.  These communications were mostly initiated by Chet Stojanovich, who proposed changes to his own price terms.  The purchase price adjustments resulted in the payment amounts alleged below.

40.         To purchase the mining devices and hosting services offered by the defendants, Alex Holmes made electronic funds transfers to defendant CMC on the following dates, in the following amounts:

      a.                On May 7, 2019, a wire transfer in the amount of $60,000.

      b.                On May 17, 2019, a wire transfer in the amount of $19,293.75.

    c.        On June 3, 2019, a wire transfer in the amount of $225,000.

    d.        On June 24, 2019, a wire transfer in the amount of $10,000.

**Total May/June 2019 Wire Transfers:**    **$314,293.75**

41.        Holmes made these payments in reliance on the Chet Stojanovich's representations that he would provide the mining devices in exchange for said payments, and host them at the defendants' purported mining facility in Canada.

42.        Stojanovich, acting for himself and for defendants CMC and CMC Canada, never intended to deliver the bargained for mining devices or provide the hosting services.  As set forth below with respect to the other plaintiffs, the defendants repeatedly, as a regular modus operandi, solicited purchase payments by making fraudulent offers, and then pocketed the money without actually delivering the goods or services.  In fact, plaintiffs Yasar Corporation and One Purpose eventually learned through private investigation that the defendants did not even own or control the facility where the hosting was supposed to occur.

43.        Holmes' delivery of the foregoing payments by wire transfer constituted an acceptance of the defendants' offer to sell the cryptocurrency mining equipment with hosting services, forming a binding contract between the parties in which the defendants were obligated to deliver the goods and services ordered.

44.        The defendants never produced, procured or delivered the mining equipment that Holmes ordered and paid for and, therefore, never hosted it.  This constitutes a breach of the parties' contract.

45.        Beginning after Holmes' payments in May 2019, the defendants pretended that they had procured and were running (hosting) mining devices for Holmes, to lull him into a belief that the defendants were performing.  The defendants did this by investing funds in NiceHash opportunities.

NiceHash is a shared market platform in which investors can buy participation shares in other people's mining devices, and share in the income generated by those devices.  In other words, instead of delivering and hosting the actual, physical mining devices that Holmes had paid for, the defendants were just buying shares in other people's machines on NiceHash, and providing some of the income back to Holmes.  Chet Stojanovich falsely characterized this income as "returns" coming from the physical machines Holmes had ordered and paid for, even though the defendants never actually produced, procured or delivered those machines.

46.        Over the summer of 2019, Chet Stojanovich, acting for himself and defendants CMC and CM Canada perpetrated this fraud transmitting the mischaracterized "returns" to Holmes by electronic means, and reporting to him falsely, by text message and/or telephone, about the progress of his investment without disclosing that the defendants had never actually produced or hosted any physical machines for Holmes.

47.        In June to July 2019, Chet Stojanovich, acting for himself and for defendants CMC and CM Canada, fraudulently induced Holmes to make additional payments to CMC.  During that time, Stojanovich solicited Holmes to "reinvest" the "returns" he had received from the defendants' NiceHash activity (which Holmes thought were returns from his own physical machines that the defendants were supposed to deliver) with CMC.  Stojanovich represented, through electronic communications, that if Holmes reinvested that money with CMC, CMC would be able to provide a higher quality of hosting service (for various technical reasons), which would yield better returns in the future.

48.        The defendants had no intention of using Holmes' reinvested "returns" to improve the hosting services.  Indeed, as noted, Stojanovich knew that the defendants had, in fact, *not* procured, produced or delivered any cryptocurrency mining devices for Holmes and were not really hosting any such machines for Holmes.

49.     In reliance on Stojanovich's representations, Holmes paid his "returns" back to CMC, in Bitcoin transfers, on the following dates, in the following amounts:

    a.  July 12, 2019: 4.41 Bitcoin (at spot price of 11,905 per Bitcoin) for a value of **$52,501**

    b.  July 12, 2019: 2.1 Bitcoin (at spot price of 11,905 per Bitcoin), for a value of **$25,000**.

    c.  July 14, 2019: 0.42 Bitcoin (at spot price of 11,451 per Bitcoin), for a value of **$4,809**.

    d.  July 17, 2019: 9.36 Bitcoin (at spot price of 10,736 per Bitcoin) for a value of **$100,488.96**

    **Total July 2019 Transfers:**              **$182,798.96**

50.     It goes without saying that the defendants did not, in fact, use those funds to enhance (or preform) any hosting services for Holmes. The defendants never procured any mining devices for Holmes, and never hosted them.

51.     Between the $314,293.75 in wire transfers that Holmes made in May and June 2019 and the Bitcoin transfers of $182,798.96 in July 2019, Holmes paid the defendants a total of $497,092.71.

52.     After Holmes made these payments to CMC, Stojanovich became less communicative, and more evasive in his dealings with Holmes. Stojanovich routinely ignored Holmes' text messages which sought an accounting of what was occurring with his machines. Eventually, in early 2020, Stojanovich admitted to Holmes that the "returns" that he had previously remitted to Holmes (and which Holmes had "reinvested") had come from NiceHash speculation, not production from any physical machines owned by Holmes.

53.     Holmes has duly demanded the return of his property and his payments, which the defendants have ignored. The foregoing constitutes a breach of the parties' contract.

B.     **Plaintiff Josh Navarro**

54.          In June 2019, Stojanovich, acting for himself and for CMC and CM Canada, offered to sell Navarro cryptocurrency mining devices and one (1) year of hosting services for those devices. The devices included, without limitation, fifty (50) L3+/++ and 12 S9 units, for a price of $60,375.00.

55.          Stojanovich, acting for himself and for CMC and CM Canada, transmitted to Navarro a written invoice memorializing those terms on June 12, 2019, by electronic means.

56.          In fact, the defendants never intended to deliver the bargained for mining devices or provide the hosting services. As noted, upon information and belief, the defendants did not in fact own or control the facility where the hosting was to occur, and their regular modus operandi was to take payment from purchasers and deliver no equipment whatsoever.

57.          In reliance on the defendants' representations, Navarro accepted the June 12, 2019 offer, and Navarro's representative transferred to CMC the purchase price of for the June 12, 2019 order ($60,375.00), by wire transfer on July 16, 2019.

58.          Navarro's acceptance of the terms offered by the defendants and delivery of payment, formed a binding and enforceable contractual agreement between Navarro and the defendants, in which the defendants were obligated to deliver the equipment and provide the hosting services.

59.          In August 2019, Stojanovich, acting for himself and for CMC and CM Canada, offered to sell Navarro additional mining devices and one (1) year of hosting services for those devices. The offered devices included, without limitation, 50 S9s and 50 L3s+/++ units, for a price of $120,750.00.

60.          Stojanovich, acting for himself and for CMC and CM Canada, transmitted to Navarro a written invoice memorializing said terms on August 12, 2019.

61.         Once again, the defendants had no intention of delivering the bargained for equipment or services.

62.         In reliance on the defendants' representations, Navarro accepted the August 12, 2019 offer, and Navarro's representative transferred to CMC the purchase price of for the August 12, 2019 order ($120,750.00), by wire transfer on August 14, 2019.

63.         Navarro's acceptance of the terms offered by the defendants and delivery of payment, formed a binding and enforceable contractual agreement between Navarro and the defendants, in which the defendants were obligated to deliver the equipment and provide the hosting services.

64.         Despite the defendants' receipt of payment, the defendants did not deliver any of the equipment that Navarro ordered (under any of the foregoing contracts), and did not host the equipment. Rather, after the defendants received the last of Navarro's payments, the defendants largely avoided Navarro's attempts to communicate with them.

65.         Between the Navarro's July 16, 2019 and August 14, 2019 wire transfers, he paid $181,125.00 for equipment and services that he never received.

66.         Navarro has duly demanded the return of his property and his payments, which demands the defendants have ignored.  The foregoing constitutes a breach of the parties' contract.

**C.      Plaintiff Nico Tramontana**

67.         In June 2019, Stojanovich, acting for himself and for CMC and CM Canada, offered to sell plaintiff Tramontana mining devices and one (1) year of hosting services for those devices.  The devices included, without limitation, fifty (50) L3+/++ and 12 S9 units, for a price of $114,843.75.

68.         Stojanovich, acting for himself and for CMC and CM Canada, transmitted to Tramontana a written invoice memorializing those terms on June 19, 2019.

69.        In fact, the defendants never intended to deliver the bargained for mining devices or provide the hosting services.  As noted, upon information and belief, the defendants did not in fact own or control the facility where the hosting was to occur, and their regular modus operandi was to take payment from purchasers and deliver no equipment whatsoever.

70.        In reliance on the defendants' representations, Tramontana accepted the above-described offer.  Tramontana and the defendants agreed that Tramontana would pay the purchase price in installments, and the defendants would deliver and host the devices likewise, proportionally, in installments.

71.        In reliance on the defendants' representations, Tramontana transferred an installment of $30,025 on June 19, 2019 (by wire transfer), an installment of $25,000 on June 24, 2019 (by wire transfer), an installment of $7,525 on June 25, 2019 (by wire transfer), a transfer of $10,000 on July 12, 2019 (by wire transfer) and one additional transfer of $8,000 (by Bitcoin), for a total of $80,550.

72.        The defendants failed to deliver or host the machines that Tramontana paid for with these transfers.  Furthermore, the defendants did not account for Tramontana's money or his machines when he inquired about their status.  As a result, Tramontana declined to make any further installment payments to the defendants.

73.        Tramontana's acceptance of the terms offered by the defendants and delivery of the payments described above, formed a binding and enforceable contractual agreement between Tramontana and the defendants, in which the defendants were obligated to deliver the equipment and provide the hosting services for the machines that Tramontana paid for.

74.        Despite the defendants' receipt of payment, the defendants did not deliver any of the equipment that Tramontana ordered, and did not host the equipment.  Rather, after the defendants received Tramontana's payments, they largely avoided Tramontana's attempts to communicate with them.

75.     Tramontana has duly demanded the return of his property and his payments, which demands the defendants have ignored.  The foregoing constitutes a breach of the parties' contract.

**D.     Plaintiff Bitcoin Ventures**

76.     In June 2019, Stojanovich, acting for himself and for CMC and CM Canada, offered to sell Bitcoin Ventures' predecessor (and current owner) one hundred (100) L3+/++ and twenty-five (25) S9 cryptocurrency mining devices and one (1) year of hosting services for those devices.  The defendants offered a purchase price of $120,750.00.

77.     On June 5, 2019, Stojanovich transmitted an invoice on CMC's letterhead, memorializing this offer at the $120,750.00 price.

78.     In fact, the defendants never intended to deliver the bargained for mining devices or provide the hosting services.  As noted, upon information and belief, the defendants did not in fact own or control the facility where the hosting was to occur, and their regular modus operandi was to take payment from purchasers and deliver no equipment whatsoever.

79.     In reliance on the defendants' representations, Bitcoin Ventures' predecessor (and current owner) accepted the above-described offer, and transferred to CMC the purchase price of $120,750.00, by wire transfer on June 6, 2019.

80.     The acceptance by Bitcoin Ventures' predecessor of the terms offered by the defendants, and delivery of payment to the defendants, formed a binding and enforceable contractual agreement between the parties, in which the defendants were obligated to deliver the equipment and provide the hosting services as ordered by Bitcoin Ventures' predecessor.

81.     Despite the defendants' receipt of payment, the defendants did not deliver any of the equipment that were ordered, and did not host the equipment.  Rather, after the defendants received the June 6, 2019 wire transfer, they largely avoided the plaintiff's attempts to communicate with them.

82.     Bitcoin Ventures and its predecessor (and current owner) have duly demanded the equipment ordered and the purchase money, which demands the defendants have ignored.  The foregoing constitutes a breach of the parties' contract.

83.     Bitcoin Ventures' owner has assigned his claims against the defendants to Bitcoin Ventures.

**E.     Plaintiffs Yasar Corporation and One Purpose**

84.     Plaintiff Yasar Corporation is a part owner of plaintiff One Purpose.  Accordingly, plaintiffs Yasar Corporation and One Purpose are affiliates.

85.     Effective March 6, 2019, One Purpose entered into a written Hosting Services Agreement with CM Canada.  In that Agreement, CM Canada agreed to host mining devices that One Purpose would ship to CM Canada's putative mining facility (in Canada).  As explained above, to "host" another person's mining devices means to take physical custody of them, and plug them into an electrical network in a controlled facility so that the machines may run and generate income for the owner.  (Unlike the other plaintiffs in this case, One Purpose did not purchase mining devices from the defendants; One Purpose already owned devices and only needed to purchase the hosting services.)

86.     The Hosting Services Agreement provided that One Purpose would pay CM Canada a base fee of $393,827.85 for the hosting services, and would pay $308,827.85 of that amount at the outset as a deposit.

87.     Between the Hosting Service's Effective Date of March 6, 2019 and March 19, 2019, the parties had further negotiations about the price, and Chet Stojanovich, acting for himself and CMC and CM Canada, requested an increase in the deposit amount to approximately $365,000.

88.     On March 19, 2019, One Purpose caused the full amount of the deposit to be paid to the defendants.  Specifically, on March 19, 2019, One Purpose effectuated five (5) transfers of

cryptocurrency to Chad Stojanovich's personal cryptocurrency wallets, to pay the deposit, in the following increments:

| Cryptocurrency Units Transferred | Dollar Value as of March 19, 2019 |
|---|---|
| 27.71 Bitcoins | $104,880.00 |
| 26.42 Bitcoins | $3,414.26 |
| 244 Ethereum | $33,300.65 |
| 32.66 Bitcoin | $129,541.97 |
| 32.50 Bitcoin | $127,623.92 |
| TOTAL: | $365,460.15 |

89.     One Purpose's principals effectuated these transfers from several different cryptocurrency wallets that they controlled.

90.     In late April 2019, defendant Chet Stojanovich, acting for himself and CMC and CM Canada, relayed to Yasar Corporation and One Purpose that it would be necessary to increase the price for the hosting services beyond the $393,827.85 base fee recited in the Hosting Services Agreement. After some additional discussion, the plaintiffs agreed to pay approximately $120,000 more in hosting fees.  On April 26, 2020, defendant CMC (not CMC Canada) issued a written invoice to Yasar Corporation's principal (Brad Yasar), charging for the additional fees in the amount of $102,224.00.

91.     On May 1, 2019, Yasar Corporation effectuated payment to CMC in the amount of $102,224.00, to pay the additional hosting services fees.  Yasar Corporation effectuated payment by wire transfer from a fund that its principals controlled.  CMC accepted the payment.

92.     Pursuant to the parties' agreement, in early May 2019, One Purpose shipped approximately 1,200 cryptocurrency mining devices to the putative mining facility in Canada, where CMC and/or CM Canada were purportedly going to host the machines.

93.        Although the machines were supposed to "go live" within a few days of delivery, they never went live.  Yasar Corporation's principals contacted the Canadian mining facility to inquire about the status.  They were told by the persons running the facility that they did not have the machines.

94.        These individuals further reported that the defendants did not own or control that mining facility (contrary to the defendants' representations), and that Chet Stojanovich had arrived and claimed possession of One Purpose's machines as his own, and removed them from the facility.

95.        One Purpose's further investigation revealed that Stojanovich had placed One Purpose's machines in a Canadian storage unit (where they were not plugged into a power source and not operating).  Yasar Corporation was able to negotiate the release of the machines with the storage unit's owner, but was forced to pay the storage unit approximately $8,000 in accrued storage fees.

96.        Between the plaintiffs' March 19, 2019 cryptocurrency transfers and May 1, 2019 wire transfer, Yasar Corporation paid the defendants $467,684.15 in fees for hosting services that the defendants never provided.  The foregoing constitutes a breach of the parties Hosting Services Agreement and the amendments thereto.

## F.    Loss of Cryptocurrency Value

97.        Each and every one of the plaintiffs who made the above payments using cryptocurrency suffered additional harm, equal to the difference in value of the cryptocurrency units at the time they made the payments, and their value at the time of trial (or motion for default judgment).  The dollar value of cryptocurrency fluctuates over time.  Through their misrepresentations, the defendants induced the plaintiffs to part with cryptocurrency units which, upon information and belief, have a higher dollar value today than they did at the time of payment.  If the defendants had not induced the above-described payments, the plaintiffs could have enjoyed the higher value that later accrued to the cryptocurrency units.

18

## AS AND FOR A FIRST CAUSE OF ACTION (CIVIL RICO)

98.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth in the above paragraphs as if repeated and set forth at length in this cause of action.

99.     The defendants carried out their scheme through the commission of two or more acts of racketeering activity within the meaning of the Racketeer Influence & Corrupt Organizations Act (RICO), including, without limitation, 18 U.S.C. §§1962(c) and 1964(c).

100.    The defendants' racketeering activity consisted of numerous acts of wire fraud in violation of 18 U.S.C. §1343.  The defendants themselves used electronic means such as emails, text messages and videoconferencing to make fraudulent misrepresentations to the defendants, and accepted payment from the plaintiffs by electronic means such as wire transfers and cryptocurrency exchanges.  The racketeering acts included, by example and without limitation:

      a.          Text messages and emails through which defendant Stojanovich, acting for himself and for CMC and CM Canada, transmitted each of the written invoices described above, on the dates set forth above, which presented offers to sell bitcoin mining devices and hosting services which the defendants never intended to deliver (and were incapable of delivering), which emails and text messages were sent for the very purpose of inducing the plaintiffs to pay money to the defendants;

      b.          Numerous text messages in which Stojanovich, acting for himself and for CMC and CM Canada, described his companies' operations in a false and misleading manner, presenting himself and the businesses as controlling a bitcoin mining facility capable of hosting their devices when, in fact, they lacked that capacity.  These include, without limitation, dozens of text messages from Stojanovich to plaintiff Holmes between May 2019 and April 2020, dozens of text messages between Stojanovich and plaintiff One Purpose LTD in 2019, dozens of emails

19

between Stojanovich and plaintiff Navarro throughout 2019 and dozens of emails between Stojanovich and Tramontana in 2019.

c.       Repeated electronic messages in which Chet Stojanovich, acting for himself and CMC and CM Canada, reported false "returns" to some of the plaintiffs, characterizing them as income from machines he was hosting for them, when in fact the Stojanovich was simply investing in, and extracting some revenue from, NiceHash opportunities.

101.     The defendants' acts of racketeering activity constituted a pattern.

102.     Said acts constituted a pattern because the acts had the same or similar purposes, results, participants, victims, or methods of commission, and are otherwise interrelated by distinguishing characteristics.  These were  not isolated events.  The defendants perpetrated this scheme against each of the plaintiffs, and other individuals, in the same way, offering the same type of equipment for sale, offering hosting services for the same durations (6 months or a year), inducing payment by making the same offers in the same format, and injuring the plaintiffs in the same way—*i.e.*, by taking their money, and utterly failing to deliver equipment or hosting services.

103.     These acts also constituted a pattern because they were characterized by continuity. The scheme reflected open-ended continuity, inasmuch as the defendants' criminal activity has continued or threatened to continue beyond the period during which the predicate acts were performed.  Indeed, the defendants have continued to use fraud and deception as a means to evade the plaintiffs and their efforts to recover their money and/or their property.  Stojanovich repeated his false and misleading text messages and emails throughout 2019 and into 2020, to disguise his non-performance.

104.     The scheme constitutes an enterprise through which each of the defendants directly or indirectly participated.  Stojanovich, CMC and CM Canada are each separate and distinct entities (although conflated and abused by Stojanovich), each of which plays a discrete part in the scheme.

20

Stojanovich peddles himself as a savant in the field of cryptocurrency mining to induce interest from investors and makes the extravagant representations and promises.  CMC is the vehicle used primarily to charge customers and collect their money—CMC was the entity that predominantly invoiced the plaintiffs and received their payments.  And CM Canada held itself out as the owner or controller of the Canadian facility where all of this hosting was actually supposed to occur.

105.      The defendants' activities affected interstate commerce.  Each and every one of the plaintiffs are domiciled out of state, did business with the defendants in New York from out of state, and transferred funds to the defendants from out of state.

106.      The defendants' activities caused injury to the plaintiffs.  By reason of the foregoing acts of racketeering activity, each of the plaintiffs was induced to pay money to the defendants, which the defendants misappropriated.

107.      That as a result of the foregoing, Chet Stojanovich, CMC and CM Canada are jointly and severally liable to plaintiffs for at least: (i) $497,092.71 in compensatory damages for Alex Holmes; (ii) $181,125.00 in compensatory damages for Josh Navarro; (iii) $80,550 in compensatory damages for Nico Tramontana; (iv) $120,750.00 in compensatory damages for Bitcoin Ventures 2020, LLC; (v) $467,684.15 in compensatory damages for Yasar Corporation and One Purpose; (vi) additional compensatory damages for each of the plaintiffs who made payments to the defendants through cryptocurrency, for the difference in value between the cryptocurrency units when paid and their value at the time of trial or motion for default judgment;  (vii) trebling of said damages pursuant to civil RICO; and (viii) interest at the legal rate thereon from and after the dates of defendants' unlawful acts.

**AS AND FOR A SECOND CAUSE OF ACTION (BREACH OF CONTRACT)**

108.      Plaintiffs repeat, reiterate and reallege each and every allegation set forth in the above paragraphs as if repeated and set forth at length in this cause of action.

109.     Each of the above-described offers to sell mining equipment and/or provide hosting services by the defendants, and the plaintiffs' acceptance of same and delivery of payment, formed binding and enforceable contracts in which the defendants were obligated to deliver the equipment and provide the hosting services for which the plaintiffs paid.

110.     The plaintiffs fully performed under their contracts by tendering the payments described above.

111.     The defendants have breached their contracts with each and every one of the plaintiffs by failing to deliver any of the equipment ordered and paid for by the plaintiffs, and failure to provide the hosting services paid for by the plaintiffs.

112.     The defendants have wrongfully refused the plaintiffs' demands for refunds.

113.     The defendants have failed to deliver the equipment and services that the plaintiffs bought and paid for.

114.     As a direct and proximate result of the defendants' breach of contract, the plaintiffs suffered actual and consequential damages.

115.     The defendants' conduct was willful, malicious, and undertaken with malice aforethought.

116.     That as a result of the foregoing, Chet Stojanovich, CMC and CM Canada are jointly and severally liable to plaintiffs for breach of contract, and the plaintiffs are entitled to at least: (i) $497,092.71 in compensatory damages for Alex Holmes; (ii) $181,125.00 in compensatory damages for Josh Navarro; (iii) $80,550 in compensatory damages for Nico Tramontana; (iv) $120,750.00 in compensatory damages for Bitcoin Ventures 2020, LLC; (v) $467,684.15 in compensatory damages for Yasar Corporation and One Purpose; (vi) additional compensatory damages for each of the plaintiffs who made payments to the defendants through cryptocurrency, for the difference in value between the

cryptocurrency units when paid and their value at the time of trial or motion for default judgment; (vii) punitive damages in an amount to be determined by the jury or the Court;  and (viii) interest at the legal rate thereon from and after the dates of defendants' unlawful acts.

**AS AND FOR A THIRD CAUSE OF ACTION (FRAUD/FRAUDULENT INDUCEMENT)**

117.        Plaintiffs repeat, reiterate and reallege each and every allegation set forth in above paragraphs as if repeated and set forth at length in this cause of action.

118.        Defendant Stojanovich used his companies CMC and CM Canada to commit fraud as against the plaintiffs.

119.        Defendant Stojanovich used CMC and CM Canada's seemingly legitimate facade to induce plaintiffs into entering into a contract for a sale of goods and/or hosting services that the defendants knew they would not and could not perform.

120.        At all relevant times defendant Stojanovich intended to cause CMC and CM Canada to breach said contracts, and never intended to perform them.

121.        Stojanovich accepted the plaintiffs' funds personally and/or by and through CMC and CM Canada, intending to keep the purchase money for his own personal use and benefit without delivering the goods sold to the plaintiffs, or performing the services promised to the plaintiffs.

122.        Stojanovich represented to the plaintiffs that he would use their funds to purchase the equipment as promised, and to host the equipment to provide crypto currency mining services, which representation was false when made because Stojanovich had a present intention not to perform said promises.

123.        The plaintiffs materially and reasonably relied upon said misrepresentations to their detriment.  Namely, said misrepresentations induced the plaintiffs to pay the price for said equipment and services in the amounts alleged above.

23

124.        Stojanovich, upon information and belief, transferred the plaintiffs' purchase money out of CMC's financial accounts, for the personal benefit of Stojanovich.

125.        Chet Stojanovich, individually, used the corporate entities to commit fraud on the plaintiffs with malice aforethought for his own personal benefit, willfully and maliciously.

126.        The Federal Bureau of Investigation is currently conducting a criminal investigation into the aforesaid fraudulent transaction described herein.

127.        As a result of the foregoing, Chet Stojanovich, CMC and CM Canada are jointly and severally liable to plaintiffs, and the plaintiffs are entitled to at least: (i) $497,092.71 in compensatory damages for Alex Holmes; (ii) $181,125.00 in compensatory damages for Josh Navarro; (iii) $80,550 in compensatory damages for Nico Tramontana; (iv) $120,750.00 in compensatory damages for Bitcoin Ventures 2020, LLC; (v)  $467,684.15 in compensatory damages for Yasar Corporation and One Purpose; (vi) additional compensatory damages for each of the plaintiffs who made payments to the defendants through cryptocurrency, for the difference in value between the cryptocurrency units when paid and their value at the time of trial or motion for default judgment; (vii) punitive damages in an amount to be determined by the jury or the Court;  and (viii) interest at the legal rate thereon from and after the dates of defendants' unlawful acts.

### AS AND FOR A FOURTH CAUSE OF ACTION (CONVERSION)

128.        Plaintiffs repeat, reiterate and reallege each and every allegation set forth in the above paragraphs as if repeated and set forth at length in this cause of action.

129.         Plaintiffs own and are entitled to the exclusive possession the money they paid the defendants or, failing that, possession of the equipment they purportedly purchased (for those plaintiffs who ordered equipment).

130.     Defendant Stojanovich wrongfully used CMC and CM Canada to convert the equipment and/or plaintiffs' purchase money.

131.     The equipment bargained for was worth at least the amounts paid by each of the plaintiffs for same.

132.     The defendants have wrongfully retained plaintiffs' funds and the equipment despite due demand from plaintiffs for the return of said funds or fulfillment of the contracts.

133.     The defendants' conduct was willful and malicious.

134.     That as a result of the foregoing, Chet Stojanovich, CMC and CM Canada are jointly and severally liable to plaintiffs, and the plaintiffs are entitled to at least: (i) $497,092.71 in compensatory damages for Alex Holmes; (ii) $181,125.00 in compensatory damages for Josh Navarro; (iii) $80,550 in compensatory damages for Nico Tramontana; (iv) $120,750.00 in compensatory damages for Bitcoin Ventures 2020, LLC; (v)  $467,684.15 in compensatory damages for Yasar Corporation and One Purpose; (vi) additional compensatory damages for each of the plaintiffs who made payments to the defendants through cryptocurrency, for the difference in value between the cryptocurrency units when paid and their value at the time of trial or motion for default judgment; (vii) punitive damages in an amount to be determined by the jury or the Court;  and (viii) interest at the legal rate thereon from and after the dates of defendants' unlawful acts.

### AS AND FOR A FIFTH CAUSE OF ACTION (NY UCC § 2-711)

135.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth in the above paragraphs as if repeated and set forth at length in this cause of action.

136.     That pursuant to NY UCC § 2-711, when the seller fails to make the delivery of goods, the buyer is entitled to a refund of the paid purchase price.

137.     That the plaintiffs are also entitled to damages pursuant to NY UCC § 2-713 for the difference in the market price at the time of purchase compared to the current market price of the goods.

138.     Upon information and belief it would now cost the plaintiffs considerably more to purchase the equipment from another provider.

139.     Pursuant to NY UCC § 2-711 and 2-713 the plaintiffs are entitled to damages in an amount of at least the amounts they paid for said equipment, plus the difference in market value between the equipment and the purchase price to "cover" the purchase of new equipment today, in an amount to be determined at trial.

### AS AND FOR A SIXTH CAUSE OF ACTION (NY UCC § 2-715)

140.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth in the above paragraphs as if repeated and set forth at length in this cause of action.

141.     That pursuant to NY UCC § 2-715 the plaintiffs are entitled to incidental and consequential damages as a result of the defendants' breach and failure to deliver the equipment as contracted with said amount to be determined at trial by the finder of fact.

### AS AND FOR A SEVENTH CAUSE OF ACTION (NY UCC § 2-716)

142.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth in the above paragraphs as if repeated and set forth at length in this cause of action.

143.     Upon information and belief, the plaintiffs have undertaken reasonable efforts to cover the goods that the defendants failed to deliver, and the circumstances indicate that the same will be unavailing.

144.     That pursuant to NY UCC § 2-716 the plaintiffs are entitled to specific performance of the parties' contract thus this Court should order that if the defendants are in actual or constructive

possession of the equipment, then it belongs to the plaintiffs and should be delivered to the plaintiffs as promised.

### AS AND FOR AN EIGHTH CAUSE OF ACTION (UNJUST ENRICHMENT)

145.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth in the above paragraphs as if repeated and set forth at length in this cause of action.

146.     In the alternative, if and to the extent the Court or the trier of fact finds that an express contract is lacking between the parties, the defendants are liable in equity.

147.     Namely, the defendants have been unjustly enriched by their receipt of the above-described purchase moneys, and their failure to deliver the equipment and services for which those funds were given.  In equity, the defendants ought not be permitted to retain those benefits, and should be enjoined to disgorge them to the plaintiffs.

148.     That as a result of the foregoing, Chet Stojanovich, CMC and CM Canada are jointly and severally liable to plaintiffs, and the plaintiffs are entitled to at least: (i) $497,092.71 in compensatory damages for Alex Holmes; (ii) $181,125.00 in compensatory damages for Josh Navarro; (iii) $80,550 in compensatory damages for Nico Tramontana; (iv) $120,750.00 in compensatory damages for Bitcoin Ventures 2020, LLC; (v)  $467,684.15 in compensatory damages for Yasar Corporation and One Purpose; (vi) additional compensatory damages for each of the plaintiffs who made payments to the defendants through cryptocurrency, for the difference in value between the cryptocurrency units when paid and their value at the time of trial or motion for default judgment; (vii) punitive damages in an amount to be determined by the jury or the Court;  and (viii) interest at the legal rate thereon from and after the dates of defendants' unlawful acts.

**WHEREFORE**, the plaintiffs demand judgment against the defendants jointly and severally for

(i)     An award of compensatory damages to Alex Holmes for at least $497,092.71;

(iii)     An award of compensatory damages to Josh Navarro for at least $181,125.00;

(iv)     An award of compensatory damages to Nico Tramontana for at least $80,550.00;

(v)     An award of compensatory damages to Bitcoin Ventures 2020, LLC for at least $120,750.00;

(v)     An award of compensatory damages to Yasar Corporation and One Purpose for at least $467,684.15;

(vi) additional compensatory damages for each of the plaintiffs who made payments to the defendants through cryptocurrency, for the difference in value between the cryptocurrency units when paid and their value at the time of trial or motion for default judgment;

(vii)     Trebling of the foregoing damages pursuant to civil RICO;

(viii)     An award of attorneys' fees and litigation costs incurred in this action pursuant to civil RICO;

(ix)     An award of punitive damages for all plaintiffs in an amount to be determined at trial; and

(x)     Interest at the legal rate thereon from and after the dates of said breaches.


Dated: June 10, 2020          **E. STEWART JONES HACKER MURPHY LLP**
       Troy, New York

                    By:     _____
                            John F. Harwick, Esq.
                            **SDNY Bar No: JH5253**
                            *Attorneys for Plaintiffs*
                            28 Second Street
                            Troy, New York  12110
                            Tel. No.:  (518) 274-5820