# Exhibit A

**To Brad YasarAffidavit (Motion for Default Judgment)**

## HOSTING SERVICES AGREEMENT

**This Hosting Services Agreement (the " Agreement") is made as of March, 6th, 2019.**

**BETWEEN:**
**[Chet Mining Co Canada Ltd],** a corporation duly incorporated under the laws of the Province of British Columbia in the Country of Canada and having an office at 105 West 43rd St Vancouver, BC V5Y 2T6, Canada ("**CMC**"

**AND**

[ ZOU, XIAO PAN], in the **Country of China and having an office at [** Room C104, Xinkongqi Apartment, Shekou New Street **Nanshan Dist., Shenzhen, 518067, China] (the "Client")**

**(CMC and the Client being collectively referred to   herein as the "Parties" and individually as a "Party")**

**WHEREAS:**

1.  The Client wishes to obtain a License and Services from CMC; and

2.  CMC wishes to provide a License and Services to the Client pursuant to the terms and conditions set out in this  Agreement.

**NOW THEREFORE** in consideration of the mutual covenants set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## 1. DEFINITIONS AND INTERPRETATION

**1.1** For the purposes of this Agreement, the following terms shall have the respective meanings set out below and grammatical variations of such terms shall have corresponding meanings:

a. "**Affiliate**" means, in reference to CMC, any other entity that (a) directly or indirectly controls or is controlled by said company, or (b) is directly or indirectly controlled by an entity that also directly or indirectly controls said company. For the purposes of this definition, "control" means the power to direct or cause the direction of the management and activities of a company, whether directly or indirectly, through one or more intermediaries or otherwise, and whether by ownership of shares or other equity interest, the holding of rights or contractual rights, by being the general partner of a limited partner, or otherwise.

b.      "**Basic Contract Damages**": All Payments that would otherwise have been payable by Client for all of the remaining Term, or Renewal Term, as the case may be, (i.e., that would otherwise have been payable under this Agreement) absent any termination of this Agreement.

c.    "**Client Default**' means any of the following items, whereby Client shall be in default beyond notice and cure periods: (i) the failure by Client to pay Payments or other amounts for 5 days after written notice that the applicable amount is overdue; (ii) any breach of section 3 of this Agreement for five (5) days after CMC's delivery of written notice to Client; and (iii) the failure by Client to cure any other breach within fifteen (15) days after written notice by CMC.

d.    "**Equipment**" means blockchain mining hardware, including but not limited to bitcoin mining hardware, as supplied by the Client and described in Schedule A hereto;

e.    "**License**" means the License granted by CMC to the Client in accordance with Section 2 of this Agreement;

f.    "**Licensed Space**" means the rack or unit space at the Location that is allocated to the Equipment by CMC for the purposes of and in accordance with this Agreement;

g.    "**Location**" means CMC's facilities in Canada;

h.    "**Outage Event**" means any event causing Equipment to be offline;

i.    "**Payments**" refers to the Client's payments of all fees and other amounts owed and payable to CMC under this Agreement from time to time, including the Base Fee and fees and other amounts payable for Additional Services;

j.    "**Power Availability Targets**" means CMC's power availability target for each month, which is set at ninety-eight (98) percent up time;

k.    "**Policies**" means the policies, guidelines or procedures published by CMC from time to time;

l.    Renewal Term:

Provided that neither party has delivered written notice to the other party that it does not wish this Agreement to be renewed, the term of this Agreement shall automatically extend for a period commencing on the day which follows the final date of the Term, or previous Renewal Term, as the case may be, and expire on the date which is three (3) years therefrom (the "**Renewal Term**"). This agreement shall automatically renew for an unlimited number of Renewal Terms, unless either party has delivered notice in writing to

the other party at least 90 days prior to the end of the then Term, or Renewal Term, as the case may be, that such party elects to have this Agreement terminate at the end of its then Term or Renewal Term, as the case may be. All provisions of this Agreement shall apply to a Renewal Term in the same manner as to the Term, and this Agreement shall be construed accordingly.

m.    "**Services**" means all services to be provided by CMC in accordance with this Agreement;

n.    "**Standard Service Hours**" has the meaning given to it in Section 6.1 of this Agreement;

o.      "**Targets**" means either one or both of the Power Availability Targets or the Temperature Targets;

p.      "**Temperature Targets**" means the target air temperature range for the front of the Licensed Space (also referred to as the cold aisle), which is set at between one (1) and thirty (30) degrees centigrade;  and

q.      "**Term**" means the period commencing on the later of:

> (i) the date this Agreement is signed by the parties, or
> (ii) the date the Equipment is received by CMC, provided that the Client has first provided CMC fifteen (15) days written notice of its intention to deliver the Equipment to the Location and CMC has responded in writing indicating that it is willing to accept delivery of the Client's Equipment,

> (the applicable circumstance being the "**Commencement Date**")

and expiring on the date which is three (3) years following the Commencement Date, subject to renewal for a Renewal  Term.

The Commencement Date will not be impacted by CMC agreeing to host additional equipment for the Client in accordance with Section 4.11 of this Agreement.

**1.2**    Any capitalized term used herein shall have the meaning ascribed to it in the Agreement, unless specifically defined otherwise  herein.

**1.3**    Words importing the singular include the plural and words importing the plural include the singular. Words importing a gender include every gender and references to persons include bodies corporate and unincorporated associations and partnerships.

**1.4**    Any reference to a Recital, Section or Schedule shall (except where specified otherwise) be deemed to be a reference to a Recital, Section or Schedule (as the case may be) of this Agreement. The Schedules form part of this Agreement and shall have the same full force and effect as if expressly set out in the body of this Agreement.

**1.5**  In this Agreement and in the Schedules, the headings of the terms and conditions herein contained are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of any of the terms and conditions and do not in any way limit or amplify the provisions of this Agreement.

## 2. GRANT OF A  LICENSE

**2.1**

**Subject to the terms and conditions of  this  Agreement, including  but  not  limited  to  the Payments and the provisions of this Section 2, CMC hereby grants to the Client, for the Term, a non-exclusive, non-transferable license to have  the  Equipment  placed  at  the Licensed Space and to access [(total 2767.2 KW) 847.2   KW starting 2/27/19 at 4 cents USD Plus 1920 KW secured at**

capacity at the Location for the Client's internal business purposes only, with access to

such power being subject to CMC's receipt of the Equipment and the Equipment meeting CMC's requirements and functioning in accordance to its specifications (the "**License**"). The power capacity will be verified by CMC following CMC's receipt of the Equipment and CMC will notify the Client in writing in that respect, through its invoicing or otherwise, with such notice to form part and parcel of the License and this Agreement.

2.2     The License shall terminate at the end of the Term or the Renewal Term, as the case may be.

2.3     The Client acknowledges and agrees as follows:

(a)     the License shall only be used to enable the functioning of the Equipment at the Location. Any other use must first be approved by CMC in writing;

(b)     CMC can assign or otherwise transfer this Agreement and its rights and obligations in the License to any another party, and CMC shall notify the Client of such an assignment or transfer;

(c)     any Equipment that is hosted by CMC at the Location shall remain at the Location and will be kept operating to the best of the Equipment's ability until the expiration of the Term, unless otherwise provided in this Agreement or as otherwise agreed by the Parties in writing;

(d)     the License does not confer on the Client any tenancy rights or create any relationship of landlord and tenant between CMC and the Client with regards to the Licensed Space or the Location, any easement rights or other interest in the Location, nor any rights whatsoever against any third parties;

(e)     in no event shall the Client record this Agreement or any memorandum or notice thereof;

(f)     the License is personal to the Client and may not be transferred, sold, rented, leased, or lent by the Client to any third party, including but not limited to an assign, sub-tenant or sub-licensee nor may the Client share the Licensed Space with any third party;

(g)     the Location will contain equipment of CMC, CMC's Affiliates or other customers of CMC and the use of the Location will be shared with CMC, CMC's Affiliates or other customers of CMC;

(h)     the Client will be responsible for shipping the Equipment to CMC and all costs associated thereto; and

(i)     the Client will bear the cost of the removal of the Equipment from the Location.

**2.4     CMC is relieved from providing the Licence and Services in the event that a third party power supplier is unable to meet the necessary power provision requirements.**

**2.5     Although CMC will use commercially reasonable efforts to ensure that there is sufficient power supply to operate the Equipment, CMC cannot guarantee the provision of power supply. Where CMC cannot obtain adequate power supply for the Equipment and other equipment located at the Location, CMC has the sole right to decide which of its clients, or itself, shall be allocated the available power and shall have no liability to the Client for its decisions as to the allocation of such power supply. CMC will use commercially reasonable efforts to restore power supply within a reasonable time thereafter.**

**2.6** <u>**The Client acknowledges and agrees that by placing Equipment for hosting with CMC, or keeping its already placed Equipment for hosting with CMC, as of the Commencement Date and CMC's provision of a License and Services to the Client, the Client has agreed to the terms and conditions outlined in this Agreement. If the Client no longer wishes to host the Equipment with CMC, the Client may terminate the Agreement in accordance with Section 10 of this Agreement.**</u>

## 3. PAYMENT BY CLIENT

**3.1** As a The Total Base Fee is 393,827.85 of which the Base Fee Deposit due as of 02/28/2019 total amount is 308,827.85 USD, This includes Equipment cost, Installation fee Deposit of and Security Deposit for additional spaces commencing after 2/27/19 and on 5/1/2019 for the remain space on hold for the License and Services hereunder for up to 1758 Units, Except for the Additional Services, the Client will pay CMC $308,827.85 USD plus applicable Harmonized Sales Tax (HST) at on 2125200 Watts on a monthly bases over the term of 12 months at rate of 4 cent USD per kW of power capacity per month throughout the Term in accordance with the instructions indicated on the invoice provided to the Client (the "Base Fee"). Partial months will be pro-rated. The total deposit and payment due via Bitcoin/ETH/LTC or BCH Is due upon receipt of contract and invoice herein. International wire are prohibited in first payments and require proof of good standing with president of said bank be any transfer will be accepted at CMC discretion. See attached wallet ID

**3.2** Upon thirty (30) days' prior written notice to the Client but not sooner than twelve (12) months after the beginning of the Term, CMC shall be entitled to increase the Base Fee.

**3.3** Notwithstanding Section 3.2, in the event of any change to the Equipment outlined in Schedule A of this Agreement, CMC shall be entitled to increase or otherwise adjust the Base Fee upon written notice to the Client, effective as of the change.

**3.4** In addition to the Base Fee, the Client will be charged for any additional services provided by CMC to the Client, with additional costs being invoiced to the Client for technical support, the use of specialized parts to provide the desired technical support to the Client, as well as any other work undertaken by CMC on the Client's behalf These fall into two categories:

    A. the unpacking, installation and setup of Equipment at the Location (the " Installation Services"). The Client will pay CMC a flat rate for Installation Services of USD $50; and

    B. general support provided to the Client, the maintenance or repair of the Equipment at the Location and/or the repackaging, removal and return shipping of the Equipment to the Client (the " Additional Services"). The Client will pay CMC for any such Additional Services in accordance with the instructions indicated on the invoice provided to the Client, at a labor rate of $75 USD per hour plus applicable Harmonized Sales Tax (HST) and all expenses, costs and disbursements incurred by CMC. <u>At any time during the Term, CMC shall be entitled to increase the charge for Additional Services upon thirty (30) days' prior written notice to the Client.</u>

**3.5** A security deposit for [6 months at 0.043 USD per kilowatt hour or 0.0364 USD per kilowatt hour] 12 months or the Term of This contract of the Base Fee plus applicable Harmonized Sales Tax (HST) shall be paid o CMC in accordance with the instructions o indicated on the invoice provided to the

CMC is entitled to draw on such deposit for any monies owing and outstanding to

CMC by the Client under this Agreement, under any other agreement between CMC

and Client, and under any agreement between the Client and a CMC Affiliate. If CMC draws on the deposit, the Client must then provide a new security deposit for the initial amount set by CMC or such amount such that the initial amount of the security is always maintained. Upon the expiry or termination of this Agreement, CMC will return any amounts remaining under the security deposit, subject to the condition that CMC shall have the right to setoff rights set out herein, within a reasonable period thereafter.

Where CMC cannot accept the delivery of the Client's Equipment within fifteen (15) days of the date indicated on the notice from the Client (as described in the definition of "Term"), then the Client has the right to the return of the Client's deposit.

3.6     In addition to the security deposit and to guarantee the performance of the Client's obligations under the Agreement, Client agrees that a security interest in the Equipment shall attached to each item of Equipment upon its delivery and Client shall execute a General Security Agreement in the form attached hereto as Schedule "B". Client waives notice of any action by CMC and any right to receive a copy of any financing statements or similar statements.

3.7     CMC shall have the right to setoff against any amount owing to the Client, including the return of a security deposit, any amounts owing by the Client to CMC or a CMC Affiliate.

## 4. EQUIPMENT

**4.1     The setting-up of the Equipment at the Location may be delayed for up to or over a month after the Equipment arrives at the Location. CMC will not be liable for any claims or damages resulting directly or indirectly from a delay in the setting-up of the Equipment at the Location, as addressed in Subsection 8.3(p) of this Agreement.**

4.2     **(a)** The Client must own all right, title and interest to the Equipment unless otherwise specified in this Agreement. For further certainty, this means that the Client cannot act as an agent of a third party by contracting with CMC for the hosting of a third party's equipment. Furthermore, as stated under Subsection 2.3(f) of this Agreement, the License is personal to the Client and may not be transferred, sold, rented, leased, or lent by the Client to any third party, including but not limited to an assign, sub-tenant or sub-licensee nor may the Client share the Licensed Space with any third party.

   **(b)** If the Client breaches Subsection 4.2(a) of this Agreement, CMC shall have the right to immediately terminate the Agreement upon notice to the Client, with the Client being liable to CMC for all reasonable costs, fees and expenses arising directly out of the termination of this Agreement, in accordance with Section 10.2 of this Agreement.

4.3     CMC shall be responsible for providing power and security at the Location in accordance with Section 5 of this Agreement.

4.4     The Client shall at all times throughout the Term use best efforts to maintain the Equipment to an industry acceptable safety standard, so that the Equipment does not adversely affect or interfere with the proper operation of CMC's own equipment, other property or services nor the equipment, other property or services of third parties. Additionally, in order to access the Services, the power capacity made available under the License and in order to enable the proper operation of the Equipment, the Equipment shall meet and be maintained in accordance with CMC's requirements, as such are communicated or otherwise made available to the Client from time to time. CMC's requirements may be changed from time to time at CMC's sole discretion, and are effective upon notice to the Client. Unless otherwise specified by CMC, the Client shall be solely responsible for updating or maintaining the Equipment as necessary to meet such requirements, and the Client shall not be entitled to customer support from CMC if the Client fails to do so.

4.5     During the Term, CMC shall keep the Equipment clearly identified at the Location as belonging to the Client, in the manner that CMC deems fit.

4.6     The Client shall ensure that adequate fire and liability insurance for the Equipment is maintained at all times, with a minimum liability coverage of five million dollars ($5,000,000), and that the Client's policy of insurance names CMC, and any Affiliate CMC may require, as an additional insured, contains a waiver of subrogation against CMC and its Affiliates and indemnifies and saves harmless CMC and its Affiliates for any and all damage caused by or to the Equipment. The Client must purchase, from reputable insurers, any additional insurance that CMC may require. The insurance that the Client must purchase under this Agreement must be primary insurance and may not seek contribution from or be in excess of any policies taken out by CMC.

        The Client must have its insurers issue certificates of insurance satisfactory to CMC evidencing the coverages, coverage extensions, policy endorsements, and waivers of subrogation required under this Agreement are in force, and that not less than thirty (30) days' written notice will be given to CMC prior to any cancellation or material change of the policy. CMC may terminate this Agreement if such certificates are not delivered to CMC within fourteen (14) days of the date of the beginning of the Term or the renewal of such policy.

        The Client's obligation to purchase and maintain insurance and CMC's acceptance of evidence of such insurance will not, in any way whatsoever, limit or alter the liabilities and obligations otherwise assumed by the Client under the Agreement.

4.7     In the event that CMC, acting reasonably, has reason to believe that the Client's Equipment may be the cause of, or a contributing factor to, or affected by any power or service problem, the Client acknowledges and agrees that CMC may temporarily disconnect the power supply to the Equipment or any part thereof for the purposes of investigating and rectifying any such problems. Moreover, the Client agrees that CMC may temporarily disconnect the power supply to the Equipment or any part thereof for the purposes of carrying out essential maintenance relating to the Licensed Space, the Location or other equipment in the Location. Wherever reasonably practicable (emergencies excluded), the Client will be given advance notice of such disconnection and CMC will use all reasonable endeavours to cause minimum disruption to the operation

of the Equipment by endeavouring to make any such disconnection outside the Standard Service Hours.

4.8    CMC shall inspect the Equipment upon delivery for any obvious damage. If repair work to the Equipment is required it shall be attempted under the direction of the Client and only to the extent that CMC has the parts, equipment and expertise to perform such work and subject to additional costs being charged to the Client in accordance with Section 3.4 of this Agreement. If such repair work fails, or if CMC declines or is otherwise unable to perform it, CMC shall inform the Client as soon as the circumstances permit and the Client will direct CMC how to return or dispose of the Equipment. CMC shall assist in such disposal and all the fees thereof shall be borne by the Client exclusively.

4.9    In the event that the Client fails to provide any Payments owing under this Agreement, CMC shall have the right in addition to any other rights it may have hereunder or at law, to one or more of the following remedies as applicable:

(a)    In the event that the Payments owing have not been received within seven (7) days of receipt of invoicing, the Client grants CMC a lien over the Equipment to secure all Payments, and such lien shall continue and CMC will be entitled to retain possession of all Equipment (and the Client shall not be entitled to ask for the removal of the Equipment from the Location) until CMC has received all such sums in cleared funds;

(b)    In the event that the Payments owing have not been received within seven (7) days of receipt of invoicing, the Client consents to CMC exercising its security rights under the General Security Agreement attached hereto as Schedule "B" which includes the right of CMC to sell or otherwise dispose of the Equipment (including any data on the Equipment) and to apply the proceeds of such sale first to CMC's costs of such sale, and then to the amount owing by the Client before accounting to the Client for the balance;

(c)    in the event that Payments owing have not been received within seven (7) days of receipt of invoicing, CMC, may, at the Client's expense and CMC's discretion, take control of the Equipment and use the Equipment to mine bitcoin or other cryptocurrency as applicable in order to mitigate CMC's loss, until the Equipment has produced the profit necessary to pay CMC any Payments owing (in such case, profits shall be the amount of revenue less all payments to which CMC would otherwise be entitled had Client continued to operate the Equipment); and

(d)    If any Payments owing have not been received by CMC within thirty (30) days of the date of invoice, such amounts will accrue interest at the compounding rate of 2% per month (26.84% per annum) from the date such payment is due to the date of payment of the outstanding amount. In the event this Agreement terminates or expires before the outstanding amount owed to CMC by the Client is paid in full, this subsection will survive such termination or expiry such that CMC may demand payment of the interest accruing up to and including the date of payment of the outstanding amount.

4.10    Any property, including but not limited to the Equipment, other equipment or goods, that are sent at the request of the Client or on behalf of the Client to or from CMC, shall be entirely at the Client's own risk and at the cost and expense of the Client.

**4.11    The Client must obtain CMC's prior written approval before sending additional equipment to CMC for hosting. CMC will not be obligated to host any equipment not agreed in writing to be included in Schedule A to this Agreement. Any equipment sent to CMC without CMC's prior written approval is subject to being sent back to the Client at the Client's expense. Any additional equipment that CMC agrees to host for the Client will be subject to the terms and conditions of this Agreement including but not limited to CMC's right to increase or otherwise adjust the Base Fee in accordance with Section 3.3 of this Agreement, unless otherwise agreed by both Parties in writing.**

## 5. THE SERVICES

**5.1**    CMC shall, upon the Payments being made in accordance with this Agreement, use all reasonable endeavours to:

(a)    provide a 208 - 268 Volt AC single phase power connection for the Equipment;

(b)    meet the Power Availability Targets and Temperature Targets;

(c)    provide the Client with adequate internet connection for the  Equipment;

(d)    provide Additional Services to the Client in accordance with Sections 3.4 and 6.1 of this Agreement; and

(e) provide the Client with fire wall protected  internet.

**5.2**    CMC shall have no liability to the Client if the failure to meet the Targets arises directly or indirectly from any of the following:

(a)    CMC acting on recommendations from third parties including but not limited to emergency  services;

(b)    scheduled maintenance being carried out by CMC or the Client, including but not limited to, physical relocation, virtual relocation or maintenance to electrical or cooling infrastructure;

(c)    any outage resulting from any failure of the Equipment;

(d)    any outage resulting directly or indirectly from a breach of any of the terms of this Agreement by the Client, including but not limited to failure to comply with CMC's Policies or caused by unauthorized changes to the Equipment;

(e)    outages resulting directly or indirectly from a service interruption or other failure by a third party such as CMC's electricity or internet  vendor;

(f)    a temporary power disconnection, as addressed in Section 4.7 of this  Agreement;

(g)    necessary maintenance which CMC will complete as quickly as reasonably possible;

(h)    CMC adapting or modifying the Licensed Space or the Location in accordance with Section 5.6 of this  Agreement;

(i)    A delay in CMC setting up the Equipment at the Location;  and

(j)    CMC being unable to provide the License and Services in the event that a third party power supplier is unable to meet the necessary power provision requirements for hosting the equipment.

**5.3**   The Client agrees and accepts that it will not be entitled to a refund or credit due to failure by CMC to meet the Targets for any reason.

**5.4**   CMC will provide security at the Location in the manner CMC deems fit. Furthermore, the area in which the Equipment is located will be kept secure in the manner CMC deems fit.

**5.5**   CMC will be entitled to, on no less than seven (7) days notice given to the Client, suspend the License and the provision of Services in the event that the Client is in arrears in payment of any amounts owed to CMC under this Agreement. CMC shall have no liability whatsoever to the Client arising directly or indirectly from the suspension of the License and the provision of Services, and a re-connection charge shall be payable by the Client to CMC if such failure to pay is not rectified by the Client within a further seven (7) days.

**5.6**   CMC reserves the right to adapt or modify the Licensed Space or the Location as may be required from time to time including, but not limited to alterations necessary to comply with changes in Government legislation, regulations or any other statutory or regulatory

instruments or orders which directly affect the Licensed Space or the Location. Any such adaptation or modification shall be carried out with a minimum of disruption to the Services and CMC shall have no liability whatsoever to the Client arising directly or indirectly from any disruption that may occur as a result of CMC adapting or modifying the Licensed Space or the Location. CMC shall, where reasonably practicable, give the Client at least forty-eight (48) hours notice in advance of CMC adapting or modifying the Licensed Space or the Location.

## 6. STANDARD SERVICE HOURS

**6.1**  Requests for Additional Services can be made by the Client to CMC's support personnel. Response times to such requests may vary based on the availability of the support personnel, the complexity of the request and the urgency of the Client's request for support. The urgency of a request for support will be determined by CMC.
Standard Service Hours shall be between the hours of 9AM to 5PM Atlantic Standard Time, Monday to Friday, excluding provincial and federal public and other statutory holidays.

## 7. UNDERTAKINGS BY THE CLIENT

**7.1**   The Client undertakes and agrees to comply strictly with the terms and conditions of this Agreement.

**7.2**   The Client undertakes and agrees to make the Payments in accordance with this Agreement.

**7.3**   The Client undertakes and agrees that it shall not directly or indirectly, and shall ensure and procure that its representatives shall not directly or indirectly:

(a)     misuse or abuse any of CMC's property or equipment or third party property or equipment;

(b)     engage in any activity that is in violation of the law while on the Location;

(c)    engage in any activity that constitutes, aids or assists any criminal activity while on the Location;

(d)    engage in, participate in or facilitate any illegal activity whatsoever in any relevant jurisdiction, including but not limited to Canada;

(e)    use, enable, facilitate or permit the use of the Services, License or Equipment for any illegal purpose, criminal or civil offence, intellectual property infringement, or in a manner that would breach any law, regulation or the policies of any internet host, or cause interference with CMC's network operations;

(f)    engage in any activity that could compromise the security of the services offered by CMC or any network or computers on the internet, or that could interfere with the services of any internet access provider;

(g)    deliberately or maliciously cause or allow to be caused any disruption to CMC's Services, business operations, its servers, network or other infrastructure, or any other networks, computers or services on the internet;

(h)    circumvent any restrictions placed on certain uses of the License and Services; or

(i)    circumvent any restrictions placed on certain uses of the Equipment at the Location or the use of the Equipment in connection with the License and Services.

## 8. LIABILITY AND INDEMNITY

8.1    Unless otherwise provided in this Agreement, the Services and License are provided "AS-IS". CMC and its directors, officers, employees, contractors and agents make no representations or warranties of any kind, whether direct, indirect, collateral, express or implied, as to the Services or the License nor as to the merchantability or fitness for a particular purpose, or non-infringement of third party rights, of any of the foregoing. CMC makes no commitments about the content, suitability, performance, or operation of the Services or License and further disclaims any warranty that (a) the Services or License will meet the Client's requirements or that the Services or access to power provided under the License will be constantly available, uninterrupted, timely, secure, or error-free; (b) the results that may be obtained from the use of the Services or License will be effective, accurate, or reliable; (c) the quality of the Services or License will meet the Client's expectations; (d) any errors or defects in the Services or License will be corrected; or that (e) a third party power supplier will be able to meet the Client's necessary power provision requirements. The Client hereby acknowledges that it has been advised by CMC to undertake its own due diligence with respect to all matters arising from this Agreement, the Services and the License. Except as set out in Section 9.2 of this Agreement, all other representations, warranties and conditions of CMC, express or implied, statutory or otherwise, are hereby disclaimed.

8.2    The Client acknowledges and agrees that it may use and access the Services or License at its own discretion and risk, and the Client is solely responsible for any damage to its Equipment or other property, computer system, or loss of data that results from the use of the Services or License.

8.3    To the fullest extent permitted by applicable law, CMC will not be liable to the Client or to any third party for any damages or expenses whatsoever or howsoever caused. For further clarity, without limitation, CMC will not be liable to the Client or any third party for:

(a)     any direct, indirect, special, consequential, incidental, economic, exemplary or punitive damages, including but not limited to expenses, lawyers' fees, property damage, loss of profit or revenue, loss or reduction of earnings, loss of future revenue, income or profits, loss of anticipated savings or failure to meet expected savings, economic loss or other similar loss, loss of goodwill, loss of use, financial loss, loss of business opportunities, business interruption, loss, destruction or alteration of data, files or software, breach of privacy or security, personal injury or death, however caused and regardless of whether or not such damages or loss

were forseeable, or any other foreseeable or unforeseeable loss, however caused, resulting or relating directly or indirectly from or relating to this Agreement or the use of or the failure of the License, Services or Equipment or any advertisements, promotions or statements relating to the License, Services or Equipment, even if CMC was negligent or was advised of the possibility of such damages;

(b)     any damages of any kind and nature caused by CMC's negligence (including gross negligence) or fundamental breach of contract or any other breach of duty whatsoever, whether or not such damages were forseeable and regardless of whether or not CMC was advised of the possibility of such damages;

(c)     the suitability, content, performance, availability, reliability, timeliness, quality, uninterrupted use, security, pricing or operation of the License, Services or Equipment;

(d)     any error, inclusion or omission with respect to the License, Services or Equipment;

(e)     the denial, restriction, disruption or inaccessibility of the License, Services or Equipment;

(f)     any lost, stolen or damaged Equipment or other property belonging to or provided by the Client;

(g)     any loss or damage caused by the Client's Equipment or other property belonging to or provided by the Client;

(h)     any error, omission or delay in connection with the transport or transfer of the Equipment or other property belonging to or provided by the Client to or from the Location;

(i)     any error, omission or delay in connection with the power or internet or any limitation connected thereto;

(j)     any claims or damages resulting directly or indirectly from any claim that the presence, installation, use, intended use or combination of the License, Services or Equipment or any material transmitted through the foregoing infringes the intellectual property, industrial, contractual, privacy or other rights of a third party;

(k)     any claims or damages resulting directly or indirectly from an Outage Event;

(l)     any claims or damages resulting directly or indirectly from the content or data stored on or transmitted through the Equipment or other property belonging to or provided by the Client;

(m)     any claims or damages resulting directly or indirectly from CMC's failure to meet the Targets;

(n)     any claims or damages resulting directly or indirectly from CMC's suspension of the Client's License or Services;

(o)     any claims or damages resulting directly or indirectly from any disruption that may occur as a result of CMC adapting or modifying the Licensed Space;

(p)      any claims or damages resulting directly or indirectly from CMC's delay in setting-up the Equipment at the Location; or

(q)      any claims or damages resulting from CMC being unable to provide the Licence and Services in the event that a third party power supplier is unable to meet the necessary power provision requirements for the hosting of the Client's Equipment.

These limits are in addition to any other limits and exclusions on CMC's' liability set out elsewhere in this Agreement and apply to any act or omission of CMC, whether or not the act or omission would otherwise be a cause of action in contract, tort or pursuant to any statute or other doctrine of law.

8.4      In the event that any exclusion of liability contained herein shall be held to be invalid for any reason, in no event shall CMC's liability to the Client hereunder, for any cause and on any basis whatsoever, exceed the amount of monthly fees and charges of CMC actually paid to CMC by the Client under this Agreement for the three (3) month period immediately preceding receipt by CMC of notice of the event giving rise to such liability. The Client acknowledges that CMC has set its fees under this Agreement in reliance on the limitations and exclusions of liability set forth in this Agreement and that such reliance forms an essential basis of this Agreement.

8.5      Moreover, the Client agrees that it shall defend, indemnify, save and hold harmless CMC and its directors, officers, employees, contractors and agents and their respective successors, heirs and assigns (collectively, the "CMC Indemnitees" and each, a "CMC Indemnitee") against any demand, liability, damage, claim, cause of action, proceeding, suit, action, cost, loss or expense (including without limitation legal costs and fees and litigation expenses), and judgment (collectively, the "Claims") that may be suffered or incurred by or imposed upon the CMC Indemnitees or any of them arising out of or resulting from:

(a)      the negligence or wilful misconduct of the Client or its officers, directors, employees, contractors or agents in connection with this Agreement;

(b)      any breach of this Agreement by the Client or any of its officers, directors, employees, contractors or agents;

(c)      the Client's violation, alleged violation or misappropriation of any intellectual property, industrial, contractual, privacy or other rights of a third party; or

(d)      any damage or expense, whatsoever or howsoever caused, including without limitation, the damages and expenses outlined in Section 8.3 of this Agreement.

## 9. Representations and Warranties

9.1      The Client represents and warrants to CMC that it has the power and capacity to enter into this Agreement and to perform and comply with the terms hereof, that this Agreement has been legally and properly executed by or on behalf of the Client and that this Agreement is legally binding and enforceable against the Client.

9.2      CMC represents and warrants to the Client that it has the power and capacity to enter into this Agreement and to perform and comply with the terms hereof, that this Agreement has

been legally and properly executed by or on behalf of CMC and that this Agreement is legally binding and enforceable against CMC.

## 10. TERMINATION

**10.1** CMC may terminate this Agreement for any reason upon thirty (30) days written notice to the Client, unless the Agreement is earlier terminated by CMC in accordance with Section
4.2 of this Agreement.

**10.2**  Provided there is no Client Default, Client may terminate this Agreement for any reason upon thirty (30) days written notice to  CMC.

**10.3**  The Client shall be liable and shall pay to CMC all reasonable costs, fees and expenses arising as a consequence of the termination of this Agreement, including but not limited to any costs, fees and expenses associated with the return, disposition or other dealings with the Equipment.

## 11. ENFORCEMENT

**11.1**  In the event of a Client Default, CMC shall have the right to exercise all of the available rights and remedies at law and in equity, and may, without limitation and free from any and all liability, (i) immediately terminate the license provided under this Agreement; (ii) recover from Client the applicable Basic Contract Damages, subject to any mitigation requirements under law (provided that CMC shall not be required to give preference to the space licensed to Client over any other space in its mitigation efforts); (iii) prevent Client from ordering or licensing any services; (iv) prevent Client from accessing or using the licensed space and Location and/or prevent Client from removing any Equipment from the Location (including, without limitation, by means of locks or other access barriers); and/or (v) perform such acts necessary to cure the Client Default, on Client's part, and all costs incurred by CMC in connection therewith shall be paid by Client to CMC.

## 12. PUBLICITY

**12.1** The Client will not use the logo(s) or trade name(s) of CMC without CMC's prior written consent.

## 13. CROSS-CLAIMS AND SET-OFFS

**13.1** The Client hereby waives any and all existing future claims and set offs against any and all Payments hereunder and agrees to make the Payments regardless of any set off or cross claim the Client may have against CMC.

## 14. WAIVER

**14.1** Failure or neglect by CMC to enforce at any time any of the provisions hereof shall not be construed nor shall be deemed to be a waiver of CMC's rights hereunder nor in any way

affect the validity of the whole or any part of this Agreement nor prejudice CMC's rights to take subsequent action.

## 15. NOTICES

**15.1** All notices given under this Agreement must be in writing and delivered by email, to the email address of the applicable Party, as set out below. In the event that a Party's email address changes, notice shall be given to the other Party by email.

| | |
|---|---|
| **For CMC:** | Attn: Chet J. Stojanovich,<br>Title: Director, Chet Mining Co<br>Canada Ltd.<br>Email: |
| **For the Client:** | Attn: Zuo, Xiao Pan<br>Title: Director,<br>Email: ANGEL_20080418@126.com<br>dj@db-technology.com<br>adam.m@gtogo.com>g |

## 16. SURVIVAL

**16.1** In addition to those provisions of this Agreement that, by their terms, survive the termination or expiration of this Agreement, Sections 1, 2.3 (d), 2.3 (h), 3.5, 3.7, 4.1, 4.2, 4.6, 4.9, 4.10, 5.2, 5.3, 5.5, 5.6, 7.1, 7.2, 8, 9 and 11 through 26 inclusive shall survive termination or expiry of this Agreement.

## 17. SEVERABILITY

**17.1** In the event that any of the terms, conditions or provisions of this Agreement or the application of it to any person or circumstance shall be determined by any competent authority to be invalid, unlawful or unenforceable to any extent, such term, condition or provision shall to that extent be severed from the body of this Agreement and the remainder thereof shall continue to valid and enforceable to the fullest extent permitted by law.

## 18. FORCE MAJEURE

**18.1** CMC shall be under no liability to the Client in respect of anything which may constitute a breach of this Agreement arising by reason of Force Majeure namely, circumstances beyond the control of CMC which shall include (but shall not be limited to) acts of God, pandemics, perils of the sea, roadways or air, transportation delays, weather, electrical power interruption, internet service interruption, fire, flood, drought, explosion, sabotage,

accident, embargo, riot, civil commotion, including acts of local government and parliamentary authority, inability to obtain or provide support or materials, breakdown of equipment, and labour difficulties of whatever nature and for whatever cause arising

including (but without prejudice to the generality of the foregoing) work to rule, overtime bars, strikes and lockouts. Moreover, CMC shall not be required to accede to the demands of its opponents in any strike, lockout or labour/industrial disturbance solely to remedy the Force Majeure constituted by such action.

## 19. GOVERNING LAW

**19.1** The Parties hereby agree that this Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of New York, and the laws of New York applicable therein. The Parties hereby attorn to the exclusive jurisdiction of the courts of the State of New York, USA.

## 20. ENTIRE AGREEMENT

**20.1** This Agreement and the Schedules attached hereto represent the entire agreement between the Parties with respect to the License, Services and the subject-matter hereof and supersedes any previous agreements, representations, understandings, commitments, negotiations and discussions, whether written or oral.

## 21. INUREMENT

**21.1** This Agreement is binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns.

## 22. RELATIONSHIP OF THE PARTIES

**22.1** Nothing in this Agreement, nor the conduct of a Party shall in anyway constitute either Party as an agent, employee, representative or fiduciary of the other Party, nor constitute or be intended to constitute a partnership or joint venture relationship between the Parties for any purpose whatsoever.

## 23. NO CONTRA PREFERENTUM

**23.1** The Parties acknowledge and agree that they have participated jointly in the negotiation and drafting of this Agreement. In the event that an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favouring or disfavouring any Party by virtue of the authorship of any of the provisions of this Agreement.

## 24. ASSIGNMENT

**24.1** The Client shall not assign this Agreement or any rights or obligations hereunder without the prior written consent of an authorized representative of CMC, which may be unreasonably withheld.

## 25. AMENDMENTS

**25.1** This Agreement may not be amended or modified except in writing signed by authorized representatives of both Parties.

## 26. RIGHT OF THIRD PARTIES

**26.1** Nothing in this Agreement is intended to create any right which may be enforceable by a third party against either Party to this Agreement.

## 27. COUNTERPARTS

**27.1** This Agreement may be executed by the Parties in two counterparts (including electronic copies), each of which when so executed and delivered shall be deemed to be an original and both of which taken together shall constitute one and the same instrument.

**IN WITNESS WHEREOF** the Parties have executed this Agreement as of the date first set out above.

**Chet Mining CO.** Authorized Official:
Chet J. Stojanovich
Title: Director, Chet Mining Co Ltd.
Signature:_____
Date:_____ _

**THE CLIENT**
Authorized Official: Zuo, Xiao Pan_____
Title: Director,_____
Signature: _____
Date: _____

**Schedule "A"**
**Equipment**

**620 Machines Effect 2/28/2019/ 1280 Machines 5/1/2019 & 6/1/2019**

**Schedule "B"**

**General Security Agreement**

## 1. Parties to this Security Agreement

Legal Name of Client (the "Debtor"): Zuo Xiao Pan
Address of Debtor: Room C104, Xinkongqi Apartment, Shekou New Street Nanshan Dist., Shenzhen, 518067, China

Name of secured party (the "Secured Party"): **Chet Mining Co Canada Ltd.**, a corporation duly incorporated under the laws of the Province of British Columbia, in the Country of Canada
Address of Secured Party: 105 West 43rd St., Vancouver, BC V5Y 2T6, Canada

Location of Collateral:

## 2. Creation of Security Interest

(1) For value received and as a general and continuing security for the payment of Indebtedness (as defined below), including any ultimate unpaid balance thereof, owed to the Secured Party and to secure the performance of the obligations under this Security Agreement or any Related Documents, the Debtor hereby grants to the Secured Party a Security Interest in all the Debtor's personal property as defined in the *Personal Property Security Act* S.N.L. 1998 c.P-7.1 (as amended from time to time, which Act, including amendments thereto and any Act substituted therefor and amendments thereto, is herein referred to as the "PPSA") located at _____(the "Location"), and in the undertaking of the Debtor located at the Location, which shall constitute Collateral, whether now owned or hereafter acquired directly or indirectly by the Debtor, whether now existing or hereafter arising.

(2) Without limiting the foregoing, but for greater certainty, Collateral at the Location includes all of the following:

(a) all Collateral at the Location described in Schedule "I" attached to this Security Agreement and incorporated by reference in this Security Agreement; and

(b) all statutory licences, quotas and other transferable rights, including an equitable right in the Collateral assigned or charged under the Security Agreement which might otherwise at law be incapable of being Collateral creating a Security Interest.

(3) Any reference to "Collateral" shall, unless the context requires otherwise, be deemed a reference to "Collateral or any part thereof".

(4) This Security Interest shall not apply to, and Collateral shall not include, the last day of the term of any lease or agreement therefor but upon the enforcement of the Security Interest the Debtor shall stand possessed of such last day in trust to assign the same to any person acquiring such term.

(5) The Debtor shall promptly inform the Secured Party in writing of the acquisition by the Debtor of any personal property which is not adequately described in this Security Agreement, and the Debtor will execute and deliver, at its own expense, from time to time amendments to this

Security Agreement or additional Security Agreements or schedules as may be required by the Secured Party in order that the Secured Interest granted herein shall attach to such personal property.

## 3. Definitions

(1) All phrases which are defined in the PPSA and not otherwise defined in this Security Agreement shall have the meaning ascribed by the PPSA.

(2) Whenever the terms "certificated security", "entitlement holder", "entitlement order", "financial asset", "security", "security certificate", "securities account", "security entitlement", "securities intermediary" and "uncertificated security" are used herein, they shall be interpreted in accordance with their respective meanings under New York Law, as amended or substituted from time to time; provided that, when used herein, the terms "certificated security" and "uncertificated security" shall be understood to mean a certificated security or uncertificated security, as the case may be, that is held directly by and registered in the name of or endorsed to the Debtor or the Secured Party or their respective nominees, as applicable, and not a certificated security or uncertificated security to which the Debtor or the Secured Party, as applicable, has a security entitlement.

(3) "Indebtedness" shall mean all liabilities of every kind and description of the Debtor to the Secured Party, whether now or hereafter owed or any future advance, whether direct, indirect, contingent, and whether the Debtor be bound alone or with others and whether as principal or surety.

(4) "Pledged Securities" shall mean the collective reference to all investment property and financial assets included in the Collateral.

(5) "Related Documents" shall mean the Hosting Services Agreement, Facility Access Agreement, account agreements, guaranties, trust deeds, or any other documents executed between the parties or in connection with this Security Agreement or Indebtedness or related to its operation or administration, whether already existing or executed now or later.

## 4. Rights and Obligations of Debtor

4.1 **Information.** The Debtor represents and warrants that all information supplied by the Debtor for this Security Agreement, including the Debtor's legal name, place of business and the location of the Collateral save for Collateral in transit to such locations and inventory on lease or consignment, is correct.

4.2 **Title.** The Debtor represents and warrants that it is the sole legal and beneficial owner of the Collateral and that there are no existing encumbrances on this Collateral. The Debtor further warrants and covenants that all intellectual property applications are valid and in good standing and the Debtor is the owner of the applications and registrations.

4.3 **Possession and use of Collateral.** Subject to paragraph 6.2, until default or unless otherwise agreed with the Secured Party, the Debtor may deal with Collateral in the ordinary course of the Debtor's business in any manner consistent with the provisions of this Security

Agreement. Except for inventory sold or accounts collected in the ordinary course of the Debtor's business the Debtor shall not sell or otherwise transfer the Collateral without the express consent of the Secured Party. Where the Secured Party provides such consent and the Collateral gives rise to proceeds that are serial numbered goods or serial numbered equipment the Debtor shall provide the Secured Party with such information as is required to maintain a perfected Security Interest in the proceeds. All proceeds from a dealing with the Collateral, whether or not in the ordinary course of the Debtor's business, will be received by the Debtor as trustee for the Secured Party and will be immediately paid to the Secured Party pursuant to the fiduciary obligation as trustee. The Debtor shall not encumber or permit the Collateral to be encumbered without the prior written consent of the Secured Party, other than by this Security Agreement.

4.4 **Change in use.** Where goods that are inventory to the Debtor cease to be inventory other than in the ordinary course of business and do not become proceeds of inventory, the Debtor shall notify the Secured Party forthwith of the change.

4.5 **Removal of Collateral.** The Collateral (or to the extent the Collateral consists of intangible property such as accounts, the records concerning the Collateral) is located at the Location. Except in the ordinary course of the Debtor's business, the Debtor shall not remove the Collateral from the Location without the prior written consent of the Secured Party, which shall not be unreasonably withheld. The Debtor shall not change its business location without first notifying the Secured Party in writing.

4.6 **Pledged Securities as Collateral.** Where the Collateral includes any Pledged Securities, the Secured Party may require the Debtor to register or cause to be registered any such Pledged Securities into the Secured Party's name or in the name of its nominee so that the Secured Party may appear of record as the sole owner of the applicable Collateral, and for such purpose, the Debtor shall comply with the provisions of paragraph 4.7. At all times other than during the continuance of an event of default, the Debtor shall be entitled to exercise, in a manner not prejudicial to the interests of the Secured Party or which would violate or otherwise be inconsistent with the provisions of this Security Agreement, all voting power from time to time exercisable in respect of the Pledged Securities.

4.7 **Perfection by Control.**

(1) Promptly upon request from time to time by the Secured Party the Debtor shall:

    (a)    deliver (or cause to be delivered) to the Secured Party or its nominee, endorsed to the Secured Party or such nominee as it may direct and/or accompanied by such instruments of assignment and transfer in such form and substance as the Secured Party may reasonably request, any and all instruments, investment property, financial assets, documents of title and chattel paper included in or relating to the Collateral as the Secured Party may specify in its request, to be held by the Secured Party subject to the terms of this Security Agreement;

    (b)    direct the issuer of any and all certificated securities included in or relating to the Collateral as the Secured Party may specify in its request to register the applicable security certificates in the name of the Secured Party or such nominee as it may direct;

    (c)    direct the issuer of any and all uncertificated securities included in or relating to the Collateral as the Secured Party may specify in its request to register the Secured Party or such nominee as it may direct as the registered owner of such uncertificated securities;

    (d)    direct the securities intermediary for any security entitlements or securities accounts included in or relating to the Collateral as the Secured Party may specify in its request to transfer any or all of the financial assets to which such security entitlements or securities accounts relate to such securities account or securities accounts as the Secured Party may specify such that the Secured Party shall become

the entitlement holder with respect to such financial assets or the person entitled to exercise all rights with respect to such securities account; and

(e) cause the Secured Party to obtain control (pursuant to the PPSA) over any Collateral described in paragraph 4.7(1)(a) (as determined pursuant to the PPSA) and the Debtor shall not cause nor shall it permit any person other than the Secured Party to have such control (pursuant to the PPSA) of any Pledged Securities.

(2) Promptly upon request from time to time by the Secured Party, acting reasonably, the Debtor shall hold its security entitlements in a securities account that (i) is maintained in the name of the Debtor at an office of a securities intermediary located in New York, USA; and (ii) together with all financial assets credited thereto and all related security entitlements, is subject to a control agreement. The Debtor shall, at the request of the Secured Party (in the Secured Party's sole discretion) (i) enter into and cause any securities intermediary holding a securities account in respect of Pledged Securities to enter into a control agreement, in the form and substance satisfactory to the Secured Party acting reasonably, in respect of all Pledged Securities constituting security entitlements of the Debtor; and (ii) deliver each such control agreement to the Secured Party. The Debtor shall cause all Pledged Securities underlying any security entitlements acquired by the Debtor after the date hereof to be credited to a securities account that is subject to a control agreement described herein.

(3) For purposes of paragraph 4.7(2), the term "control agreement" means (a) with respect to any uncertificated securities included in the Collateral, an agreement between the issuer of such uncertificated securities and another person whereby such issuer agrees to comply with instructions that are originated by such person in respect of such uncertificated securities, without the further consent or instruction of the Debtor; and (b) with respect to any securities accounts or security entitlements included in the Collateral, an agreement between the securities intermediary in respect of such securities accounts or security entitlements and another person to comply with any entitlement orders with respect to such securities accounts or security entitlements that are originated by such person, without the further consent or instruction of the Debtor.

4.8 **Preservation of rights and Collateral.** The Debtor shall defend its own and the Secured Party's rights in the Collateral against the claims and demands of all persons. The Debtor shall keep all agreements, registrations and applications relating to intellectual property used by the Debtor in its business in good standing and shall renew all agreements and registrations as may be necessary or desirable to protect intellectual property, unless otherwise agreed in writing by the Secured Party. The Debtor shall register all patents, trade marks and copyrights whenever it is commercially reasonable to do so. The Debtor shall maintain the Collateral in a condition and state of repair that preserves the value of the Collateral, reasonable wear and tear excluded. The Debtor will not commit or permit damage to or destruction of the Collateral and will effect repair if it occurs. The Debtor shall procure and maintain policies of fire and other casualty insurance covering the Collateral on the basis and in at least the amount described above on terms satisfactory to the Secured Party and with loss payable to the Secured Party and Debtor jointly.

of:

4.9 **Material changes in information.** The Debtor shall notify the Secured Party promptly

(a) any material change in the information contained in this Security Agreement (including the schedules hereto) relating to the Debtor, the Debtor's business or Collateral, including any address change or establishment of an additional place of business;

(b) the details of any change in name of the Debtor;

(c) the details of any significant acquisition of Collateral;

(d) the details of any claims or litigation affecting the Debtor or Collateral;

(e) any loss of or damage to Collateral;

(f) any default by any account debtor in its obligations with respect to Collateral;

(g) the return to or repossession by Debtor of Collateral.

4.10 **Debtor's conduct.** The Debtor will conduct its business and affairs in a proper and efficient manner, in accordance with applicable law and keep records in accordance with Accounting Standards for Private Enterprise and Generally Accepted Accounting Principles.

4.11 **Protest and notice.** The Debtor waives protest and notice of same of any instrument constituting Collateral at any time held by the Secured Party on which the Debtor is in any way liable and, subject to the notice requirements of the PPSA, notice of any other action taken by the Secured Party.

4.12 **Joint and several liability.** If more than one Debtor executes this Security Agreement the obligations of such Debtors hereunder shall be joint and several.

4.13 **Security agreement is valid.** The Debtor warrants that this Security Agreement has been properly authorized and constitutes a legally valid and binding obligation of the Debtor in accordance with its terms.

## 5. Events of Default

The Debtor shall be in default under this Security Agreement or Related Documents upon occurrence of any of the following:

(a) Non-payment when due, whether by acceleration or otherwise, of Indebtedness.

(b) Failure to comply within seven days after written notice from the Secured Party demanding compliance with any provision contained in this Security Agreement or Related Documents and if compliance is not practically possible, failure to take steps that will produce compliance as soon as is reasonably practical.

(c) Any warranty, representation or statement made or furnished to the Secured Party by or on behalf of the Debtor proves in any material respect to have been false when made or furnished.

(d) Bankruptcy or insolvency of the Debtor; the filing against the Debtor of a petition in bankruptcy; the making of an authorized assignment for the benefit of creditors by the Debtor; the appointment of a receiver, trustee, monitor, or liquidator for the Debtor or for any assets of the Debtor; or the institution by or against the Debtor of any type of insolvency proceeding or creditor rearrangement.

(e) Death or declaration of incompetency of the Debtor (if the Debtor is an individual) or cessation of the Debtor's viability as a going business concern (if the Debtor is not an individual), which includes the cessation or threat by the Debtor to cease to carry on in the normal course of the Debtor's business or any material part thereof.

(f) The Debtor ceases or threatens to cease, or the Secured Party has reasonable knowledge that the Debtor will cease to carry on the Debtor's business in the normal course of the Debtor's business all or any material part thereof.

(g) Any interest, including an encumbrance affecting the Collateral that is held by a third party, which has become enforceable against the Collateral.

(h) On the occurrence of such other events where the Secured Party considers in good faith and on commercially reasonable grounds that the Collateral is in jeopardy or that the Secured Party's position is insecure.

## 6. Secured Party Rights and Obligations

6.1 **General rights.** In addition to the rights granted herein, the Secured Party may enforce any other rights and remedies it may have at law or in equity, and specifically shall have all rights and remedies of a Secured Party under the PPSA. All rights and remedies of the Secured Party are cumulative and one or more of these rights may be exercised independently or in combination from time to time including marshalling. The Secured Party shall not be liable for failing to exercise its rights and remedies and shall have no obligation to take any steps to preserve its rights against prior parties to any instrument or chattel paper whether Collateral or proceeds and whether or not in the Secured Party's possession and shall not be liable or accountable for failure to do so.

6.2 **Collection of debts forming part of Collateral.** The Secured Party may direct account debtors of the Debtor, with or without notice to the Debtor, to make all payments owing to the Debtor on Collateral subject to the Security Interest directly to the Secured Party's interest, either before or after default.

6.3 **Inspection of Collateral and right of access.** The Secured Party shall have the right at any time to confirm the existence and state of the Collateral in any manner the Secured Party may consider appropriate and the Debtor agrees to furnish all assistance as the Secured Party may reasonably request in connection therewith. The Debtor grants to the Secured Party or its agents access to all places where Collateral may be located and to all premises occupied by the Debtor for the purposes of inspection or obtaining possession.

6.4 **Receivers and others.** The Secured Party may appoint by instrument or by application to a court of competent jurisdiction a receiver or other person to act on its behalf, before or after default, or in any insolvency or like proceeding (receiver includes a receiver-manager). The Secured Party may also remove the receiver and appoint a replacement receiver at any time. Any receiver appointed by the Secured Party shall be considered to be the Debtor's agent. The appointee has all the powers of the Secured Party under this Security Agreement. In addition, on instructions from the Secured Party, the receiver shall be entitled to carry on the business of the Debtor, with all the powers the Debtor would have to operate its business, for such time as the receiver determines it advisable and in the best interest of the Secured Party. The Secured Party is not liable for any act or omission by any receiver appointed or selected by a court.

6.5 **Acceleration.** The Secured Party may declare all or any part of Indebtedness which is not by its terms payable on demand to be immediately due and payable on the occurrence of any default or if the Secured Party considers in good faith and on commercially reasonable grounds that the Collateral is in jeopardy or that the Secured Party's position is insecure.

6.6 **Possession and disposition of Collateral.** The Secured Party may take possession or constructive possession of, collect, demand, sue on, enforce, recover and receive both

Collateral and proceeds and give binding receipts and discharges therefor. The Secured Party in possession may use Collateral as it sees fit, providing such use is reasonable. Any income from or money that is Collateral shall be applied to the Debtor's Indebtedness. Upon default, the Secured Party may also sell, lease or otherwise dispose of Collateral in any commercially reasonable manner. The Secured Party reserves the right to repair or restore Collateral prior to sale and to add any costs incurred to Indebtedness.

6.7 **Costs.** The Debtor agrees to pay all charges, including solicitors', auditors', receivers' or like persons' costs and remuneration or other expenses reasonably incurred by the Secured Party or other party appointed by the Secured Party in operating the Debtor's accounts and in preparing or enforcing this Security Agreement. Such sums shall constitute a future advance increasing the Indebtedness hereunder.

6.8 **Deficiencies.** The failure of the Secured Party to receive full payment or satisfaction of Indebtedness through its rights and remedies herein provided shall not in any way release the Debtor from the obligation to satisfy any deficiency, including any costs of realization.

6.9 **Waivers.**

(l) No variation, amendment (except for any schedules which may be added hereto pursuant to the provisions of this Security Agreement) or waiver of any provision of this Security Agreement shall be effective unless made by written agreement executed by the parties to this Security Agreement.

(2) No delay or omission by the Secured Party in exercising any right or remedy hereunder or with respect to any Indebtedness shall operate as a waiver of that right or remedy and no single or partial exercise of any right or remedy shall preclude any other exercise of cumulative rights and remedies.

(3) The Secured Party may remedy any default or perform any duty of the Debtor hereunder or with respect to any Indebtedness in any reasonable manner without waiving the default remedied and without waiving any other prior or subsequent default by the Debtor.

**6.10    Notice of Intention to Realize.**

(1) Prior to realization, there is an obligation on the Secured Party to deliver a notice of intention to realize to the Debtor under s. 244 of the *Bankruptcy and Insolvency Act.* Any events which trigger default, including those within paragraph 5(d), shall be deferred as required by that legislation. Valid service of this notice will occur upon sending of the notice to the address herein or as changed by the Debtor through paragraph 4.9.

(2) Pursuant to the Personal Property Security Act, where applicable, the Secured Party shall also give notice in writing in the appropriate time period to (a) the Debtor and any other person who is known by the Secured Party to be an owner of the Collateral; (b) each creditor or person with a Security Interest in the Collateral whose Security Interest is subordinate to that of the secured party and (i) who has registered, before the notice of disposition is given to the Debtor, a financing statement that includes the name of the Debtor or that includes the serial number of the Collateral if the Collateral is goods of a kind that are prescribed as serial numbered goods, or (ii) whose Security Interest was perfected by possession when the secured party seized or repossessed the Collateral; (c) each judgment creditor whose interest in the Collateral is subordinate to that of the Secured Party and who has registered, before the notice of disposition is given to the Debtor, a notice of judgment that includes the name of the debtor or that includes the serial number of the Collateral if the Collateral is goods of a kind that are prescribed as serial numbered goods; and (d) any other person with an interest in the Collateral

who has given a written notice to the Secured Party of that person's interest in the Collateral before the notice of disposition is given to the Debtor.

(3) The notice shall include the content stipulated by s. 60(5) of the Alberta *Personal Property Security Act*, R.S.A. 2000, c. P-7 of the British Columbia *Personal Property Security Act*, R.S.B.C. 1996, c. 359, s. 59(9) of the New Brunswick *Personal Property Security Act*, S.N.B. 1993, c. P-7.1, s. 60(9) of the Nova Scotia *Personal Property Security Act*, S.N.S. 1995-96, c. 13, s. 59(9) of the Prince Edward Island *Personal Property Security Act*, S.P.E.I. 1997, c. 33, and s. 59(7) of the Saskatchewan *Personal Property Security Act, 1993*, S.S. 1993, c. P-6.2.

**6.11    Perishable Collateral.** If any part of the Collateral is perishable or will decline speedily in value, the secured party can sell or otherwise dispose of the perishable Collateral without giving any notice whatsoever.

## 7. Subordination

No action by the Secured Party shall constitute a subordination of its Security Interest to any other interest in the Collateral unless such subordination is effected by an agreement in writing, titled "Subordination Agreement", signed by the Secured Party.

## 8. Successor Interests

This Security Agreement shall enure to the benefit of and be binding on the parties hereto and their respective heirs, executors, administrators, successors and assigns. The Debtor shall not assign this Security Agreement without the Secured Party's prior written consent.

## 9. Attachment

The Security Interest created by this Security Agreement shall attach to existing Collateral when this Security Agreement is signed and delivered to the Secured Party and shall attach to after-acquired Collateral immediately upon the Debtor acquiring rights in such Collateral. The parties do not intend to postpone attachment of any Security Interest created by this Security Agreement.

## 10. Amalgamation

In the event that the Debtor amalgamates with another company, the term "Debtor" shall apply to each of the amalgamating companies and the amalgamated company, such that the Security Interest created in this Security Agreement shall extend to Collateral, as defined in this Agreement, owned by each of the amalgamating companies and the amalgamated company at the time of amalgamation and to any Collateral subsequently acquired by the amalgamated company. The Security Interest shall secure the indebtedness, as described in this Security Agreement, of each of the amalgamating companies and the amalgamated company at the time of amalgamation to the Secured Party. The Security Interest shall attach to the Collateral of the amalgamating companies and the amalgamated company at the time of amalgamation and shall attach to any after-acquired Collateral immediately upon the amalgamated company acquiring rights in such Collateral. The Secured Party's Security Interest in any after-acquired Collateral of the amalgamated company shall have priority over any security interests by other secured creditors of the amalgamated company. To the extent that there is a priority conflict between the Secured Party and another secured creditor, the parties shall share priority over the amalgamated company's after-acquired Collateral on a ratable basis, calculated based on obligations outstanding at the time of amalgamation.

## 11. Further Assurances

The Debtor shall, at its own expense, from time to time do, execute and deliver, or cause to be done, executed and delivered, all such financing statements, further assignments, documents, acts, matters and things as may be reasonably requested by the Secured Party for the purpose of giving effect to this Security Agreement or for the purpose of establishing compliance with the representations, warranties and covenants contained herein and in the other Related Documents.

## 12. Applicable Law

This Security Agreement and Related Documents shall be governed by the laws of the state of New York, USA.

## 13. Termination

This Security Agreement shall remain in full force and effect until the Indebtedness has been paid and written notice of discharge by the Secured Party is received by the Debtor.

## 14. Acknowledgments of Debtor

The Debtor hereby acknowledges receipt of a copy of this Security Agreement. The Debtor waives the Debtor's right to receive or sign a copy of any financing statement or financing change

statement registered by the Secured Party, or any verification statement issued by the registry with respect to any financing statement or financing change statement registered by the Secured Party.

**IN WITNESS WHEREOF** the Parties have executed this Agreement as of the date first set out above.

**Chet Mining Co Canada Ltd.**
Authorized Official: Chet J. Stojanovich

Title: Director, Chet Mining Co Ltd.
Signature:_____

Name:      Chet Stojanovich
Date:2/28/2019

**THE DEBTOR**
**Authorized  Official:** Zuo, Xiao Pan

**Title:** Director,

**Signature:**_____
**Date:**_____

## Schedule "I" Description of Collateral
*[Insert Description of Debtor's Equipment]*


The Following wallet addresses shall be used to convey cryptocurrency to CMC for all payments. A small token exchange shall be done to test the validity of the address and conveyance method. Both parties shall acknowledge via email or text that a valid transaction has taken place before conveyance of any significant sums.

CMC is solely responsible for the security of their recieving wallets. Payments made to these wallets shall be considered payments made in full with no escrow or holds placed on the funds.
Receiving Wallets: (Use only the Hexadecimal characters with no spaces before or after)
BTC= 3CHBV4d2G2CaTviDp24nePAgTEMqwix5s1
ETH= 0x8B68C9dcf23544Eb8a58c18b2B6671B2D6B4b7al
BCH= qpuw9hr9ujwq757rg4g6lxt45d22x6jqxg7hhmlmrh
LTC= MDgAz3vRfHFyfye4SXvHnfJkBviqYDJqCf


Wallet addresses may be updated at any time with the consent and validation of addresses by both parties

| Date Due | Units | Cost of hardware | Power cost | Wattage | Installation Cost | Monthly | 5 Month | 6 Month | 12 month/60 | Deposit Due Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 2/28/2019 | 75 Unit Buffer Space | 0 | 0.04 | 112500 | 3,240.00 | 3,240.00 | 16,200.00 | 19,440.00 | 38,880.00 | |
| 2/28/2019 | 60 Avalon 921 w/PSU | 19500.0 | 0.04 | 108000 | 3,110.00 | 3,110.00 | 15,550.00 | 18,660.00 | 408,120.00 | |
| 2/28/2019 | 500 Units | N/a | 0.04 | 750000 | 21,600.00 | 21,600.00 | 108,000.00 | 129,600.00 | 259,200.00 | |
| 5/1/2019 | 425 Units | N/a | 0.04 | 637500 | 18,666.00 | 18,666.00 | 93,330.00 | 111,996.00 | 816,240.00 | 93,330.00 |
| 6/1/2019 | 280 Units | N/a | 0.04 | 420000 | 12,297.60 | 12,297.60 | 61,488.00 | 73,785.60 | 223,992.00 | 61,488.00 |
| 6/1/2019 | S9 60 | 0 | 0.04 | 97200 | 2,800.00 | 2,800.00 | 14,000.00 | 16,800.00 | 147,571.20 | |
| | | 19500 | | 2125200 | 61,713.60 | 61,713.60 | 308,568.00 | 370,281.60 | 1,894,003.20 | 154,818.00 |
| | Equipment cost | 5 Months | 6 Months | 1 month install fee | Total Deposit of Bill Due Now | | Deposit Due Today | | | |
| SubTotal | 19500 | 153,750.00 | - | 2125200 | | | | | | |
| Total | 23546.25 | 153,750.00 | - | | 239,009.85 | | 153,750.00 | | | 393,827.85 |