EXHIBIT "C"

Page 1

1

2    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

3    ------------------------------------------X

     ALEX HOLMES, et al.,

4

                                  PLAINTIFF,

5

6         -against-

                              Case No.:

7

                              1:20-cv-04448-LJL

8

9    CHET MINING CO., LLC, et al.,

10                            DEFENDANTS.

     ------------------------------------------X

11

12              DATE: March 4, 2022

13              TIME: 11:35 A.M.

14

15         CONTINUED DEPOSITION of the

16   Defendant, CHET STOJANOVICH, taken by the

17   Plaintiff, pursuant to an Order and to the

18   Federal Rules of Civil Procedure, held at

19   the offices of Veritext Legal Solutions, 7

20   Times Square, 16th floor, New York New

21   York, before Cathy Leone via Veritext

22   Virtual Zoom, a Notary Public of the State

23   of New York.

24

25

Page 2

```
 1
 2   A P P E A R A N C E S:
 3
 4   E. STEWART JONES HACKER MURPHY LAW OFFICE
        Attorneys for the Plaintiff
 5      ALEX HOLMES, et al.
        200 Harborside Drive, Suite 300
 6      Schenectady, New York 12305
        BY: JOHN HARWICK
 7      jharwich@joneshacker.com
 8   CHET STOJANOVICH, Pro-Se Litigant
 9   ALSO PRESENT:
10   VERITEXT LEGAL SOLUTIONS
     BY:  MATTHEW CHIN-QUEE, Videographer
11
     NICO DRAMONTANI
12   ALEX HOLMES
13
                 *          *          *
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

1

2    F E D E R A L   S T I P U L A T I O N S

3

4

5    IT IS HEREBY STIPULATED AND AGREED by and

6    between the counsel for the respective

7    parties herein that the sealing, filing and

8    certification of the within deposition be

9    waived; that the original of the deposition

10   may be signed and sworn to by the witness

11   before anyone authorized to administer an

12   oath, with the same effect as if signed

13   before a Judge of the Court; that an

14   unsigned copy of the deposition may be used

15   with the same force and effect as if signed

16   by the witness, 30 days after service of

17   the original & 1 copy of same upon counsel

18   for the witness.

19

20   IT IS FURTHER STIPULATED AND AGREED that

21   all objections except as to form, are

22   reserved to the time of trial.

23

24              *      *      *      *

25

Page 4

1              C. STOJANOVICH

2          The attorneys participating in

3      this deposition acknowledge that the

4      Court Reporter is not physically

5      present in the deposition room and

6      that the Court Reporter will be

7      reporting this deposition remotely.

8          They further acknowledge that

9      in lieu of an oath administered in

10     person, the Court Reporter will

11     administer the oath remotely.

12         The parties and their counsel

13     consent to this arrangement and waive

14     any objections to this manner of

15     reporting.

16         THE VIDEOGRAPHER:  Good

17     morning.  We are going on the record

18     at 11:35 a.m. on March 4, 2022.  This

19     is Media Unit 1 of the deposition of

20     Chet Stojanovich in the matter of

21     Alex Holmes v Chet Mining Company

22     LLC, et al. in the United States

23     District Court, Southern District of

24     New York, No. 20-CV-4448.

25         The deposition is being held at

Page 5

```
 1              C. STOJANOVICH
 2         Veritext located at 7 Times Square,
 3         New York, New York.
 4              My name is Matthew Chin-Quee
 5         from the firm Veritext and I am the
 6         videographer.  The court reporter is
 7         Cathy Leone from Veritext.
 8              Will counsel please introduce
 9         yourself?
10              MR. HARWICK:  John F. Harwick,
11         E. Stewart Jones Hacker Murphy for
12         the plaintiffs and judgment
13         creditors, Alex Holmes, et al.
14              THE VIDEOGRAPHER:  Will the
15         court reporter please swear in the
16         witness?
17  C H E T    S T O J A N O V I C H, called as
18  a witness, having been first duly sworn by
19  a Notary Public of the State of New York,
20  was examined and testified as follows:
21  EXAMINATION BY
22  MR. HARWICK:
23         Q.    Mr. Stojanovich, as you know,
24  my name is John Harwick.  I represent a
25  group of individuals that have judgments
```

Page 6

1                    C. STOJANOVICH

2    against you, federal court judgments

3    arising out of a lawsuit that was brought

4    against you in the Southern District of New

5    York with regard to your theft of their

6    funds after promising bitcoin mining

7    equipment and mining services.  This is a

8    continuation of your deposition after we

9    made a motion for contempt and you are here

10   under court order.

11              Do you understand that?

12       A.    What you first said.  I don't

13   entirely understand the second part.  The

14   court order I understand.

15       Q.    You understand that we had a

16   conference with the judge and the judge

17   ordered you to appear in person today in

18   Manhattan?

19       A.    Right.

20       Q.    Thank you for appearing.

21              The judge also ordered you to

22   search your records and disclose the

23   various documents that were subpoenaed by

24   me and also demanded at your last

25   deposition in this case.  Have you

Page 7

1                      C. STOJANOVICH
2      delivered those documents to me as of
3      today?
4          A.    I sent you an e-mail very
5      recently asking you if there is anything
6      else that you additionally needed.  I sent
7      you three e-mails actually.
8          Q.    For the record, I don't have
9      any of the document responses to the
10     subpoena that we served and I don't have
11     any of the documents --
12         A.    Okay --
13         Q.    You have to let me talk.  We
14     can't both talk at the same time.
15     Otherwise, we will be here all day.
16         A.    Go ahead.
17         Q.    For the record, I want to put
18     on the record that I have not received
19     documents in electronic format that are
20     responsive to the subpoena.  I have not
21     received documents in electronic or other
22     format that are responsive to the demands
23     that were made at your last deposition and
24     that the court ordered you to produce, so
25     we will be moving forward with the contempt

Page 8

C. STOJANOVICH

1          C. STOJANOVICH

2   proceeding against you.  We will be asking

3   the judge for an order directing the Unites

4   States Marshal to place you under arrest

5   until such time that we do receive all of

6   the documentation that was called for by

7   the subpoena that was served upon you and

8   for the documentation that was requested at

9   the last deposition in this case where you

10  appeared and I put various demands on the

11  record, so I just wanted to make that

12  clear.

13          Are you represented by counsel

14  today?

15      A.    I don't have a counselor today

16  at the deposition.  They said that a

17  counselor could be present, but getting

18  here was very difficult.  I wasn't sure if

19  I was going to be able to make it

20  physically.

21      Q.    What is your legal name,

22  Mr. Stojanovich?

23      A.    Chet Stojanovich.

24      Q.    What's the name that appears on

25  your birth certificate?

Page 9

```
 1                    C. STOJANOVICH
 2        A.      Chet Stojanovich.
 3        Q.      Is it Chester or Chet?
 4        A.      Chet Stojanovich.
 5        Q.      Is your legal name Chester
 6   Stojanovich?
 7        A.      No.  It is Chet Stojanovich.
 8        Q.      Is there another Chester
 9   Stojanovich in your family?
10        A.      Yes.
11        Q.      Who is that?
12        A.      My grandfather has the named
13   Chester and I believe my cousin, as well.
14   I'm not very close with my family.
15        Q.      Do you have a bank account at
16   Morgan Stanley?
17        A.      I do.  I got a bank account
18   there and it wasn't really open and
19   activated, I think, until late September.
20   I don't know.  I wasn't funded at all until
21   November.
22        Q.      What's your affiliation with
23   the company called Phoenix Data?
24        A.      Phoenix Data is a company that
25   I was working with for a few months.
```

Page 10

1                    C. STOJANOVICH

2      Q.    Are you an owner of Phoenix

3   Data?

4      A.    I do have shares.   I don't know

5   what the exact holdings are.

6      Q.    What is the legal name of that

7   entity?

8      A.    Phoenix Data.

9      Q.    Phoenix Data?

10      A.    I think so.

11      Q.    Is that an LLC or an Inc.?

12      A.    I don't know.   I would have to

13   look up that.   That's outside of my

14   purview.

15      Q.    Who are the other partners?

16      A.    I don't know who is listed on

17   it.   The filing wasn't done by me.

18      Q.    Who was the filing done by?

19      A.    I think it was done by SWIFT.

20      Q.    Is that an individual?

21      A.    No.  It is a company.

22      Q.    Are you the sole member of

23   Phoenix Data?

24      A.    I don't know how it was

25   incorporated, who was the shareholders and

Page 11

                        C. STOJANOVICH
1
2    where.
3         Q.    It has a website though,
4    correct?
5         A.    I don't think so anymore.
6         Q.    What's your girlfriend's name?
7         A.    I don't have a girlfriend.  I
8    have a fiancée.
9         Q.    What is your fiancée's name?
10        A.    Tamsan, T-A-M-S-A-N.
11        Q.    What is her last name?
12        A.    Measroch.
13        Q.    Spell that.
14        A.    M-E-A-S-R-O-C-H.
15        Q.    What's your date of birth?
16        A.    I am drawing a blank right now.
17   January 30, I believe, '89.
18        Q.    January 30, 1989; is that
19   correct?
20        A.    That's correct.
21        Q.    What's your phone number?
22        A.    I don't have my phone with me.
23   I don't memorize numbers.
24        Q.    You didn't bring your phone
25   with you today?

```
                                          Page 12
 1                     C. STOJANOVICH
 2          A.    No.
 3          Q.    Where is your phone?
 4          A.    I think it is either in the car
 5   or it is in storage.
 6          Q.    How did you get to today's
 7   deposition?
 8          A.    What?
 9          Q.    How did you get to today's
10   deposition?
11          A.    I got down here via a vehicle,
12   a car.
13          Q.    Whose vehicle?
14          A.    It was a rental vehicle that I
15   was able to get at the last minute.
16          Q.    Where did you rent the vehicle
17   from?
18          A.    I don't know the rental
19   company.  I could look it up if you would
20   like.
21          Q.    Go ahead.  Did you bring an
22   iPad, a computer or anything with you
23   today?
24          A.    No, I didn't.
25          Q.    Did you bring any hard drives
```

1                    C. STOJANOVICH

2  with you today?

3         A.     I don't have any hard drives.

4  The hard drive that you asked about before,

5  when I went to go look for it, I didn't

6  have it, so I don't have anymore backup

7  drives, so that's kind of the difficulty

8  when I first brought that up with you.  I

9  told you that I would look for it when I

10  couldn't find it.  It was -- it has been

11  gone, so I haven't got a replacement drive

12  because I don't have a lot of data to back

13  up anymore.

14         Q.     Where does your girlfriend

15  live?

16         A.     My girlfriend is -- I don't

17  have a girlfriend, like I said before.  I

18  have a fiancée and she lives in -- she

19  lives in New York most of the time, but she

20  has been in California.

21         Q.     What's her address?

22         A.     I don't have her contact

23  details or information.

24         Q.     You don't know your fiancée's

25  address?  You realize that you are

Page 14

                    C. STOJANOVICH

1
2    testifying under oath?
3         A.    I don't have her address
4    registered.  She stayed with me at my old
5    apartment and since we have been between
6    places, it is kind of a new thing, so --
7         Q.    Is it your testimony under oath
8    today, and this testimony is going to be
9    shared with the federal court judge, that
10   you don't know your fiancée's address?
11        A.    Off the top of my head, I
12   don't.  I could look it up.  Like I said
13   before, I don't memorize these things.  I
14   basically have it stored in my phone or
15   written down in a book or something, that
16   is kind of like an address book, but I
17   don't memorize that stuff.
18        Q.    Do you live with your fiancée?
19        A.    I did, yeah.  Right now, I am
20   in between places, so it is kind of a
21   difficult thing.
22        Q.    When did you get engaged to
23   your fiancée?
24        A.    Last year.
25        Q.    What's your current address?

Page 15

1                    C. STOJANOVICH

2        A.    I am between places right now,

3    so I don't have a permanent address yet.

4        Q.    What's your temporary address?

5        A.    The last place I stayed at, I

6    believe, was 4545 Park Avenue.  I can pull

7    up -- the record is downstairs.  I can go

8    and see what it is because I'm in between

9    places.  I don't have a standalone address

10   right now.  I have been using digital

11   e-mail for any kind of communications and

12   storing everything at the postal office.

13       Q.    What's your e-mail address?

14       A.    My e-mail address -- I just

15   e-mailed you a little bit ago.  It is

16   Chetchet11.

17       Q.    What's your phone number?

18       A.    310-824-3903.

19       Q.    What provider do you use for

20   phone service?

21       A.    Verizon.  I'm trying to switch

22   over to a better provider, but Verizon is

23   what I got right now.

24       Q.    What are your sources of

25   income?

Page 16

C. STOJANOVICH

1

2    A.    Right now I am still sorting
3    that out.
4    Q.    Do you have any source of
5    income?
6    A.    Not right now, not at this very
7    moment.
8    Q.    Did you retain counsel in
9    California?
10   A.    Yes.
11   Q.    How did you pay them?
12   A.    That was before I moved.  When
13   I lost my space, it changed what it was.
14   Before that was paid through a deposit.
15   Q.    Right.  From what source?
16   A.    Just from revenue from the
17   business that I was running.
18   Q.    Was it from a bank account?
19   A.    Yes.
20   Q.    Okay.  What bank account?
21   A.    I think that it was -- now, I'm
22   not positive, but I think this was done
23   through my Capital One, but I'm not
24   positive on that.  It was quite a while
25   ago.  It was almost six months ago, so it

Page 17

C. STOJANOVICH

1

2     was kind of hard to remember how that was

3     transferred.

4          Q.    Was it paid by wire or by

5     check?

6          A.    I think it was actually -- I

7     think it was -- six months ago I think I

8     actually used my credit card that I had at

9     the time that I don't have right now.

10    Again, I think I had a credit card that I

11    used at the time.

12         Q.    Do you have your wallet with

13    you today?

14         A.    No.  I left everything

15    downstairs.

16         Q.    Where downstairs?

17         A.    I left everything, I think, in

18    the vehicle or it is either at the storage

19    location.

20         Q.    Where is your storage location?

21         A.    It is just one of those lockers

22    that you can get.

23         Q.    Now you recently moved out of

24    Duane Street?

25         A.    I wouldn't say recently.  It

```
                                    Page 18
 1              C. STOJANOVICH
 2   has been some time.  I have been
 3   transitioning out of that place since
 4   January.
 5        Q.    Did they pay you to leave?
 6        A.    They did.
 7        Q.    How much?
 8        A.    2800.
 9        Q.    Where did you put that money?
10        A.    I put that money -- I sent
11   money out and I put that money to
12   basically, you know, temporary space.
13        Q.    Where did you put that money?
14   Did you put it in an account?
15        A.    Yeah.  I did a deposit and then
16   I did the withdrawal part.  This is before.
17        Q.    Where did you deposit the
18   money?
19        A.    I think this was at RBC before
20   the account was closed.
21        Q.    That's Royal Bank of Canada?
22        A.    Yes.  It was Royal Bank of
23   Canada.  I think that's what it was --
24   yeah, Royal Bank of Canada.
25        Q.    When did you open that account?
```

Page 19

1                    C. STOJANOVICH

2      A.    December or -- December or

3  November.  I'm not sure exactly, but it was

4  at the end of the year, after --

5      Q.    Is that account closed or open?

6      A.    All closed.

7      Q.    What bank accounts do you have

8  now?

9      A.    Right now, I just have my --

10  let's see.  I have my Santander Bank right

11  now.

12      Q.    How much money is in that

13  account?

14      A.    I have $30 in that account

15  right now, to the best of my knowledge.  It

16  is still going through the opening process.

17      Q.    Where did you fund that account

18  from?

19      A.    Cash that I had.  I had $30, so

20  I put $30 in.

21      Q.    What other bank accounts do you

22  have?

23      A.    I have -- I think I just -- I'm

24  waiting on an opening approval from another

25  account and I think Citizens is coming in,

Page 20

                        C. STOJANOVICH

1
2    but I have -- I'm trying to think.
3    Santander is the one that I have right now.
4    That's the main account that I have right
5    now.  It is hard to find a bank.  I don't
6    have Morgan Stanley to use and I don't have
7    Capital One.
8        Q.    Why not?
9        A.    Because you have a subpoena in
10   it, I think.
11       Q.    Are those accounts frozen to
12   your knowledge?
13       A.    Yes, they definitely are.
14       Q.    Now, there is approximately 150
15   to $175,000 in Phoenix Data's account at
16   Morgan Stanley, are you aware of that?
17       A.    Yes.  I sent you over the
18   statement for that account.
19             MR. HARWICK:  For the record, I
20        did not receive that.
21       Q.    When did you send that?
22       A.    I sent it first on February
23   14th and I sent it again two days ago and I
24   sent it again today.  You haven't received
25   any of those e-mails?

Page 21

1          C. STOJANOVICH

2     Q.    No.   What was the source of the

3    funds in the Morgan Stanley account for

4    Phoenix Data?

5     A.    I would have to see.  I think

6    it may have been a wire transfer for a

7    purchase that I don't know.

8     Q.    Are you still in the

9    cryptocurrency business?

10     A.    I am segueing out of that

11    completely.

12     Q.    Are you still in the business

13    now?

14     A.    Nope.  I'm staying out of it

15    completely right now.  I am focusing

16    predominantly on entertainment and I'm

17    looking at education as a focus.

18     Q.    Do you own any cryptocurrency?

19     A.    I think that my coin base which

20    is closed has about $400 in cryptocurrency

21    in it, but I haven't got that sorted out

22    yet or why that's closed out or what the

23    issue is.

24     Q.    Other than that, do you own any

25    other cryptocurrency?

1                    C. STOJANOVICH

2        A.        I may have a few random coins

3    from before, but I don't know where they

4    would be.  I don't have -- my apartment had

5    a surge and basically fried all of my

6    systems and my two desktops in there are

7    fried and my laptop, that's fried.

8        Q.        What does your fiancée do for a

9    living?

10       A.        She is not working right now.

11       Q.        Do you have a job?

12       A.        That's what I'm working on

13   right now, kind of segueing over.

14       Q.        Do you have any source of

15   income right now?

16       A.        I answered that earlier.

17   Right now I don't have a source of income

18   or regular checks coming in.

19       Q.        Do you have a safety deposit

20   box anywhere?

21       A.        No, not that I know of.

22       Q.        Do you have any brokerage

23   accounts?

24       A.        Morgan Stanley is a brokerage

25   account, I believe.

                    C. STOJANOVICH

1

2      Q.    Do you work with an advisor

3   there?

4      A.    There is -- I don't know who my

5   advisor is now.  There was -- what was it?

6   DV something or DV something or other that

7   was on there.

8      Q.    Do you know a gentleman by the

9   name of Cunningham?

10     A.    Cunningham?  I don't know

11  anybody with the first name Cunningham.

12     Q.    Do you know a gentleman by the

13  name of Troy Cunningham?

14     A.    Troy works for Wattum,

15  W-A-T-T-U-M.

16     Q.    Did you defraud Mr. Cunningham?

17     A.    I am not going to go there.

18     Q.    Are you aware there is a

19  pending lawsuit against you in the Southern

20  District brought by Mr. Cunningham?

21     A.    I will talk to my counselors in

22  California about that.

23     Q.    Are you receiving the e-mails

24  that I sent to your new e-mail address?

25     A.    Chetchet11?

Page 24

1              C. STOJANOVICH

2      Q.    Yes.

3      A.    I got an e-mail earlier.   I

4  didn't get a response back.

5      Q.    Was that e-mail from me?

6      A.    Yeah.

7      Q.    So that's a valid working

8  e-mail address; is that correct?

9      A.    Excuse me?

10     Q.    Is that a valid working e-mail

11  address?

12     A.    Yes, Chetchet1122@gmail.com and

13  Chetchet11.

14     Q.    You can receive notices at that

15  e-mail; is that correct?

16     A.    I don't know if that means

17  notices as in -- can you be specific or

18  clarify?

19     Q.    Who is Paul Wu?

20     A.    Paul Wu?

21     Q.    Yes.

22     A.    Paul Wu is a stuntman that

23  works up in Vancouver.

24     Q.    Are you friends with him?

25     A.    Yeah.  He is a nice guy, a

Page 25

C. STOJANOVICH

1

2    really good guy.

3        Q.    Are you business associates

4    with him?

5        A.    Not at this moment.  We do talk

6    a lot, but -- we usually talk a lot.  It

7    has been a little bit of time.  He has been

8    very busy.

9        Q.    What's his number?

10       A.    I don't have my phone numbers,

11   as you well know.

12       Q.    Where is your phone again

13   today?  Is it down in your car?

14       A.    I think it is in my car or in

15   the storage --

16       Q.    Where did you park?

17       A.    Somewhere within like three

18   blocks.  I think it is on 44th, 45th --

19   maybe it is 47th.  I don't know.

20       Q.    How did you pay for parking?

21       A.    I haven't paid for parking.

22       Q.    How are you going to pay for

23   parking today when you leave?

24       A.    I have cash on me.

25       Q.    How much cash do you have on

Page 26

1                    C. STOJANOVICH

2    you?

3        A.    I don't know.  I think I have

4    got 60 bucks in my pocket.  I'm not sure,

5    maybe 65 or something.  I think I have

6    three 20s in here, $66, I think.

7        Q.    Now, you rented a car, but it

8    is your testimony under oath today that you

9    don't know the name of the rental company?

10       A.    I don't know.  It is a very

11   small rental company like a remote rental

12   car company.  It is not like Hertz or

13   Budget Or Enterprise or any of those

14   places.

15       Q.    Where is it located?

16       A.    It is located -- I think it is

17   located throughout the United States and

18   Canada.  It is like one of those rideshare

19   kind of places, kind of like a Zipcar, but

20   much smaller than that company.

21       Q.    Did you pay for that using a

22   credit card or did you have to put a

23   deposit down like a credit card?

24       A.    No, I don't have a credit card,

25   like I said.

```
                                      Page 27
 1                  C. STOJANOVICH
 2        Q.     You don't have any credit?
 3        A.     No.
 4        Q.     How did you pay for the rental?
 5        A.     That's one of those places that
 6   let's you rent with a debit.
 7        Q.     What debit card did you use?
 8        A.     I honestly don't know.  I would
 9   have to go to the rental agreement and I
10   don't have that with me.
11               MR. HARWICK:  We would request
12        a copy of the rental agreement and a
13        copy of the debit card that you used.
14        Q.     Where is the debit card tied
15   to, what bank?
16        A.     I am assuming it is in my
17   wallet.  I don't have that on me right now.
18        Q.     Where is your wallet?
19        A.     Like I said before, I think it
20   is either in the car or in the storage
21   thing.
22        Q.     Have you filed tax returns
23   within the last five years?
24        A.     The lawyers are still working
25   that out.
```

Page 28

                    C. STOJANOVICH

1
2        Q.      Have you filed tax returns
3    within the last five years?
4        A.      I don't know.  They are still
5    working that out.  That's not my purview.
6    I don't do my taxes directly.  I don't know
7    how to do them.
8        Q.      Have you signed tax returns
9    within the last five years?
10       A.      I sent them some paperwork, but
11   I don't have actual tax returns at my
12   disposal and I am waiting to here back how
13   it is going to work.  We were operating at
14   a loss for three years.
15       Q.      Have you filed a federal or
16   state personal tax return within the last
17   five years; yes or no?
18       A.      I don't -- I honestly don't
19   know because I haven't talked to my
20   counselor about that.  They are working
21   through that.
22       Q.      Who is your counselor?
23       A.      Mark.  You know him very well.
24       Q.      So it is your testimony that
25   Mark Riera is assisting you with your tax

```
                                        Page 29
 1                  C. STOJANOVICH
 2   returns?
 3        A.     The law firm is.
 4        Q.     The law firm is?
 5        A.     Yes, because we had -- it was a
 6   complicated situation with my taxes
 7   because --
 8        Q.     What's the complicated
 9   situation?
10        A.     The CPA before, the certified
11   public accountant before had passed away
12   prior to my filing and it was then brought
13   over to H&R in a desperate attempt to get
14   it sorted out, but they ended up losing all
15   of my paperwork, and I am still working
16   things out with my lawyers.  It is
17   complicated.  I don't fully understand it.
18   I am trying to, but they are giving me
19   guidance with that respect.
20        Q.     What attorneys are you working
21   with at Mark Riera's firm on your tax
22   returns?
23        A.     I have been talking to Bradford
24   Cohen a little bit on that side, but I
25   don't know exactly who is going to be doing
```

Page 30

                    C. STOJANOVICH

1
2    what in which capacity.  The law firm
3    pretty much handles that as a company and
4    then they determine who handles exactly
5    which aspect of --
6         Q.    How much of a retainer balance
7    do you have left at Mark Riera's firm?
8         A.    I don't know.
9         Q.    How much did you pay them up
10   front?
11        A.    30,000 so far, I think, maybe
12   more.
13        Q.    Where did you get the money for
14   that, Chet?
15        A.    The 30,000 was put on my credit
16   card before and that's how I was paying
17   him.  I was putting 5,000 on at a time.
18        Q.    Have any credit card companies
19   obtained judgments against you for unpaid
20   bills?
21        A.    Not that I know of.
22        Q.    What about American Express?
23        A.    I haven't talked to American
24   Express about that, but the last I spoke to
25   American Express, I was trying to sort out

```
                                          Page 31
 1                   C. STOJANOVICH
 2   exactly what had happened.  I paid them up.
 3   To the best of my knowledge, I paid them up
 4   and there was a credit due, but we are
 5   still working on that.
 6        Q.    When you left your Duane Street
 7   apartment, tell me exactly when you left
 8   that apartment.
 9        A.    I don't know the exact date,
10   but I started segueing out of that place in
11   January.
12        Q.    Were you being evicted from
13   that apartment?
14        A.    We had a dispute and they had
15   four complaints that they removed from the
16   system.
17        Q.    How much back rents do you owe
18   that landlord?
19        A.    I don't.
20        Q.    You owe them nothing?
21        A.    We settled things.
22        Q.    How much did you settle for?
23        A.    They paid me 2800.
24        Q.    When was the last time you paid
25   them rent before January 2022?
```

                    C. STOJANOVICH

1

2       A.    January -- January through

3   April -- I'm not really sure, somewhere in

4   that time in 2020.

5       Q.    In 2020?

6       A.    Yeah.

7       Q.    So you didn't pay rent for

8   approximately three-quarters of the better

9   part of the year; is that correct?

10      A.    They rejected my payments for

11  rent, so it ended up being a point of

12  contention.

13      Q.    What account were you trying to

14  pay them from?

15      A.    I don't remember.  That was

16  2020.

17      Q.    The Royal Bank of Canada

18  account, is that frozen, to your knowledge?

19      A.    No.  That's closed.

20      Q.    Okay.  What companies, LLCs,

21  corporations, businesses do you have an

22  ownership interest in presently?

23      A.    I honestly don't know.  There

24  has been a lot of filings through the

25  years.  I don't know what's open and what

```
 1                    C. STOJANOVICH
 2   is closed.  I would have to go and talk to
 3   SWIFT, the company.  I don't know how they
 4   spell it.  It is definitely not like the
 5   typical way that you would spell the word
 6   or maybe it is.  I don't know.  Everything
 7   looks strange online.
 8        Q.     Now, at one point recently you
 9   had offered to pay my clients in full for
10   their judgments; is that correct?
11        A.     Yeah.  We had a settlement
12   agreement in place and under the Section 55
13   or 52 or 56, around that area, we needed to
14   get a document from you guys to help
15   facilitate that inbound deposit to close
16   out the necessary funds to pay over to you
17   guys, but we were unable to find -- we
18   weren't able to get that documentation
19   signed and delivered to the bank so we
20   could do a deposit and settle up with your
21   clients, which I have wanting to do for
22   quite some time now.  It is definitely
23   getting in the way of settlement and for
24   this to be completed.  Unfortunately,
25   without that documentation it will be
```

Page 34

C. STOJANOVICH

1    impossible to get the funds in and out too,

2    so it is a gating issue and it is

3    unfortunate because I don't want anybody to

4    have to wait longer than they do to get

5    their funds.

6        Q.    So you have the money to pay

7    the judgments if you get this one document,

8    right?

9        A.    If we are able to get this

10   document, then I should be able to get the

11   funds transferred in and then transferred

12   out.

13       Q.    So I will ask you the question

14   again.

15            You have the money to pay the

16   judgments if you get this one document,

17   correct?

18       A.    If we get the document settled

19   and they release the inbound and outbound

20   on the accounts, there shouldn't be any

21   issue.  Although, it is becoming a gating

22   issue because it is risking the principal

23   because I can't get receivables in for

24   anything until that's done and the longer

Page 35

C. STOJANOVICH

1
2    that goes on, the higher the risk is that I
3    won't get the funds at all.
4        Q.    Let me ask you the question.
5    It is a yes or no question, okay?
6               You have the money to pay my
7    clients if you wanted so long as you get
8    one other document from them; is that
9    correct?
10       A.    I should be able to transfer
11   all of the funds into the account once that
12   document lifts the hold.  These holds have
13   been on there for some time and depending
14   on the bank right now, I don't know what
15   their policies are, but if this document is
16   done, I feel confident that we can get this
17   settled out.
18       Q.    What document are you referring
19   to?
20       A.    A document -- well, I think it
21   is a two-parter.  The motion document is
22   part of it.  The other part of it is the
23   release of the subpoena on the accounts.
24       Q.    So you need your accounts
25   unfrozen; is that correct?

1                    C. STOJANOVICH

2          A.    Yes.

3          Q.    What's the other document that

4    you need in order to pay my clients in

5    full?

6          A.    Well, according to the

7    agreement that they had, the appeal of the

8    motion.

9          Q.    I don't know what you are

10   talking about.  What motion?

11         A.    The motion for contempt.  It is

12   also causing an issue because that's an

13   outstanding thing and it really does cause

14   issues with banks then they see that there

15   is a motion for contempt.  They want to

16   stay away from stuff like that.

17         Q.    Who told you that, Chet?

18         A.    Virtually every banker that I

19   have spoken to.

20         Q.    Who was the last banker that

21   you spoke to that said that the contempt

22   motion was an obstacle for you paying my

23   clients what you owe them?

24         A.    That's not what they said.

25   They said it is an obstacle when banking

```
                                         Page 37
 1                    C. STOJANOVICH
 2   with people.
 3        Q.    So if your accounts were
 4   unfroze and we vacate the contempt motion
 5   and/or abandon the contempt proceeding,
 6   then you can pay my clients; is that
 7   correct?
 8        A.    I feel confident it would go
 9   through.
10        Q.    Okay.  Where are you going to
11   get the money from, Chet?
12        A.    Well, there are a couple of
13   options that I have right now, but right
14   now I don't want to go into too much
15   without risking the actual principle by
16   talking without a public record, but there
17   is one option that I have right now that I
18   am confident that will go through and I
19   think we can go ahead and close that out.
20   There is a paid service that we have that
21   we would be able to go and extend and that
22   would cover the difference.
23        Q.    I'm sorry, what was the last
24   part that you said?
25        A.    That would cover the difference
```

Page 38

```
 1              C. STOJANOVICH
 2  that's needed.
 3      Q.    So you have access to funds
 4  somewhere; is that correct?
 5      A.    No.  It is not that I'm sitting
 6  on funds and not wanting to move forward.
 7  It is that I have access to bring in
 8  revenue which would cover the difference.
 9      Q.    How are you going to bring in
10  revenue to cover over a million dollars
11  worth of judgments?
12      A.    There are services that a third
13  party has that's well established that I
14  can go ahead and provide and it is a nice
15  way to go ahead and get the services
16  provided for one party and also get the
17  funds for another party.
18      Q.    You will have to explain that
19  to me because it sounds like you have
20  access to funds, but you are not paying
21  them over.  I want to know who the third
22  party is and explain how you propose to pay
23  these judgments.
24      A.    Simply we would provide
25  services to another person who would get
```

```
 1              C. STOJANOVICH
 2   that through an established first party,
 3   somebody that is well known and respected
 4   and trusted and they would go ahead and in
 5   turn pay us the servicing fee and we would
 6   out of our revenue profit base, after our
 7   costs, would pay that amount to the
 8   clients.  It is not that complicated.  It
 9   is like revenue in any business.  You are a
10   lawyer.  You charge for that and you have
11   your fees and your hard costs and your
12   office.  Once those are deducted, then the
13   rest of the fees go to a profit base and
14   anything after costs or costs incurred or
15   bills and so on would then go to what you
16   call your profit or what you report as your
17   profit and file with the IRS for taxes,
18   just like any business works and then you
19   provide the services and then you put the
20   profit in a separate account and utilize it
21   for whatever things you need to do.
22       Q.    What services are you going to
23   provide that's going to be worth a million
24   dollars?
25       A.     There are a lot of services
```

Page 40

C. STOJANOVICH

that you could provide.  Consultation

services.  There are a few third-party

companies.  They could provide valuable

hosting services and also provide access to

space.  There is also media that you can do

from that standpoint, media encoding.

There is a lot of stuff that's out there

that can be really valuable, especially in

this day and age and right now there is a

great demand for it, so it is something

that takes times and it usually takes time.

We believe that it is going to move forward

very, very quickly, but that's what we

thought at the start of the month, but we

are still waiting on that.

        Q.    Do you have anything in the

works?

        A.    That's precisely what we are

trying to do right now.

        Q.    What do you mean by that?

        A.    That's precisely what we are

trying to finish right now.

        Q.    Have you reached out to

potential customers to provide services to

Page 41

1                          C. STOJANOVICH
2    them?
3          A.     Customers have reached out to
4    us, but yeah.
5          Q.     Is Troy Cunningham one of your
6    customers?
7          A.     No.  Troy is not one of my
8    customers right now.  Troy and I had a bit
9    of a falling out and we are not doing any
10   business together right now.
11         Q.     What business were you in
12   together?
13         A.     Well, I was a customer at
14   Wattum.
15         Q.     Can you spell that?
16         A.     Yeah.  I spelled it at the
17   beginning of the deposition.  It is
18   W-A-T-T-U-M.
19         Q.     What kind of company was that?
20         A.     It is a hosting company.  They
21   also do hardware resales.
22         Q.     When were you last involved
23   with Wattum?
24         A.     Well, I actually heard from
25   them the other day.  I'm still waiting.  It

```
                                        Page 42
 1                  C. STOJANOVICH
 2   has been three and a half months for
 3   services that I paid for that have been
 4   rendered.  I don't know what that's about,
 5   but I inquired about it again.  A lot of
 6   the spaces here sometimes, you know, it is
 7   hard to calculate electricity.  People come
 8   up short or they make mistakes and overbook
 9   like a hotel does and that can lead to
10   outages of service or not enough vacancy,
11   if you will, and it is a pretty common
12   things that could happen with the locations
13   as opposed to level 3 data centers.  Level
14   3 data centers don't make that mistake
15   usually.
16        Q.    Does anybody owe you money?
17        A.    Yeah, up north in Canada.
18        Q.    Have you been to Canada lately?
19        A.    I have.  I was trying to settle
20   the money that I was owed for the very
21   purpose of the settlement.
22        Q.    Where did you go in Canada?
23        A.    I went up to or back to go to
24   Bitfarms and tried to get what we are owed
25   in terms of hardware and money.
```

```
                                        Page 43
 1                    C. STOJANOVICH
 2        Q.     What happened?
 3        A.     I'm still -- it has been a
 4   lengthy process going back and forth with
 5   them.
 6        Q.     Do you have any plans to move
 7   to Canada?
 8        A.     Not right now.
 9        Q.     Did your fiancée tell Paul Wu
10   you were moving to Canada?
11        A.     We are considering Montreal,
12   but it is not something we are going to do
13   right now.  Maybe down the line, maybe in a
14   couple of months.  Staying up there is
15   nice, but I do not like to leave New York.
16   Unfortunately, I don't have a lot of
17   options right now and until I find a place,
18   I will be going back and forth just to get
19   this settled out.
20        Q.     When you leave here today,
21   where are you going to sleep tonight?
22        A.     I'm not sure yet.  I don't know
23   when I'm leaving yet and I don't know what
24   the timeline looks like.
25        Q.     If you get out of here by 3:00,
```

Page 44

```
 1                    C. STOJANOVICH
 2   where are you going to go next?
 3        A.    I have to look it up.  I have
 4   to find it.
 5        Q.    You don't have a place to stay
 6   tonight?
 7        A.    No because I don't know what my
 8   day is going to be like with today's
 9   deposition.
10        Q.    Do you have an apartment
11   anywhere?
12        A.    I mean unless you call hotels
13   apartments, but --
14        Q.    I'm sorry?
15        A.    Unless you call a hotel an
16   apartment.
17        Q.    What hotel are you staying at?
18        A.    Well, I'm saying I have stayed
19   at hotels, but they are not really
20   apartments.
21        Q.    Do you have a hotel tonight?
22        A.    No, I haven't booked it yet.
23        Q.    Where did you come from today?
24        A.    I came from upstate.  You know
25   that.  I was in upstate by Chestertown.
```

Page 45

C. STOJANOVICH

1

2      Q.     Where?

3      A.     Upstate by Chestertown.   I

4   don't know.   There is not a lot out there.

5   You know that.

6      Q.     Were you at somebody's house?

7      A.     Nope.

8      Q.     Were you at a hotel?

9      A.     I was out there for a while

10   trying to get the -- my vehicle broke down

11   on Monday, which I notified John Harwick of

12   because I wanted to see if we could go

13   ahead and do this a little bit closer to

14   where I was while I was sorting through the

15   issues of the logistics of the breakdown,

16   and unfortunately, I was tied up all week

17   dealing with this nonsense and I ended up

18   having a little bit of luck.   I was able to

19   rent a vehicle and I was able to get down

20   here, a separate rental vehicle --

21      Q.     Try to listen to my question.

22   My clients unfortunately have to pay for

23   this, so try to listen to my question and

24   answer it.   Here is the question again.

25             Where are you staying in

Page 46

C. STOJANOVICH

2   Upstate New York?

3       A.    I'm not staying anywhere right

4   now.  I don't have anywhere settled, per

5   say.

6       Q.    Okay.  Where did you stay when

7   you were in Chestertown?

8       A.    I didn't stay in Chestertown.

9   That's where the car was stranded.  I

10  wasn't staying in Chestertown.  I have been

11  between like Plattsburgh, Chestertown.  I

12  was up in Montreal for a day.  I am not

13  staying in one place right now.

14      Q.    Okay.  Where did you sleep last

15  night?

16      A.    In the car.

17      Q.    Where did the sleep the night

18  before that?

19      A.    I think it was a night in

20  Montreal.

21      Q.    Where did you stay in Montreal?

22      A.    I was -- I think it was

23  downtown somewhere.  It is one of their

24  buildings they have down there, one of

25  their rental buildings, a hotel, Airbnb

Page 47

1                C. STOJANOVICH

2    kind of things.

3        Q.    What is the name of it?

4        A.    Honestly, I don't know.  When

5    you stay in this many places between places

6    you don't keep track of everything.

7        Q.    How did you pay for that?

8        A.    With money, the same way that

9    you --

10       Q.    With cash or debit card?

11       A.    Honestly, I don't pay attention

12   that closely to how I process payments.  I

13   don't want to be dishonest about what I'm

14   doing, so I would have to go ahead and look

15   that up.  If it is a very important

16   question to you, then I will find an

17   answer.

18       Q.    What would you have to look at,

19   Chet?

20       A.    I would have to look up how I

21   paid for it.  I don't want to bear false

22   witness and sit here and lie.

23       Q.    What would you have to look at,

24   Chet?

25       A.    I would have to go look and

Page 48

1                    C. STOJANOVICH
2    see, go online and see what the payment or
3    how the payment was made.
4         Q.    What would you look at online,
5    Chet?
6         A.    Go to like Airbnb or Expedia or
7    whatever venue that I was using, which I
8    don't know what that is because I don't
9    have a reference point nor do I have a
10   phone or a computer with me, so there is no
11   way to know that.  Is this really important
12   for you to know, like where I was staying
13   and how I paid for the place?  It is a
14   hotel.
15        Q.    I want to know where your bank
16   account is, Chet, so I can freeze it.
17   Where is your bank account?
18        A.    My bank account, like I told
19   you before, I have one account at RBC and
20   that bank account closed.  I have the
21   Santander account.  That's the only other
22   account that I have right now that's
23   active.  I don't have any other debit
24   cards, so it is literally that simple.  It
25   is not that complicated.  I told you the

1                    C. STOJANOVICH
2    banks that I have.  I'm not going to tell
3    you a different answer.
4         Q.    So it is your testimony that
5    the only banks that you have right now are
6    Santander, correct?
7         A.    Santander and I have RBC, as
8    you well know.  That's closed and then I
9    have the frozen accounts over at Capital
10   One and JPMorgan, all of which I am trying
11   to make sure are unfrozen, so I can pay
12   your clients the full amount.
13        Q.    I still don't understand how
14   you are going to get a million dollars to
15   pay my clients.  You are going to work for
16   that money and provide consulting services
17   and then pay them; is that your testimony?
18        A.    What I am saying is between
19   providing consulting services and getting
20   in touch with other third-party companies
21   that can provide the necessary services
22   that they need especially things that --
23   there are companies that provide housing
24   services, like data center services that we
25   have knowledge of that help people get into

Page 50

1                 C. STOJANOVICH

2   the necessary space that they need to, that

3   we know are reputable that we can trust.

4   That's the most important things because we

5   want to get them a space where they can go

6   ahead and expand and grow and we

7   basically --

8        Q.    Already, Chet.  When you say

9   "we", who are you referring to?

10       A.    We as in the proverbial, we as

11   in a company.

12       Q.    As in you?

13       A.    No.  The company, not the

14   proverbial --

15       Q.    Well, what companies are you

16   referring to, Chet?

17       A.    There are a lot of companies

18   out there that provide these kind of

19   services.  You look at a company that --

20       Q.    Well, you say we provide

21   services.  My question, Chet, was when you

22   say we can provide services --

23       A.    I'm talking about the space

24   itself.  When I say, you know, services we

25   could provide as in people that work in the

Page 51

                    C. STOJANOVICH

1

2   space of providing services, so Equinox,

3   stuff like that, like companies like

4   Internap, companies like that, very big

5   companies, established.

6        Q.    What computers do you own,

7   Chet?

8        A.    Right now I don't even know if

9   I have a functional laptop because of what

10  happened.  I think most of that stuff has

11  been chocked up.  I have to figure out if I

12  even have a warranty.

13       Q.    Here is the question again,

14  Chet.  What computers do you currently own?

15  List them for me.

16       A.    I had a MacBook.  That's dead.

17       Q.    I don't want to know about

18  MacBooks that are dead.  I want you to list

19  for me on the record under oath what

20  computers, tablets or phones you currently

21  own or have access to.

22       A.    Well, I have one and you don't

23  want to hear about anything that was

24  affected by the power surge?  For a point

25  of clarity, you don't want to hear anything

Page 52

```
 1                    C. STOJANOVICH
 2    that -- are you there?
 3        Q.    Here is the question again.  It
 4    is not that difficult.  List for me the
 5    phones, tablets, computers, laptops or hard
 6    drives you currently own or have access to.
 7        A.    Okay.  Well, like I said
 8    before, I had a power surge at my place
 9    which burned out most of my equipment, so I
10    don't have any desktops left.  The only
11    thing I have is my -- I have to see if I
12    can get it working with Apple, but the
13    Apple warranty is no longer on it.  I had
14    an Apple laptop and then I had a black --
15        Q.    Not what you had, Chet.  Here
16    is the question one more time.
17        A.    It is not gone.  I have it.  It
18    is just not working right now.
19        Q.    Stop.  I'm going to give you
20    some instructions.  I want you to list for
21    me each computer, laptop, hard drive, phone
22    or tablets that you currently own or have
23    access to, whether or not they are working.
24    I want you to list them for me.
25        A.    Working or not?
```

```
                                        Page 53
 1                  C. STOJANOVICH
 2      Q.     Correct.
 3      A.     That's what I was asking.  So I
 4  have my cell phone, which I have a Nokia
 5  right now.  I have an old Galaxy somewhere.
 6  I have to find out where it is.  I'm not
 7  really sure where it is at.  I have two
 8  laptops, a Windows and a Mac and neither
 9  one of them is properly working, of course.
10  I'm still trying to get the data retrieved
11  or see if I can even fix them and then I
12  had a desktop and that desktop is not
13  working right now and it is burnt out, so I
14  don't even know if it is worth selling.
15      Q.     Any other computers, laptops
16  desktops, tablets or phones that you
17  currently own or have access to; yes or no?
18      A.     Not that I can think of right
19  now.
20             MR. HARWICK:  We are going to
21         request that those devices be
22         produced for forensic examination.
23         We will give you a time and date for
24         that production.  That production
25         will be in New York City unless you
```

```
 1              C. STOJANOVICH
 2         are telling me you are living
 3         somewhere else.
 4         Q.    Where would we call your
 5    residence these days?
 6         A.    I said I am between places.
 7    Hard to say.
 8         Q.    Does your fiancée have her own
 9    apartment?
10         A.    No.  She doesn't have an
11    apartment.  She lives with her family when
12    she is not with me.
13         Q.    Where does her family live,
14    Chet?
15         A.    I think her dad lives in -- he
16    is in the Los Angeles ares.
17         Q.    When was the last time you saw
18    her?
19         A.    I saw her the day before
20    yesterday.
21         Q.    Where?
22         A.    Here.
23         Q.    In New York City?
24         A.    Not in New York City -- in New
25    York.
```

Page 55

1                  C. STOJANOVICH

2      Q.      Where in New York?

3      A.      We also were in Montreal a few

4  days before that too.

5      Q.      Does she have a Facebook page?

6      A.      I don't know.  I don't deal

7  with Facebook or that stuff.  I'm sure -- I

8  think almost every girl has one, but I

9  don't know what she does with it.

10     Q.      Do you own any stocks?

11     A.      I have no idea.  I know Morgan

12  Stanley has not done any trades and that's

13  the brokerage account that I have.  I don't

14  have any other brokerage accounts to my

15  knowledge.  I checked to see if there is

16  anything out there.  I don't have the app

17  that I used to have, but there was an app

18  that I had that put out the stocks that I

19  had.  They are either negligible or next to

20  nothing.

21     Q.      Are you willing to turn over

22  the money in the Morgan Stanley account to

23  partially satisfy their judgment?

24     A.      I am looking to fully satisfy

25  the settlement.

```
                                        Page 56
 1                  C. STOJANOVICH
 2      Q.    Are you willing to turn over
 3  the money in the Morgan Stanley account to
 4  my clients to partially satisfy their
 5  judgments now?
 6      A.    That's not in line with the
 7  settlement agreement.  I said I would
 8  settle the full settlement.
 9      Q.    The answer is no?
10      A.    Well, it is not no.  It is a
11  little more complicated than that.
12      Q.    It is actually not.  You can
13  authorized the wire of that money to my
14  account and that would partially satisfy my
15  client's judgment.  Are you willing to do
16  that voluntarily or do I need to get the
17  sheriff involved?
18      A.    No.  I just need to be able to
19  open the account to do transfers.
20      Q.    I can authorize the unfreezing
21  of that account for that specific purpose.
22  Are you willing to do that; yes or no,
23  Chet?
24      A.    Well, once we get the
25  documentation, I would be more than happy
```

1                    C. STOJANOVICH
2    to satisfy the full judgment.
3        Q.    And you are going to satisfy
4    the full judgment by trying to provide
5    consulting services to third parties and
6    other things like that?  You don't have the
7    money now; is that correct?
8        A.    Well, I don't have the money in
9    my account right now because I can't move
10   anything around with my banks.  You froze
11   up my bank accounts.
12       Q.    Right.  Where would you move
13   the money from to satisfy my client's
14   judgment?
15       A.    Well, I would be paid for
16   basically services.
17       Q.    Okay.  So you would earn the
18   money to satisfy my client's judgment; is
19   that correct?
20       A.    Yeah.
21       Q.    Right, but you don't have a
22   million dollars -- Chet, this is a yes or
23   no question.  Currently sitting here today,
24   do you have access to a million plus
25   dollars to satisfy my client's judgments;

Page 58

```
 1                    C. STOJANOVICH
 2   yes or no?
 3        A.     In revenue I can bring in a
 4   million dollars.
 5        Q.     Do you have it today; yes or
 6   no?
 7        A.     Do I have it in my pocket
 8   today?
 9        Q.     Not in your pocket.  Do you
10   have access to it in some account or in
11   some form?
12        A.     No.  I'm not holding it in some
13   secret account that I am not telling you
14   about.  It is literally something that I'm
15   waiting to come in.
16        Q.     Where is it coming in from?
17        A.     It is going to be coming in
18   from any number of clients.
19        Q.     Do you have contracts now with
20   these clients?
21        A.     Well, it is nothing that I can
22   execute right now because I don't have the
23   ability to take in revenue.
24        Q.     This is a yes or no question.
25   Remember, you are under oath, Chet.  This
```

Page 59

1                    C. STOJANOVICH
2    will be read to the federal court judge.
3    Do you have contracts with clients now?
4         A.    I can't execute a contract with
5    a client in good faith while I have a
6    subpoena on my account so I won't do that
7    with them until we have this lifted.
8         Q.    You can't open up a new account
9    somewhere?
10        A.    I spoke to you about this
11   before.  Opening new accounts and trying to
12   transfer over 7 figures will cause some
13   serious issues with transfers and it can
14   get them held up for weeks on end, even
15   months.  I will not go ahead and do that
16   when multiple banks told me that when you
17   transfer that kind of money without a prior
18   history --
19        Q.    What money are you going to
20   transfer, Chet?  I am confused.  Try to
21   explain that to me.  You don't have money
22   to transfer now; is that correct?
23        A.    I didn't say that at all.  What
24   I was saying right now was that I have this
25   already lined up.  I have been waiting to

1                   C. STOJANOVICH

2   go ahead and move forward, but I cannot do

3   that in good faith and ethically speaking,

4   and I don't know about legally speaking

5   because I won't be able to execute it, so

6   long as I have holds on my accounts.  It is

7   really simple.

8          Q.    So you think that if we lift

9   the hold on your account, you would be able

10  to enter into this new business

11  relationship, earn a million dollars and

12  pay off my clients; is that what you are

13  saying?

14         A.    Yup.

15         Q.    Well, when did you open up the

16  Santander account?

17         A.    Last week.

18         Q.    So you can open up a new

19  account, right?

20         A.    It is a personal checking

21  account, but I can't put this through a

22  personal checking account.

23         Q.    I'm sorry?  What about a

24  personal checking account?

25         A.    A personal checking account I

Page 61

C. STOJANOVICH

1

2 don't use for business.

3     Q.    Well, since we obtained a

4 judgment against you, you created and

5 formed and operated under Phoenix Data;

6 isn't that true?

7     A.    There was three parts to that.

8 Could you clarify?

9     Q.    When did you open up Phoenix

10 Data?

11     A.    I don't know the exact date.  I

12 would have to look that up.

13     Q.    It was after we got a judgment

14 against you, correct?

15     A.    What was that?

16     Q.    It was after we obtained a

17 judgment against you, correct?

18     A.    I don't know.

19     Q.    Do you know what jurisdiction

20 that was formed in?

21     A.    No, I don't have the filing

22 documents or the Articles of Incorporation.

23 I don't have any of that information.

24     Q.    But you have access to them

25 online; is that correct?

```
                                              Page 62
 1                    C. STOJANOVICH
 2        A.    I would have to check.
 3        Q.    Is that through SWIFT?
 4        A.    I think it was SWIFT.  I'm not
 5   sure.  I would have to check.  I don't want
 6   to speak out of turn.  Any of these answers
 7   I am more than happy to answer.  I just
 8   need to have the appropriate time to go
 9   ahead and do the homework.
10        Q.    Is there a company called
11   Phoenix Investments, as well?
12        A.    Phoenix Investments?  I think
13   that was something that we were trying to
14   move forward with, but it didn't work.  I
15   don't know if it was ever filed.
16        Q.    Does it have a website?
17        A.    I don't know.  Someone was
18   doing some web development.  I don't know
19   if they actually created a page for it or
20   not, but they were doing web development
21   with a couple of different brands.
22        Q.    Were you involved in Phoenix
23   Investments?
24        A.    I don't even know if Phoenix
25   Investments was ever launched.
```

1                  C. STOJANOVICH

2      Q.    Did that have an address of 100

3  Wall Street, New York?

4      A.    Like I said, how could I

5  possibly know that question when I just

6  answered the previous question?  I don't

7  know.  I don't know enough about it to go

8  ahead and speak with absolute confidence

9  and validity.

10      Q.    When was the last time you

11  talked to your mother?

12      A.    I don't know.  It has been

13  months.

14      Q.    I'm sorry?

15      A.    It has been months.  Are you

16  talking about my biological mother?

17      Q.    Yes.

18      A.    It has been a long time.  Why?

19      Q.    Were you talking about your

20  stepmother when you said you talked with

21  your mother a few months ago?

22      A.    No.  That's why I was trying to

23  get clarity.  My father raised me.  My

24  mother wasn't really in the picture when I

25  was younger, so when you say mother, I need

```
                                    Page 64
 1                 C. STOJANOVICH
 2   a little more specificity.
 3        Q.    Has any of your family members
 4   reached out to you to notify you that they
 5   have been subpoenaed in this case?
 6        A.    No way.
 7        Q.    What's your mother's name?
 8        A.    Suzanne.
 9        Q.    What's her last name?
10        A.    I don't know if she still uses
11   her husband's name or her ex-husband's name
12   or not, but it was Berman before.
13        Q.    What's her address?
14        A.    I have no idea.  I don't think
15   I have that written down somewhere.  I
16   haven't seen my mom in over three years
17   now.  I think it has been since before
18   2019, like right around early 2019 because
19   since COVID started, it has been very hard
20   to travel.
21        Q.    Have you filed for bankruptcy?
22        A.    No.
23        Q.    Are you aware of any criminal
24   proceedings that have been commenced or
25   started against you?
```

C. STOJANOVICH

1

2          A.      I haven't had any confirmed.

3          Q.      Okay.  Have you heard of

4     possibilities?

5          A.      From you.

6          Q.      Have you ever been contacted by

7     the FBI?

8          A.      Not to my knowledge.  I talked

9     to the FBI to help them out and stuff

10    before, but it never materialized into a

11    real conversation.

12         Q.      Who did you talk to at the FBI?

13         A.      I don't think you heard what I

14    said.  It didn't materialize into a full

15    conversation.  I offered to help them out.

16         Q.      Have you ever been interviewed

17    by Special Agent Blair Deil from the FBI?

18         A.      No, I haven't been interviewed

19    by them, but I offered to help him.

20         Q.      Would you be willing to give

21    the FBI a statement?

22         A.      Absolutely not.

23                 MR. HARWICK:  Okay.  It is

24             12:30 and we have been going for

25                about an hour, so let's take a break.

Page 66

```
 1                   C. STOJANOVICH
 2              What I want you to do during
 3         the break, Chet, is I want you to go
 4         down to your car or storage locker
 5         and get your phone, whatever
 6         paperwork you have with you today
 7         that.
 8              THE WITNESS:  I don't have any
 9         paperwork with me today.  I didn't
10         bring anything with me.
11              MR. HARWICK:  Go get your phone
12         and your wallet and we will come back
13         at noon.  That's going to give you
14         enough time to get that.
15              THE WITNESS:  What time is it
16         now?  You said come back at noon?
17              MR. HARWICK:  Or before, if you
18         can get back before then.
19              THE COURT REPORTER:  It is
20         12:30.
21              MR. HARWICK:  Oh, I'm sorry.
22         Strike that.  We will come back at
23         1:00 and I want you to bring your
24         phone with you and your wallet and
25         any other financial documents or
```

```
                                        Page 67
 1                    C. STOJANOVICH
 2         computers or anything that you have
 3         with you in your car.
 4              THE WITNESS:  I don't.
 5              MR. HARWICK:  I want you to
 6         take a picture of the license plate
 7         of your car and you have the rental
 8         agreement in the car or some
 9         insurance info in the car, don't you?
10              THE WITNESS:  I think it is
11         done digitally, but I can check and
12         see.
13              MR. HARWICK:  So bring that all
14         back with you.  We will take a break
15         until 1:00, okay?
16              THE WITNESS:  Until 1:00?  I
17         don't think you understand how far
18         away this stuff is.
19              MR. HARWICK:  Come back when
20         you come back.
21              What did you just pick up
22         there, Chet?  What was that?
23              THE WITNESS:  This is my
24         medicine.
25              MR. HARWICK:  What kind of
```

Page 68

```
 1                    C. STOJANOVICH
 2        medicine?
 3              THE WITNESS:  My medicine for
 4        my CMT -- my neuropathy.
 5              MR. HARWICK:  Why don't you go
 6        to your car and bring back with you
 7        any documents that you have that are
 8        in response to my subpoena or demands
 9        including the rental agreement or any
10        information that you have about the
11        rental car that you have.  I want to
12        see your phone and I want to see your
13        wallet, okay?  What else is in your
14        car?
15              THE WITNESS:  I have my wallet
16        in my car.  There is not much in it.
17        It has my driver's license -- well,
18        not my driver's license.
19              MR. HARWICK:  Is your
20        girlfriend or fiancée with you today?
21              THE WITNESS:  No.  We are
22        apart.
23              MR. HARWICK:  I'm sorry?
24              THE WITNESS:  We are apart.
25              MR. HARWICK:  Where is she
```

Page 69

```
 1              C. STOJANOVICH
 2      today?
 3           THE WITNESS:  I don't know.  We
 4      are just doing a little break right
 5      now.
 6           MR. HARWICK:  Okay.  Go down
 7      and get your phone, Chet.  Get your
 8      wallet.
 9           THE WITNESS:  I can get my
10      phone.  I don't have anything else
11      with me, so I don't know what else I
12      am supposed to bring.
13           MR. HARWICK:  Well, you have
14      your wallet.  I want to see your
15      wallet.  Bring it all back.
16           THE WITNESS:  Fine.
17           MR. HARWICK:  Let's adjourn
18      until 1:00, please.
19           THE VIDEOGRAPHER:  We are going
20      off the record at 12:33 p.m.
21           (Whereupon, a short recess was
22      taken.)
23           THE VIDEOGRAPHER:  Back on the
24      record at 1:30 p.m.
25           MR. HARWICK:  Again, this is
```

Page 70

1                    C. STOJANOVICH

2        John Harwick.  We are back on the

3        record.  The time is now 1:31 p.m.

4            We had taken a break from this

5        deposition at approximately 12:30

6        p.m. to allow Mr. Stojanovich to go

7        to his rental car, get a copy of his

8        rental agreement, a copy of his --

9        not get a copy, but rather retrieve

10       his wallet and to also retrieve his

11       phone, which we intended to examine

12       as part of this deposition along with

13       his wallet.  The time is now 1:31.

14       Mr. Stojanovich has not come back and

15       we made it expressly clear on the

16       record that we were to begin again at

17       1:00 p.m.

18           For the record, I did try

19       calling his number that he had given

20       us on the record here.  That number

21       is area code 310-824-3903.  When I

22       dialed that number, it rang and rang.

23       It went to voicemail and the

24       voicemail box was full, so I was

25       unable to leave a message.

Page 71

```
 1            C. STOJANOVICH
 2            I will attempt to continue this
 3       deposition via communication through
 4       Chet by phone and e-mail and we will
 5       be pursuing the remedy of civil
 6       and/or criminal contempt for his
 7       failure to comply with the court's
 8       directive with the lawfully issued
 9       subpoenas and with the other requests
10       that I have made at this deposition
11       and at his former deposition.
12            So with that, we are going to
13       close this record.  I would ask the
14       videographer to confirm that
15       Mr. Stojanovich is not in the room;
16       is that correct?
17            THE VIDEOGRAPHER:  No, he is
18       not in the room.
19            MR. HARWICK:  Okay.
20            Would it be possible for you to
21       go and check the waiting room
22       outside?  I'm not familiar with the
23       offices, but is there a waiting room
24       to see if he is out in the hall or
25       anything?
```

Page 72

```
 1                    C. STOJANOVICH
 2              THE VIDEOGRAPHER:  Yeah, I will
 3         take a look.
 4              MR. HARWICK:  Let's just allow
 5         for that and we will go off the
 6         record for now.
 7              (Pause.)
 8              THE VIDEOGRAPHER:  He is not
 9         there.
10              MR. HARWICK:  So you have gone
11         out in the hallway in the waiting
12         area and you were unable to locate
13         Mr. Stojanovich?
14              THE VIDEOGRAPHER:  Yes.
15              MR. HARWICK:  Again, what's
16         your name for the record?
17              THE VIDEOGRAPHER:  Matthew
18         Chin-Quee.
19              MR. HARWICK:  What company are
20         you with?
21              THE VIDEOGRAPHER:  Veritext.
22              MR. HARWICK:  Got it.  Great.
23         We will conclude.
24              I am reserving our rights and I
25         thank everybody for participating.
```

Page 73

1                    C. STOJANOVICH

2              THE VIDEOGRAPHER:  This marks

3        the end of the deposition.  We are

4        going off the record at 1:34 p.m.

5              (Whereupon, at 1:34 P.M., the

6        Examination of this witness was

7        concluded.)

8

9            °          °          °          °

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 74

1              C. STOJANOVICH
2          D E C L A R A T I O N
3

4      I hereby certify that having been
5  first duly sworn to testify to the truth, I
6  gave the above testimony.
7

8      I FURTHER CERTIFY that the foregoing
9  transcript is a true and correct transcript
10 of the testimony given by me at the time
11 and place specified hereinbefore.
12
13
14

                   _____
15                     CHET STOJANOVICH
16
17

18 Subscribed and sworn to before me
19 this _____ day of _____ 20___.
20
21

   _____
22     NOTARY PUBLIC
23
24
25

Page 75

1                    C. STOJANOVICH

2                  E X H I B I T S

3

4    EXHIBIT    EXHIBIT                        PAGE

5    NUMBER     DESCRIPTION

6    (None)

7

8

9                    I N D E X

10

11   EXAMINATION BY                           PAGE

12   MR. HARWICK                              5

13

14     INFORMATION AND/OR DOCUMENTS REQUESTED

15   INFORMATION AND/OR DOCUMENTS       PAGE

16   Copy of the rental agreement and a copy of

17   the debit card                     27

18   Devices be produced for forensic

19   examination                        53

20

21

22        QUESTIONS MARKED FOR RULINGS

23   PAGE LINE QUESTION

24   (None)

25

Page 76

```
 1                    C. STOJANOVICH
 2              C E R T I F I C A T E
 3

 4   STATE OF NEW YORK        )

                             :  SS.:
 5   COUNTY OF NASSAU          )

 6

 7        I, CATHY LEONE, a Notary Public for
 8   and within the State of New York, do hereby
 9   certify:
10        That the witness whose examination is
11   hereinbefore set forth was duly sworn and
12   that such examination is a true record of
13   the testimony given by that witness.
14        I further certify that I am not
15   related to any of the parties to this
16   action by blood or by marriage and that I
17   am in no way interested in the outcome of
18   this matter.
19        IN WITNESS WHEREOF, I have hereunto
20   set my hand this 14th day of March 2022.
21

22                    Cathy Leone
23
                      CATHY LEONE

24

25
```

Page 77

ERRATA SHEET

VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Holmes, Alex  v. Chet Mining Company LLC, Etal
DATE OF DEPOSITION: 3/4/2022
WITNESSES' NAME: Chet  Stojanovich

| PAGE | LINE (S) | CHANGE | REASON |
|------|----------|--------|--------|
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |

_____

Chet  Stojanovich

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF _____, 20__.


_____        _____

(NOTARY PUBLIC)                MY COMMISSION EXPIRES:

**&**

**&** 3:17

**0**

**04448** 1:7

**1**

**1** 3:17 4:19
**100** 63:2
**11:35** 1:13 4:18
**12305** 2:6
**12:33** 69:20
**14th** 20:23 76:20
**150** 20:14
**16th** 1:20
**175,000** 20:15
**1989** 11:18
**19891** 76:23
**1:00** 66:23 67:15
  67:16 69:18 70:17
**1:20** 1:7
**1:30** 69:24
**1:31** 70:3,13
**1:34** 73:4,5

**2**

**20** 4:24 74:19
  77:22
**200** 2:5
**2019** 64:18,18
**2020** 32:4,5,16
**2022** 1:12 4:18
  31:25 76:20
**20s** 26:6
**27** 75:17
**2800** 18:8 31:23

**3**

**3** 42:13,14
**3/4/2022** 77:3
**30** 3:16 11:17,18
  19:14,19,20

**30,000** 30:11,15
**300** 2:5
**310-824-3903**
  15:18 70:21
**3:00** 43:25

**4**

**4** 1:12 4:18
**400** 21:20
**4448** 4:24
**44th** 25:18
**4545** 15:6
**45th** 25:18
**47th** 25:19

**5**

**5** 75:12
**5,000** 30:17
**52** 33:13
**53** 75:19
**55** 33:12
**56** 33:13

**6**

**60** 26:4
**65** 26:5
**66** 26:6

**7**

**7** 1:19 5:2 59:12

**8**

**89** 11:17

**a**

**a.m.** 1:13 4:18
**abandon** 37:5
**ability** 58:23
**able** 8:19 12:15
  33:18 34:10,11
  35:10 37:21 45:18
  45:19 56:18 60:5
  60:9

**absolute** 63:8
**absolutely** 65:22
**access** 38:3,7,20
  40:5 51:21 52:6
  52:23 53:17 57:24
  58:10 61:24
**account** 9:15,17
  16:18,20 18:14,20
  18:25 19:5,13,14
  19:17,25 20:4,15
  20:18 21:3 22:25
  32:13,18 35:11
  39:20 48:16,17,18
  48:19,20,21,22
  55:13,22 56:3,14
  56:19,21 57:9
  58:10,13 59:6,8
  60:9,16,19,21,22
  60:24,25
**accountant** 29:11
**accounts** 19:7,21
  20:11 22:23 34:21
  35:23,24 37:3
  49:9 55:14 57:11
  59:11 60:6
**acknowledge** 4:3
  4:8
**action** 76:16
**activated** 9:19
**active** 48:23
**actual** 28:11 37:15
**additionally** 7:6
**address** 13:21,25
  14:3,10,16,25
  15:3,4,9,13,14
  23:24 24:8,11
  63:2 64:13
**adjourn** 69:17
**administer** 3:11
  4:11

**administered** 4:9
**advisor** 23:2,5
**affiliation** 9:22
**age** 40:10
**agent** 65:17
**ago** 15:15 16:25
  16:25 17:7 20:23
  63:21
**agreed** 3:5,20
**agreement** 27:9
  27:12 33:12 36:7
  56:7 67:8 68:9
  70:8 75:16
**ahead** 7:16 12:21
  37:19 38:14,15
  39:4 45:13 47:14
  50:6 59:15 60:2
  62:9 63:8
**airbnb** 46:25 48:6
**al** 1:3,9 2:5 4:22
  5:13
**alex** 1:3 2:5,12
  4:21 5:13 77:2
**allow** 70:6 72:4
**american** 30:22
  30:23,25
**amount** 39:7
  49:12
**angeles** 54:16
**answer** 45:24
  47:17 49:3 56:9
  62:7
**answered** 22:16
  63:6
**answers** 62:6
**anybody** 23:11
  34:4 42:16
**anymore** 11:5
  13:6,13
**apart** 68:22,24

apartment 14:5
22:4 31:7,8,13
44:10,16 54:9,11
apartments 44:13
44:20
app 55:16,17
appeal 36:7
appear 6:17
appeared 8:10
appearing 6:20
appears 8:24
apple 52:12,13,14
appropriate 62:8
approval 19:24
approximately
20:14 32:8 70:5
april 32:3
area 33:13 70:21
72:12
ares 54:16
arising 6:3
arrangement 4:13
arrest 8:4
articles 61:22
asked 13:4
asking 7:5 8:2
53:3
aspect 30:5
assisting 28:25
associates 25:3
assuming 27:16
attempt 29:13
71:2
attention 47:11
attorneys 2:4 4:2
29:20
authorize 56:20
authorized 3:11
56:13
avenue 15:6

aware 20:16 23:18
64:23

**b**

b 75:2
back 13:12 24:4
28:12 31:17 42:23
43:4,18 66:12,16
66:18,22 67:14,19
67:20 68:6 69:15
69:23 70:2,14
backup 13:6
balance 30:6
bank 9:15,17
16:18,20 18:21,22
18:24 19:7,10,21
20:5 27:15 32:17
33:19 35:14 48:15
48:17,18,20 57:11
banker 36:18,20
banking 36:25
bankruptcy 64:21
banks 36:14 49:2
49:5 57:10 59:16
base 21:19 39:6,13
basically 14:14
18:12 22:5 50:7
57:16
bear 47:21
becoming 34:22
beginning 41:17
believe 9:13 11:17
15:6 22:25 40:13
berman 64:12
best 19:15 31:3
better 15:22 32:8
big 51:4
bills 30:20 39:15
biological 63:16
birth 8:25 11:15
bit 15:15 25:7
29:24 41:8 45:13

45:18
bitcoin 6:6
bitfarms 42:24
black 52:14
blair 65:17
blank 11:16
blocks 25:18
blood 76:16
book 14:15,16
booked 44:22
box 22:20 70:24
bradford 29:23
brands 62:21
break 65:25 66:3
67:14 69:4 70:4
breakdown 45:15
bring 11:24 12:21
12:25 38:7,9 58:3
66:10,23 67:13
68:6 69:12,15
broke 45:10
brokerage 22:22
22:24 55:13,14
brought 6:3 13:8
23:20 29:12
bucks 26:4
budget 26:13
buildings 46:24,25
burned 52:9
burnt 53:13
business 16:17
21:9,12 25:3 39:9
39:18 41:10,11
60:10 61:2
businesses 32:21
busy 25:8

**c**

c 2:2 4:1 5:1,17,17
6:1 7:1 8:1 9:1
10:1 11:1,14 12:1
13:1 14:1 15:1

16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1,2 75:1
76:1,2,2
calculate 42:7
california 13:20
16:9 23:22
call 39:16 44:12
44:15 54:4
called 5:17 8:6
9:23 62:10
calling 70:19
canada 18:21,23
18:24 26:18 32:17
42:17,18,22 43:7
43:10
capacity 30:2
capital 16:23 20:7
49:9
car 12:4,12 25:13
25:14 26:7,12
27:20 46:9,16
66:4 67:3,7,8,9
68:6,11,14,16

70:7
**card** 17:8,10 26:22
    26:23,24 27:7,13
    27:14 30:16,18
    47:10 75:17
**cards** 48:24
**case** 1:6 6:25 8:9
    64:5 77:2
**cash** 19:19 25:24
    25:25 47:10
**cathy** 1:21 5:7
    76:7,23
**cause** 36:13 59:12
**causing** 36:12
**cell** 53:4
**center** 49:24
**centers** 42:13,14
**certificate** 8:25
**certification** 3:8
**certified** 29:10
**certify** 74:4,8 76:9
    76:14
**change** 77:5
**changed** 16:13
**charge** 39:10
**check** 17:5 62:2,5
    67:11 71:21
**checked** 55:15
**checking** 60:20,22
    60:24,25
**checks** 22:18
**chester** 9:3,5,8,13
**chestertown** 44:25
    45:3 46:7,8,10,11
**chet** 1:9,16 2:8
    4:20,21 8:23 9:2,3
    9:4,7 30:14 36:17
    37:11 47:19,24
    48:5,16 50:8,16
    50:21 51:7,14
    52:15 54:14 56:23

57:22 58:25 59:20
    66:3 67:22 69:7
    71:4 74:15 77:2,3
    77:21
**chetchet11** 15:16
    23:25 24:13
**chetchet1122**
    24:12
**chin** 2:10 5:4
    72:18
**chocked** 51:11
**citizens** 19:25
**city** 53:25 54:23
    54:24
**civil** 1:18 71:5
**clarify** 24:18 61:8
**clarity** 51:25
    63:23
**clear** 8:12 70:15
**client** 59:5
**client's** 56:15
    57:13,18,25
**clients** 33:9,21
    35:7 36:4,23 37:6
    39:8 45:22 49:12
    49:15 56:4 58:18
    58:20 59:3 60:12
**close** 9:14 33:15
    37:19 71:13
**closed** 18:20 19:5
    19:6 21:20,22
    32:19 33:2 48:20
    49:8
**closely** 47:12
**closer** 45:13
**cmt** 68:4
**code** 70:21
**cohen** 29:24
**coin** 21:19
**coins** 22:2

**come** 42:7 44:23
    58:15 66:12,16,22
    67:19,20 70:14
**coming** 19:25
    22:18 58:16,17
**commenced** 64:24
**commission** 77:25
**common** 42:11
**communication**
    71:3
**communications**
    15:11
**companies** 30:18
    32:20 40:4 49:20
    49:23 50:15,17
    51:3,4,5
**company** 4:21
    9:23,24 10:21
    12:19 26:9,11,12
    26:20 30:3 33:3
    41:19,20 50:11,13
    50:19 62:10 72:19
    77:2
**complaints** 31:15
**completed** 33:24
**completely** 21:11
    21:15
**complicated** 29:6
    29:8,17 39:8
    48:25 56:11
**comply** 71:7
**computer** 12:22
    48:10 52:21
**computers** 51:6
    51:14,20 52:5
    53:15 67:2
**conclude** 72:23
**concluded** 73:7
**conference** 6:16
**confidence** 63:8

**confident** 35:16
    37:8,18
**confirm** 71:14
**confirmed** 65:2
**confused** 59:20
**consent** 4:13
**considering** 43:11
**consultation** 40:2
**consulting** 49:16
    49:19 57:5
**contact** 13:22
**contacted** 65:6
**contempt** 6:9 7:25
    36:11,15,21 37:4
    37:5 71:6
**contention** 32:12
**continuation** 6:8
**continue** 71:2
**continued** 1:15
**contract** 59:4
**contracts** 58:19
    59:3
**conversation**
    65:11,15
**copy** 3:14,17
    27:12,13 70:7,8,9
    75:16,16
**corporations**
    32:21
**correct** 11:4,19,20
    24:8,15 32:9
    33:10 34:18 35:9
    35:25 37:7 38:4
    49:6 53:2 57:7,19
    59:22 61:14,17,25
    71:16 74:9
**costs** 39:7,11,14
    39:14
**counsel** 3:6,17
    4:12 5:8 8:13 16:8

counselor 8:15,17
  28:20,22
counselors 23:21
county 76:5
couple 37:12
  43:14 62:21
course 53:9
court 1:2 3:13 4:4
  4:6,10,23 5:6,15
  6:2,10,14 7:24
  14:9 59:2 66:19
court's 71:7
cousin 9:13
cover 37:22,25
  38:8,10
covid 64:19
cpa 29:10
created 61:4 62:19
credit 17:8,10
  26:22,23,24 27:2
  30:15,18 31:4
creditors 5:13
criminal 64:23
  71:6
cryptocurrency
  21:9,18,20,25
cunningham 23:9
  23:10,11,13,16,20
  41:5
current 14:25
currently 51:14
  51:20 52:6,22
  53:17 57:23
customer 41:13
customers 40:25
  41:3,6,8
cv 1:7 4:24

**d**

d 3:2 74:2 75:9
dad 54:15

data 9:23,24 10:3
  10:8,9,23 13:12
  21:4 42:13,14
  49:24 53:10 61:5
  61:10
data's 20:15
date 1:12 11:15
  31:9 53:23 61:11
  77:3
day 7:15 40:10
  41:25 44:8 46:12
  54:19 74:19 76:20
  77:22
days 3:16 20:23
  54:5 55:4
dead 51:16,18
deal 55:6
dealing 45:17
debit 27:6,7,13,14
  47:10 48:23 75:17
december 19:2,2
deducted 39:12
defendant 1:16
defendants 1:10
definitely 20:13
  33:4,22
defraud 23:16
deil 65:17
delivered 7:2
  33:19
demand 40:11
demanded 6:24
demands 7:22
  8:10 68:8
depending 35:13
deposit 16:14
  18:15,17 22:19
  26:23 33:15,20
deposition 1:15
  3:8,9,14 4:3,5,7
  4:19,25 6:8,25

7:23 8:9,16 12:7
  12:10 41:17 44:9
  70:5,12 71:3,10
  71:11 73:3 77:3
description 75:5
desktop 53:12,12
desktops 22:6
  52:10 53:16
desperate 29:13
details 13:23
determine 30:4
development
  62:18,20
devices 53:21
  75:18
dialed 70:22
difference 37:22
  37:25 38:8
different 49:3
  62:21
difficult 8:18
  14:21 52:4
difficulty 13:7
digital 15:10
digitally 67:11
directing 8:3
directive 71:8
directly 28:6
disclose 6:22
dishonest 47:13
disposal 28:12
dispute 31:14
district 1:2,2 4:23
  4:23 6:4 23:20
document 7:9
  33:14 34:8,11,17
  34:19 35:8,12,15
  35:18,20,21 36:3
documentation
  8:6,8 33:18,25
  56:25

documents 6:23
  7:2,11,19,21
  61:22 66:25 68:7
  75:14,15
doing 29:25 41:9
  47:14 62:18,20
  69:4
dollars 38:10
  39:24 49:14 57:22
  57:25 58:4 60:11
downstairs 15:7
  17:15,16
downtown 46:23
dramontani 2:11
drawing 11:16
drive 2:5 13:4,11
  52:21
driver's 68:17,18
drives 12:25 13:3
  13:7 52:6
duane 17:24 31:6
due 31:4
duly 5:18 74:5
  76:11
dv 23:6,6

**e**

e 2:2,2,4 3:2,2
  5:11,17 7:4,7
  11:14 15:11,13,14
  15:15 20:25 23:23
  23:24 24:3,5,8,10
  24:15 71:4 74:2
  75:2,9 76:2,2
earlier 22:16 24:3
early 64:18
earn 57:17 60:11
education 21:17
effect 3:12,15
either 12:4 17:18
  27:20 55:19

electricity 42:7
electronic 7:19,21
encoding 40:7
ended 29:14 32:11
  45:17
engaged 14:22
enter 60:10
enterprise 26:13
entertainment
  21:16
entirely 6:13
entity 10:7
equinox 51:2
equipment 6:7
  52:9
errata 77:1
especially 40:9
  49:22
established 38:13
  39:2 51:5
et 1:3,9 2:5 4:22
  5:13
etal 77:2
ethically 60:3
everybody 72:25
evicted 31:12
ex 64:11
exact 10:5 31:9
  61:11
exactly 19:3 29:25
  30:4 31:2,7
examination 5:21
  53:22 73:6 75:11
  75:19 76:10,12
examine 70:11
examined 5:20
excuse 24:9
execute 58:22 59:4
  60:5
exhibit 75:4,4

expand 50:6
expedia 48:6
expires 77:25
explain 38:18,22
  59:21
express 30:22,24
  30:25
expressly 70:15
extend 37:21

**f**

f 3:2 5:10 76:2
facebook 55:5,7
facilitate 33:15
failure 71:7
faith 59:5 60:3
falling 41:9
false 47:21
familiar 71:22
family 9:9,14
  54:11,13 64:3
far 30:11 67:17
father 63:23
fbi 65:7,9,12,17,21
february 20:22
federal 1:18 6:2
  14:9 28:15 59:2
fee 39:5
feel 35:16 37:8
fees 39:11,13
fiancée 11:8 13:18
  14:18,23 22:8
  43:9 54:8 68:20
fiancée's 11:9
  13:24 14:10
figure 51:11
figures 59:12
file 39:17
filed 27:22 28:2,15
  62:15 64:21
filing 3:7 10:17,18
  29:12 61:21

filings 32:24
financial 66:25
find 13:10 20:5
  33:17 43:17 44:4
  47:16 53:6
fine 69:16
finish 40:23
firm 5:5 29:3,4,21
  30:2,7
first 5:18 6:12
  13:8 20:22 23:11
  39:2 74:5
five 27:23 28:3,9
  28:17
fix 53:11
floor 1:20
focus 21:17
focusing 21:15
follows 5:20
force 3:15
foregoing 74:8
forensic 53:22
  75:18
form 3:21 58:11
format 7:19,22
formed 61:5,20
former 71:11
forth 43:4,18
  76:11
forward 7:25 38:6
  40:13 60:2 62:14
four 31:15
freeze 48:16
fried 22:5,7,7
friends 24:24
front 30:10
froze 57:10
frozen 20:11
  32:18 49:9
full 33:9 36:5
  49:12 56:8 57:2,4

65:14 70:24
fully 29:17 55:24
functional 51:9
fund 19:17
funded 9:20
funds 6:6 21:3
  33:16 34:2,6,12
  35:3,11 38:3,6,17
  38:20
further 3:20 4:8
  74:8 76:14

**g**

galaxy 53:5
gating 34:3,22
gentleman 23:8,12
getting 8:17 33:23
  49:19
girl 55:8
girlfriend 11:7
  13:14,16,17 68:20
girlfriend's 11:6
give 52:19 53:23
  65:20 66:13
given 70:19 74:10
  76:13
giving 29:18
gmail.com 24:12
go 7:16 12:21 13:5
  15:7 23:17 27:9
  33:2 37:8,14,18
  37:19,21 38:14,15
  39:4,13,15 42:22
  42:23 44:2 45:12
  47:14,25 48:2,6
  50:5 59:15 60:2
  62:8 63:7 66:3,11
  68:5 69:6 70:6
  71:21 72:5
goes 35:2
going 4:17 8:19
  14:8 19:16 23:17

25:22 28:13 29:25
37:10 38:9 39:22
39:23 40:13 43:4
43:12,18,21 44:2
44:8 49:2,14,15
52:19 53:20 57:3
58:17 59:19 65:24
66:13 69:19 71:12
73:4
**good** 4:16 25:2
59:5 60:3
**grandfather** 9:12
**great** 40:11 72:22
**group** 5:25
**grow** 50:6
**guidance** 29:19
**guy** 24:25 25:2
**guys** 33:14,17

**h**

**h** 5:17,17 11:14
75:2
**h&r** 29:13
**hacker** 2:4 5:11
**half** 42:2
**hall** 71:24
**hallway** 72:11
**hand** 76:20
**handles** 30:3,4
**happen** 42:12
**happened** 31:2
43:2 51:10
**happy** 56:25 62:7
**harborside** 2:5
**hard** 12:25 13:3,4
17:2 20:5 39:11
42:7 52:5,21 54:7
64:19
**hardware** 41:21
42:25
**harwick** 2:6 5:10
5:10,22,24 20:19

27:11 45:11 53:20
65:23 66:11,17,21
67:5,13,19,25
68:5,19,23,25
69:6,13,17,25
70:2 71:19 72:4
72:10,15,19,22
75:12
**head** 14:11
**hear** 51:23,25
**heard** 41:24 65:3
65:13
**held** 1:18 4:25
59:14
**help** 33:14 49:25
65:9,15,19
**hereinbefore**
74:11 76:11
**hereunto** 76:19
**hertz** 26:12
**higher** 35:2
**history** 59:18
**hold** 35:12 60:9
**holding** 58:12
**holdings** 10:5
**holds** 35:12 60:6
**holmes** 1:3 2:5,12
4:21 5:13 77:2
**homework** 62:9
**honestly** 27:8
28:18 32:23 47:4
47:11
**hosting** 40:5 41:20
**hotel** 42:9 44:15
44:17,21 45:8
46:25 48:14
**hotels** 44:12,19
**hour** 65:25
**house** 45:6
**housing** 49:23

**husband's** 64:11
64:11

**i**

**idea** 55:11 64:14
**important** 47:15
48:11 50:4
**impossible** 34:2
**inbound** 33:15
34:20
**including** 68:9
**income** 15:25 16:5
22:15,17
**incorporated**
10:25
**incorporation**
61:22
**incurred** 39:14
**individual** 10:20
**individuals** 5:25
**info** 67:9
**information** 13:23
61:23 68:10 75:14
75:15
**inquired** 42:5
**instructions** 52:20
**insurance** 67:9
**intended** 70:11
**interest** 32:22
**interested** 76:17
**internap** 51:4
**interviewed** 65:16
65:18
**introduce** 5:8
**investments** 62:11
62:12,23,25
**involved** 41:22
56:17 62:22
**ipad** 12:22
**irs** 39:17
**issue** 21:23 34:3
34:22,23 36:12

**issued** 71:8
**issues** 36:14 45:15
59:13

**j**

**j** 5:17
**january** 11:17,18
18:4 31:11,25
32:2,2
**jharwich** 2:7
**job** 22:11
**john** 2:6 5:10,24
45:11 70:2
**jones** 2:4 5:11
**joneshacker.com**
2:7
**jpmorgan** 49:10
**judge** 3:13 6:16,16
6:21 8:3 14:9 59:2
**judgment** 5:12
55:23 56:15 57:2
57:4,14,18 61:4
61:13,17
**judgments** 5:25
6:2 30:19 33:10
34:8,17 38:11,23
56:5 57:25
**jurisdiction** 61:19

**k**

**keep** 47:6
**kind** 13:7 14:6,16
14:20 15:11 17:2
22:13 26:19,19
41:19 47:2 50:18
59:17 67:25
**know** 5:23 9:20
10:4,12,16,24
12:18 13:24 14:10
18:12 21:7 22:3
22:21 23:4,8,10
23:12 24:16 25:11

**[know - money]**

25:19 26:3,9,10
27:8 28:4,6,19,23
29:25 30:8,21
31:9 32:23,25
33:3,6 35:14 36:9
38:21 42:4,6
43:22,23 44:7,24
45:4,5 47:4 48:8
48:11,12,15 49:8
50:3,24 51:8,17
53:14 55:6,9,11
60:4 61:11,18,19
62:15,17,18,24
63:5,7,7,12 64:10
69:3,11
**knowledge**  19:15
20:12 31:3 32:18
49:25 55:15 65:8
**known**  39:3

**l**

**l**  3:2,2 74:2
**landlord**  31:18
**laptop**  22:7 51:9
52:14,21
**laptops**  52:5 53:8
53:15
**late**  9:19
**lately**  42:18
**launched**  62:25
**law**  2:4 29:3,4
30:2
**lawfully**  71:8
**lawsuit**  6:3 23:19
**lawyer**  39:10
**lawyers**  27:24
29:16
**lead**  42:9
**leave**  18:5 25:23
43:15,20 70:25
**leaving**  43:23

**left**  17:14,17 30:7
31:6,7 52:10
**legal**  1:19 2:10
8:21 9:5 10:6
**legally**  60:4
**lengthy**  43:4
**leone**  1:21 5:7
76:7,23
**level**  42:13,13
**license**  67:6 68:17
68:18
**lie**  47:22
**lieu**  4:9
**lift**  60:8
**lifted**  59:7
**lifts**  35:12
**line**  43:13 56:6
75:23 77:5
**lined**  59:25
**list**  51:15,18 52:4
52:20,24
**listed**  10:16
**listen**  45:21,23
**literally**  48:24
58:14
**litigant**  2:8
**little**  15:15 25:7
29:24 45:13,18
56:11 64:2 69:4
**live**  13:15 14:18
54:13
**lives**  13:18,19
54:11,15
**living**  22:9 54:2
**ljl**  1:7
**llc**  1:9 4:22 10:11
77:1,2
**llcs**  32:20
**locate**  72:12
**located**  5:2 26:15
26:16,17

**location**  17:19,20
**locations**  42:12
**locker**  66:4
**lockers**  17:21
**logistics**  45:15
**long**  35:7 60:6
63:18
**longer**  34:5,25
52:13
**look**  10:13 12:19
13:5,9 14:12 44:3
47:14,18,20,23,25
48:4 50:19 61:12
72:3
**looking**  21:17
55:24
**looks**  33:7 43:24
**los**  54:16
**losing**  29:14
**loss**  28:14
**lost**  16:13
**lot**  13:12 25:6,6
32:24 39:25 40:8
42:5 43:16 45:4
50:17
**luck**  45:18

**m**

**m**  11:10,14 23:15
41:18
**mac**  53:8
**macbook**  51:16
**macbooks**  51:18
**mail**  7:4 15:11,13
15:14 23:24 24:3
24:5,8,10,15 71:4
**mailed**  15:15
**mails**  7:7 20:25
23:23
**main**  20:4
**manhattan**  6:18

**manner**  4:14
**march**  1:12 4:18
76:20
**mark**  28:23,25
29:21 30:7
**marked**  75:22
**marks**  73:2
**marriage**  76:16
**marshal**  8:4
**materialize**  65:14
**materialized**
65:10
**matter**  4:20 76:18
**matthew**  2:10 5:4
72:17
**mean**  40:21 44:12
**means**  24:16
**measroch**  11:12
**media**  4:19 40:6,7
**medicine**  67:24
68:2,3
**member**  10:22
**members**  64:3
**memorize**  11:23
14:13,17
**message**  70:25
**million**  38:10
39:23 49:14 57:22
57:24 58:4 60:11
**mining**  1:9 4:21
6:6,7 77:2
**minute**  12:15
**mistake**  42:14
**mistakes**  42:8
**mom**  64:16
**moment**  16:7 25:5
**monday**  45:11
**money**  18:9,10,11
18:11,13,18 19:12
30:13 34:7,16
35:6 37:11 42:16

**[money - participating]**

42:20,25 47:8
49:16 55:22 56:3
56:13 57:7,8,13
57:18 59:17,19,21
**month** 40:15
**months** 9:25 16:25
17:7 42:2 43:14
59:15 63:13,15,21
**montreal** 43:11
46:12,20,21 55:3
**morgan** 9:16 20:6
20:16 21:3 22:24
55:11,22 56:3
**morning** 4:17
**mother** 63:11,16
63:21,24,25
**mother's** 64:7
**motion** 6:9 35:21
36:8,10,11,15,22
37:4
**move** 38:6 40:13
43:6 57:9,12 60:2
62:14
**moved** 16:12
17:23
**moving** 7:25 43:10
**multiple** 59:16
**murphy** 2:4 5:11

**n**

**n** 2:2 3:2 5:17
11:10 74:2 75:9
**name** 5:4,24 8:21
8:24 9:5 10:6 11:6
11:9,11 23:9,11
23:13 26:9 47:3
64:7,9,11,11
72:16 77:2,3
**named** 9:12
**nassau** 76:5
**necessary** 33:16
49:21 50:2

**need** 35:24 36:4
39:21 49:22 50:2
56:16,18 62:8
63:25
**needed** 7:6 33:13
38:2
**negligible** 55:19
**neither** 53:8
**neuropathy** 68:4
**never** 65:10
**new** 1:2,20,20,23
2:6 4:24 5:3,3,19
6:4 13:19 14:6
23:24 43:15 46:2
53:25 54:23,24,24
55:2 59:8,11
60:10,18 63:3
76:4,8 77:1
**nice** 24:25 38:14
43:15
**nico** 2:11
**night** 46:15,17,19
**nokia** 53:4
**nonsense** 45:17
**noon** 66:13,16
**nope** 21:14 45:7
**north** 42:17
**notary** 1:22 5:19
74:22 76:7 77:25
**notices** 24:14,17
**notified** 45:11
**notify** 64:4
**november** 9:21
19:3
**number** 11:21
15:17 25:9 58:18
70:19,20,22 75:5
**numbers** 11:23
25:10

**o**

**o** 3:2 5:17,17
11:14 74:2
**oath** 3:12 4:9,11
14:2,7 26:8 51:19
58:25
**objections** 3:21
4:14
**obstacle** 36:22,25
**obtained** 30:19
61:3,16
**offered** 33:9 65:15
65:19
**office** 2:4 15:12
39:12
**offices** 1:19 71:23
**oh** 66:21
**okay** 7:12 16:20
32:20 35:5 37:10
46:6,14 52:7
57:17 65:3,23
67:15 68:13 69:6
71:19
**old** 14:4 53:5
**once** 35:11 39:12
56:24
**online** 33:7 48:2,4
61:25
**open** 9:18 18:25
19:5 32:25 56:19
59:8 60:15,18
61:9
**opening** 19:16,24
59:11
**operated** 61:5
**operating** 28:13
**opposed** 42:13
**option** 37:17
**options** 37:13
43:17

**order** 1:17 6:10,14
8:3 36:4
**ordered** 6:17,21
7:24
**original** 3:9,17
**outages** 42:10
**outbound** 34:20
**outcome** 76:17
**outside** 10:13
71:22
**outstanding** 36:13
**overbook** 42:8
**owe** 31:17,20
36:23 42:16
**owed** 42:20,24
**owner** 10:2
**ownership** 32:22

**p**

**p** 2:2,2 3:2
**p.m.** 69:20,24 70:3
70:6,17 73:4,5
**page** 55:5 62:19
75:4,11,15,23
77:5
**paid** 16:14 17:4
25:21 31:2,3,23
31:24 37:20 42:3
47:21 48:13 57:15
**paperwork** 28:10
29:15 66:6,9
**park** 15:6 25:16
**parking** 25:20,21
25:23
**part** 6:13 18:16
32:9 35:22,22
37:24 70:12
**parter** 35:21
**partially** 55:23
56:4,14
**participating** 4:2
72:25

parties  3:7 4:12
  57:5 76:15
partners  10:15
parts  61:7
party  38:13,16,17
  38:22 39:2 40:3
  49:20
passed  29:11
paul  24:19,20,22
  43:9
pause  72:7
pay  16:11 18:5
  25:20,22 26:21
  27:4 30:9 32:7,14
  33:9,16 34:7,16
  35:6 36:4 37:6
  38:22 39:5,7
  45:22 47:7,11
  49:11,15,17 60:12
paying  30:16
  36:22 38:20
payment  48:2,3
payments  32:10
  47:12
pending  23:19
people  37:2 42:7
  49:25 50:25
permanent  15:3
person  4:10 6:17
  38:25
personal  28:16
  60:20,22,24,25
phoenix  9:23,24
  10:2,8,9,23 20:15
  21:4 61:5,9 62:11
  62:12,22,24
phone  11:21,22,24
  12:3 14:14 15:17
  15:20 25:10,12
  48:10 52:21 53:4
  66:5,11,24 68:12

69:7,10 70:11
  71:4
phones  51:20 52:5
  53:16
physically  4:4
  8:20
pick  67:21
picture  63:24 67:6
place  8:4 15:5
  18:3 31:10 33:12
  43:17 44:5 46:13
  48:13 52:8 74:11
places  14:6,20
  15:2,9 26:14,19
  27:5 47:5,5 54:6
plaintiff  1:4,17 2:4
plaintiffs  5:12
plans  43:6
plate  67:6
plattsburgh  46:11
please  5:8,15
  69:18
plus  57:24
pocket  26:4 58:7,9
point  32:11 33:8
  48:9 51:24
policies  35:15
positive  16:22,24
possibilities  65:4
possible  71:20
possibly  63:5
postal  15:12
potential  40:25
power  51:24 52:8
precisely  40:19,22
predominantly
  21:16
present  2:9 4:5
  8:17
presently  32:22

pretty  30:3 42:11
previous  63:6
principal  34:23
principle  37:15
prior  29:12 59:17
pro  2:8
procedure  1:18
proceeding  8:2
  37:5
proceedings  64:24
process  19:16 43:4
  47:12
produce  7:24
produced  53:22
  75:18
production  53:24
  53:24
profit  39:6,13,16
  39:17,20
promising  6:6
properly  53:9
propose  38:22
proverbial  50:10
  50:14
provide  38:14,24
  39:19,23 40:2,4,5
  40:25 49:16,21,23
  50:18,20,22,25
  57:4
provided  38:16
provider  15:19,22
providing  49:19
  51:2
public  1:22 5:19
  29:11 37:16 74:22
  76:7 77:25
pull  15:6
purchase  21:7
purpose  42:21
  56:21

pursuant  1:17
pursuing  71:5
purview  10:14
  28:5
put  7:17 8:10 18:9
  18:10,11,13,14
  19:20 26:22 30:15
  39:19 55:18 60:21
putting  30:17

          q
quarters  32:8
quee  2:10 5:4
  72:18
question  34:14
  35:4,5 45:21,23
  45:24 47:16 50:21
  51:13 52:3,16
  57:23 58:24 63:5
  63:6 75:23
questions  75:22
quickly  40:14
quite  16:24 33:22

          r
r  2:2 3:2 11:14
  74:2 76:2
raised  63:23
random  22:2
rang  70:22,22
rbc  18:19 48:19
  49:7
reached  40:24
  41:3 64:4
read  59:2
real  65:11
realize  13:25
really  9:18 25:2
  32:3 36:13 40:9
  44:19 48:11 53:7
  60:7 63:24

reason 77:5
receivables 34:24
receive 8:5 20:20
  24:14
received 7:18,21
  20:24
receiving 23:23
recess 69:21
record 4:17 7:8,17
  7:18 8:11 15:7
  20:19 37:16 51:19
  69:20,24 70:3,16
  70:18,20 71:13
  72:6,16 73:4
  76:12
records 6:22
reference 48:9
referring 35:18
  50:9,16
regard 6:5
registered 14:4
regular 22:18
rejected 32:10
related 76:15
relationship 60:11
release 34:20
  35:23
remedy 71:5
remember 17:2
  32:15 58:25
remote 26:11
remotely 4:7,11
removed 31:15
rendered 42:4
rent 12:16 27:6
  31:25 32:7,11
  45:19
rental 12:14,18
  26:9,11,11 27:4,9
  27:12 45:20 46:25
  67:7 68:9,11 70:7

70:8 75:16
rented 26:7
rents 31:17
replacement
  13:11
report 39:16
reporter 4:4,6,10
  5:6,15 66:19
reporting 4:7,15
  77:1
represent 5:24
represented 8:13
reputable 50:3
request 27:11
  53:21
requested 8:8
  75:14
requests 71:9
resales 41:21
reserved 3:22
reserving 72:24
residence 54:5
respect 29:19
respected 39:3
respective 3:6
response 24:4
  68:8
responses 7:9
responsive 7:20
  7:22
rest 39:13
retain 16:8
retainer 30:6
retrieve 70:9,10
retrieved 53:10
return 28:16
returns 27:22 28:2
  28:8,11 29:2,22
revenue 16:16
  38:8,10 39:6,9
  58:3,23

rideshare 26:18
riera 28:25
riera's 29:21 30:7
right 6:19 11:16
  14:19 15:2,10,23
  16:2,6,15 17:9
  19:9,10,15 20:3,4
  21:15 22:10,13,15
  22:17 27:17 34:9
  35:14 37:13,13,17
  40:10,20,23 41:8
  41:10 43:8,13,17
  46:3,13 48:22
  49:5 51:8 52:18
  53:5,13,18 57:9
  57:12,21 58:22
  59:24 60:19 64:18
  69:4
rights 72:24
risk 35:2
risking 34:23
  37:15
room 4:5 71:15,18
  71:21,23
royal 18:21,22,24
  32:17
rules 1:18
rulings 75:22
running 16:17

s

s 2:2 3:2,2 5:17
  11:10,14 75:2
  77:5
safety 22:19
santander 19:10
  20:3 48:21 49:6,7
  60:16
satisfy 55:23,24
  56:4,14 57:2,3,13
  57:18,25

saw 54:17,19
saying 44:18
  49:18 59:24 60:13
schenectady 2:6
se 2:8
sealing 3:7
search 6:22
second 6:13
secret 58:13
section 33:12
see 15:8 19:10
  21:5 36:14 45:12
  48:2,2 52:11
  53:11 55:15 67:12
  68:12,12 69:14
  71:24
seen 64:16
segueing 21:10
  22:13 31:10
selling 53:14
send 20:21
sent 7:4,6 18:10
  20:17,22,23,24
  23:24 28:10
separate 39:20
  45:20
september 9:19
serious 59:13
served 7:10 8:7
service 3:16 15:20
  37:20 42:10
services 6:7 38:12
  38:15,25 39:19,22
  39:25 40:3,5,25
  42:3 49:16,19,21
  49:24,24 50:19,21
  50:22,24 51:2
  57:5,16
servicing 39:5
set 76:11,20

settle  31:22 33:20
  42:19 56:8
settled  31:21
  34:19 35:17 43:19
  46:4
settlement  33:11
  33:23 42:21 55:25
  56:7,8
shared  14:9
shareholders
  10:25
shares  10:4
sheet  77:1
sheriff  56:17
short  42:8 69:21
side  29:24
signature  76:23
signed  3:10,12,15
  28:8 33:19
simple  48:24 60:7
simply  38:24
sit  47:22
sitting  38:5 57:23
situation  29:6,9
six  16:25 17:7
sleep  43:21 46:14
  46:17
small  26:11
smaller  26:20
sole  10:22
solutions  1:19
  2:10
somebody  39:3
somebody's  45:6
sorry  37:23 44:14
  60:23 63:14 66:21
  68:23
sort  30:25
sorted  21:21 29:14
sorting  16:2 45:14

sounds  38:19
source  16:4,15
  21:2 22:14,17
sources  15:24
southern  1:2 4:23
  6:4 23:19
space  16:13 18:12
  40:6 50:2,5,23
  51:2
spaces  42:6
speak  62:6 63:8
speaking  60:3,4
special  65:17
specific  24:17
  56:21
specificity  64:2
specified  74:11
spell  11:13 33:4,5
  41:15
spelled  41:16
spoke  30:24 36:21
  59:10
spoken  36:19
square  1:20 5:2
ss  76:4
standalone  15:9
standpoint  40:7
stanley  9:16 20:6
  20:16 21:3 22:24
  55:12,22 56:3
start  40:15
started  31:10
  64:19,25
state  1:22 5:19
  28:16 76:4,8
statement  20:18
  65:21
states  1:2 4:22 8:4
  26:17
stay  36:16 44:5
  46:6,8,21 47:5

stayed  14:4 15:5
  44:18
staying  21:14
  43:14 44:17 45:25
  46:3,10,13 48:12
stepmother  63:20
stewart  2:4 5:11
stipulated  3:5,20
stocks  55:10,18
stojanovich  1:16
  2:8 4:1,20 5:1,23
  6:1 7:1 8:1,22,23
  9:1,2,4,6,7,9 10:1
  11:1 12:1 13:1
  14:1 15:1 16:1
  17:1 18:1 19:1
  20:1 21:1 22:1
  23:1 24:1 25:1
  26:1 27:1 28:1
  29:1 30:1 31:1
  32:1 33:1 34:1
  35:1 36:1 37:1
  38:1 39:1 40:1
  41:1 42:1 43:1
  44:1 45:1 46:1
  47:1 48:1 49:1
  50:1 51:1 52:1
  53:1 54:1 55:1
  56:1 57:1 58:1
  59:1 60:1 61:1
  62:1 63:1 64:1
  65:1 66:1 67:1
  68:1 69:1 70:1,6
  70:14 71:1,15
  72:1,13 73:1 74:1
  74:15 75:1 76:1
  77:3,21
stop  52:19
storage  12:5 17:18
  17:20 25:15 27:20
  66:4

stored  14:14
storing  15:12
stranded  46:9
strange  33:7
street  17:24 31:6
  63:3
strike  66:22
stuff  14:17 36:16
  40:8 51:3,10 55:7
  65:9 67:18
stuntman  24:22
subpoena  7:10,20
  8:7 20:9 35:23
  59:6 68:8
subpoenaed  6:23
  64:5
subpoenas  71:9
subscribed  74:18
  77:22
suite  2:5
supposed  69:12
sure  8:18 19:3
  26:4 32:3 43:22
  49:11 53:7 55:7
  62:5
surge  22:5 51:24
  52:8
suzanne  64:8
swear  5:15
swift  10:19 33:3
  62:3,4
switch  15:21
sworn  3:10 5:18
  74:5,18 76:11
  77:22
system  31:16
systems  22:6

|  t  |
| --- |

t  3:2,2 5:17,17
  11:10 23:15,15
  41:18,18 74:2

75:2 76:2,2
**tablets**  51:20 52:5
  52:22 53:16
**take**  58:23 65:25
  67:6,14 72:3
**taken**  1:16 69:22
  70:4
**takes**  40:12,12
**talk**  7:13,14 23:21
  25:5,6 33:2 65:12
**talked**  28:19 30:23
  63:11,20 65:8
**talking**  29:23
  36:10 37:16 50:23
  63:16,19
**tamsan**  11:10
**tax**  27:22 28:2,8
  28:11,16,25 29:21
**taxes**  28:6 29:6
  39:17
**tell**  31:7 43:9 49:2
**telling**  54:2 58:13
**temporary**  15:4
  18:12
**terms**  42:25
**testified**  5:20
**testify**  74:5
**testifying**  14:2
**testimony**  14:7,8
  26:8 28:24 49:4
  49:17 74:6,10
  76:13
**thank**  6:20 72:25
**theft**  6:5
**thing**  14:6,21
  27:21 36:13 52:11
**things**  14:13 29:16
  31:21 39:21 42:12
  47:2 49:22 50:4
  57:6

**think**  9:19 10:10
  10:19 11:5 12:4
  16:21,22 17:6,7,7
  17:10,17 18:19,23
  19:23,25 20:2,10
  21:5,19 25:14,18
  26:3,5,6,16 27:19
  30:11 35:20 37:19
  46:19,22 51:10
  53:18 54:15 55:8
  60:8 62:4,12
  64:14,17 65:13
  67:10,17
**third**  38:12,21
  40:3 49:20 57:5
**thought**  40:15
**three**  7:7 25:17
  26:6 28:14 32:8
  42:2 61:7 64:16
**tied**  27:14 45:16
**time**  1:13 3:22
  7:14 8:5 13:19
  17:9,11 18:2 25:7
  30:17 31:24 32:4
  33:22 35:13 40:12
  52:16 53:23 54:17
  62:8 63:10,18
  66:14,15 70:3,13
  74:10
**timeline**  43:24
**times**  1:20 5:2
  40:12
**today**  6:17 7:3
  8:14,15 11:25
  12:23 13:2 14:8
  17:13 20:24 25:13
  25:23 26:8 43:20
  44:23 57:23 58:5
  58:8 66:6,9 68:20
  69:2

**today's**  12:6,9
  44:8
**told**  13:9 36:17
  48:18,25 59:16
**tonight**  43:21 44:6
  44:21
**top**  14:11
**touch**  49:20
**track**  47:6
**trades**  55:12
**transcript**  74:9,9
**transfer**  21:6
  35:10 59:12,17,20
  59:22
**transferred**  17:3
  34:12,12
**transfers**  56:19
  59:13
**transitioning**  18:3
**travel**  64:20
**trial**  3:22
**tried**  42:24
**troy**  23:13,14 41:5
  41:7,8
**true**  61:6 74:9
  76:12
**trust**  50:3
**trusted**  39:4
**truth**  74:5
**try**  45:21,23 59:20
  70:18
**trying**  15:21 20:2
  29:18 30:25 32:13
  40:20,23 42:19
  45:10 49:10 53:10
  57:4 59:11 62:13
  63:22
**turn**  39:5 55:21
  56:2 62:6
**two**  20:23 22:6
  35:21 53:7

**typical**  33:5

**u**

**u**  3:2 23:15 41:18
**unable**  33:17
  70:25 72:12
**understand**  6:11
  6:13,14,15 29:17
  49:13 67:17
**unfortunate**  34:4
**unfortunately**
  33:24 43:16 45:16
  45:22
**unfreezing**  56:20
**unfroze**  37:4
**unfrozen**  35:25
  49:11
**unit**  4:19
**united**  1:2 4:22
  26:17
**unites**  8:3
**unpaid**  30:19
**unsigned**  3:14
**upstate**  44:24,25
  45:3 46:2
**use**  15:19 20:6
  27:7 61:2
**uses**  64:10
**usually**  25:6 40:12
  42:15
**utilize**  39:20

**v**

**v**  4:21 5:17 77:2
**vacancy**  42:10
**vacate**  37:4
**valid**  24:7,10
**validity**  63:9
**valuable**  40:4,9
**vancouver**  24:23
**various**  6:23 8:10

[vehicle - zoom]

vehicle  12:11,13
    12:14,16 17:18
    45:10,19,20
venue  48:7
veritext  1:19,21
    2:10 5:2,5,7 72:21
    77:1
verizon  15:21,22
videographer  2:10
    4:16 5:6,14 69:19
    69:23 71:14,17
    72:2,8,14,17,21
    73:2
virtual  1:22
virtually  36:18
voicemail  70:23
    70:24
voluntarily  56:16

w

w  23:15 41:18
wait  34:5
waiting  19:24
    28:12 40:16 41:25
    58:15 59:25 71:21
    71:23 72:11
waive  4:13
waived  3:9
wall  63:3
wallet  17:12 27:17
    27:18 66:12,24
    68:13,15 69:8,14
    69:15 70:10,13
want  7:17 34:4
    36:15 37:14 38:21
    47:13,21 48:15
    50:5 51:17,18,23
    51:25 52:20,24
    62:5 66:2,3,23
    67:5 68:11,12
    69:14

wanted  8:11 35:7
    45:12
wanting  33:21
    38:6
warranty  51:12
    52:13
wattum  23:14
    41:14,23
way  33:5,23 38:15
    47:8 48:11 64:6
    76:17
web  62:18,20
website  11:3 62:16
week  45:16 60:17
weeks  59:14
went  13:5 42:23
    70:23
whereof  76:19
willing  55:21 56:2
    56:15,22 65:20
windows  53:8
wire  17:4 21:6
    56:13
withdrawal  18:16
witness  3:10,16,18
    5:16,18 47:22
    66:8,15 67:4,10
    67:16,23 68:3,15
    68:21,24 69:3,9
    69:16 73:6 76:10
    76:13,19
witnesses'  77:3
word  33:5
work  23:2 28:13
    49:15 50:25 62:14
working  9:25
    22:10,12 24:7,10
    27:24 28:5,20
    29:15,20 31:5
    52:12,18,23,25
    53:9,13

works  23:14 24:23
    39:18 40:18
worth  38:11 39:23
    53:14
written  14:15
    64:15
wu  24:19,20,22
    43:9

x

x  1:3,10 75:2,9

y

yeah  14:19 18:15
    18:24 24:6,25
    32:6 33:11 41:4
    41:16 42:17 57:20
    72:2
year  14:24 19:4
    32:9
years  27:23 28:3,9
    28:14,17 32:25
    64:16
yesterday  54:20
york  1:2,20,21,23
    2:6 4:24 5:3,3,19
    6:5 13:19 43:15
    46:2 53:25 54:23
    54:24,25 55:2
    63:3 76:4,8 77:1
younger  63:25
yup  60:14

z

zipcar  26:19
zoom  1:22

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.