# Exhibit A

Approved: _____
DAVID RAYMOND LEWIS
Assistant United States Attorney

Before:   HONORABLE JENNIFER E. WILLIS
          United States Magistrate Judge
          Southern District of New York    **22 MAG 3298**

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA          :      **SEALED COMPLAINT**

          - v. -                  :
                                         Violation of 18 U.S.C. §§
CHET STOJANOVICH,                 :      1343 and 2
  a/k/a "Chester J. Stojanovich,"
                                  :      COUNTY OF OFFENSE:
          Defendant.                     NEW YORK
                                  :
- - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

     BLAIR R. DIEL, being duly sworn, deposes and says that he is
a Special Agent with the Federal Bureau of Investigation ("FBI"),
and charges as follows:

### COUNT ONE
### (Wire Fraud)

     1.   From at least in or about 2019, up to and including the
date of this Complaint, in the Southern District of New York and
elsewhere, CHET STOJANOVICH, a/k/a "Chester J. Stojanovich," the
defendant, willfully and knowingly, having devised and intending
to devise a scheme and artifice to defraud, and for obtaining money
and property by means of false and fraudulent pretenses,
representations, and promises, transmitted and caused to be
transmitted by means of wire, radio, and television communication
in interstate and foreign commerce, writings, signs, signals,
pictures, and sounds for the purpose of executing such scheme and
artifice, to wit, STOJANOVICH obtained money and cryptocurrency
from individuals and businesses for the purchase of
cryptocurrency-mining computers ("Miners") and Miner-hosting
services through false and fraudulent representations regarding
STOJANOVICH's acquisition and possession of Miners and his
provision of Miner-hosting services, and sent and received

interstate wires to and from the Southern District of New York,
and elsewhere , in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and the foregoing charges are,
in part, as follows:

2.    I am a Special Agent with the FBI and I have been
personally involved in the investigation of this matter.  This
affidavit is based upon my personal participation in the
investigation of this matter, my conversations with law
enforcement agents, witnesses, and others, as well as my
examination of reports and records.  Because this affidavit is
being submitted for the limited purpose of establishing probable
cause, it does not include all the facts that I have learned during
the course of my investigation.  Where the contents of documents
and the actions, statements, and conversations of others are
reported herein, they are reported in substance and in part, except
where otherwise indicated.  Where figures, calculations, and dates
are set forth herein, they are approximate, unless stated
otherwise.

<u>Overview of the Scheme</u>

3.    At all times relevant to this Complaint, CHET
STOJANOVICH, a/k/a "Chester J. Stojanovich," the defendant,
controlled various companies, including Chet Mining Co. LLC ("Chet
Mining"), Chet Mining Co. Canada, Ltd. ("Chet Mining Canada"), and
Phoenix Data LLC, sometimes referred to as Phoenix Datas ("Phoenix
Data"). From at least in or about 2019, up to and including the
date of this Complaint, STOJANOVICH engaged in a scheme to defraud
individuals and companies who were seeking to purchase
cryptocurrency-mining computers ("Miners") and who were seeking
Miner-hosting services through which they expected to obtain "hash
power" convertible into cryptocurrency and money. STOJANOVICH
defrauded and deceived these victims by fraudulently and falsely
telling them that: (1) he would purchase Miners on their behalf;
(2) he already had purchased such Miners on their behalf; (3) he
would provide them with Miner-hosting services; and (4) he had
already obtained such Miner-hosting services for them. In fact,
STOJANOVICH largely failed to deliver the promised Miners and
Miner-hosting services, and instead misappropriated the money and
cryptocurrency provided to him for Miners and Miner-hosting
services, including by spending a substantial portion those funds
on personal expenses, including chartered air flights, hotel
rooms, limousines, and private parties.

2

## Relevant Terminology

4.    "Cryptocurrency," also known as "digital currency," is a digital representation of value that can be traded, and functions as a medium of exchange, a unit of account, and a store of value. Its value is determined by consensus within the community of users of the cryptocurrency.

5.    "Bitcoin" is a type of cryptocurrency. Bitcoin is generated and controlled through computer software operating via a decentralized, peer-to-peer network. Bitcoin can be used for purchases or exchanged for other currency on currency exchanges.

6.    "Mining" is the way new cryptocurrency is produced and the way cryptocurrency transactions are verified. Individuals or entities run special computer software to solve complex algorithms that validate groups of transactions in a particular cryptocurrency. Under cryptocurrency protocols, which foster a competition to verify transactions for inclusion on public cryptocurrency ledgers, known as "blockchains," the first miner to solve the algorithm is rewarded with a preset amount of newly issued cryptocurrency.

7.    "Hash rate" is the measure of the speed at which a cryptocurrency-mining computer, or Miner, operates by way of computer processing power that is applied by one or more Miners to solve the algorithms and harvest new currency. Hash rate is expressed generally as the number of calculations Miners can perform per second. In general, the greater the hash rate, the greater the Miners' chance to solve the algorithm and be rewarded with the newly issued cryptocurrency.

8.    "Mining pools" are combinations of cryptocurrency Miners in which Miners consolidate their computing power to achieve a greater overall hash rate.

## The Fraud Scheme

9.    In the course of this investigation, I have reviewed various records, including copies of electronic text messages and email communications, contracts, invoices, bank records, records of cryptocurrency transactions, records of actual and potential customers and victims of CHET STOJANOVICH, a/k/a "Chester J. Stojanovich," the defendant, and his companies, records of third-party service providers, and publicly available records. Based on these records, as well as from interviews with customers and victims, vendors, third-party contractors, and former employees of Chet Mining, I have learned in substance and part that, in marketing cryptocurrency Miners and Miner-hosting services, STOJANOVICH represented to actual and potential customers and others that STOJANOVICH, through his companies, was prepared to

3

provide large quantities of Miners and associated Miner-hosting packages. STOJANOVICH and his companies also created invoices, which STOJANOVICH caused to be transmitted to customers and potential customers, seeking payment for such Miners and Miner-hosting services. Such invoices generally represented that the customer would be provided with specific quantities of particular models of Miners, with certain specifications, which would then be hosted for a specific number of months at a facility to be chosen by STOJANOVICH.

10. Based on interviews of customers and prospective customers of CHET STOJANOVICH, a/k/a "Chester J. Stojanovich," the defendant, and with former employees of STOJANOVICH, as well as a review of publicly available documents, court documents, text messages and emails, invoices, purchase orders, and agreements, I have learned in substance and part that, from in or about the spring of 2019, STOJANOVICH induced more than a dozen customers to pay a total of more than $1.84 million to STOJANOVICH and his companies, ostensibly in return for Miners and Miner-hosting services. For the reasons that follow, I submit that there is probable cause to believe that STOJANOVICH induced these customers to make these payments through fraudulent misrepresentations, and that STOJANOVICH, despite fraudulent representations to the contrary:  (1) failed to provide many of the Miners that he told customers he had acquired; (2) failed to provide the hosting services and cryptocurrency hash power that he represented that he would provide to those customers; (3) employed deceptive practices to create the illusion that such Miners had been acquired and were being used to provide hash power to the accounts of those customers; and (4) misappropriated his customers' funds and spent the funds on unrelated and personal expenditures.

11.  From in or about 2019 through at least in or about early 2022, CHET STOJANOVICH, a/k/a "Chester J. Stojanovich," the defendant, maintained his primary residence in the Southern District of New York, and sent and received numerous interstate bank wires and wire communications in the Southern District of New York in furtherance of the scheme.

A. Defrauding Customers Starting in 2019

12. Based on interviews of STOJANOVICH's customers, prospective customers, and former employees, as well as a review of publicly available documents, court documents, text messages and emails, invoices, purchase orders, and agreements, I have learned in substance and part that, in or about March 2019 through in or about July 2019, CHET STOJANOVICH, a/k/a "Chester J. Stojanovich," the defendant, induced at least 10 customers to pay a total of more than $1.66 million to STOJANOVICH and Chet Mining,

4

in return for Miners and Miner-hosting services. As detailed below, I have learned STOJANOVICH induced these customers to make these payments through fraudulent misrepresentations, and that STOJANOVICH, despite representations to the contrary: (1) failed to acquire many of the Miners that he told customers he had acquired; (2) failed to provide the hosting services and cryptocurrency hash power that he represented that he was providing to those customers; and (3) employed deceptive practices to create the illusion that such Miners had been acquired and were being used to provide hash power to the accounts of those customers.

13. Regarding the misrepresentations of CHET STOJANOVICH, a/k/a "Chester J. Stojanovich," the defendant, to his customers regarding his acquisition of Miners, based on a review of bank records, shipping records, vendor records, invoices, and interviews of STOJANOVICH customers and former employees, I have learned in substance and part that, from in or about March 2019 through in or about July 2019, STOJANOVICH told his customers in substance and part that he would be acquiring -- and later that he had acquired -- a total of approximately 1,492 model S9 Miners (primarily used to mine Bitcoin) and approximately 1,543 model L3 Miners (primarily used to mine other types of cryptocurrency), which were less expensive than S9 Miners. I have further learned that, between on or about April 24, 2019, and on or about July 18, 2019, STOJANOVICH issued at least 15 invoices to approximately 10 customers, billing them for the purchase of the above-described Miners. These invoices included instructions for payment to STOJANOVICH or one of his companies. In response to these invoices, and as directed by STOJANOVICH, these 10 customers paid STOJANOVICH a total of approximately $1,618,000 in bank wires and cryptocurrency transfers. However, as described further below, I have learned from a review of bank records, financial records, and the records of retailers, that STOJANOVICH acquired only a very small quantity of S9 Miners during this relevant time period and did not provide the Miner-hosting services for which he had obtained payment.

14. Notwithstanding the payment of over $1.6 million by these customers, I have learned that CHET STOJANOVICH, a/k/a "Chester J. Stojanovich," the defendant, largely failed to obtain the promised Miners and mining services. Specifically:

a. Based on a review of the bank records and cryptocurrency exchange records of the accounts into which STOJANOVICH directed his customers' funds between April and July 2019, and a review of various purchase and vendor records, it appears that STOJANOVICH acquired (or attempted to acquire) only two quantities of Miners during those months, as follows:

i.    Based on a review of bank records, cryptocurrency exchange records, and Amazon records, I have learned that the first such quantity was approximately 72 S9 Miners, which STOJANOVICH acquired from on or about April 4, 2019 through on or about May 23, 2019, in small groups through Amazon, which is not a logical source for someone commercially supplying Miners. Moreover, the FBI interviewed an employee who briefly worked for STOJANOVICH in or about May and June 2019 ("Employee-1"). Employee-1 stated in substance and part that STOJANOVICH was purchasing Miners from Amazon for resale to different, unrelated potential customers. From STOJANOVICH's PayPal records, it appears that he also purchased approximately two Miners on eBay.

ii.    Based on a review of bank records and cryptocurrency exchange records, I have learned that the only other funds spent from STOJANOVICH's bank account that appear to have gone toward the purchase of Miners are three payments in or about June 2019 totaling $225,000, paid to Backbone Hosting Solutions, Inc. ("Backbone"). The reference line accompanying those wire transfers indicated that they were supposed to be part of a payment of $400,000 for the purchase of 2,980 model L3++ Miners. However, there is no indication in STOJANOVICH's bank and cryptocurrency exchange records that he ever provided the balance of the $400,000 payment nor, more importantly, that he ever purchased any model S9 Miners (other than those from Amazon), either from Backbone or from any other source. Moreover, a STOJANOVICH business associate, whose statements to the FBI have been corroborated by financial and other records, further described what appears to be that same transaction, informing the FBI in substance and part that STOJANOVICH was involved in a $400,000 deal to purchase Miners from Bitfarms (a company that acquired Backbone), but that that deal fell apart before it was completed.

15.    Regarding the misrepresentations of CHET STOJANOVICH, a/k/a "Chester J. Stojanovich," the defendant, to his customers that he would provide them with specific numbers of Miners and with specific Miner-hosting services and cryptocurrency hash power, for which he was paid, based on interviews with at least five former STOJANOVICH customers and two former STOJANOVICH employees, and reviewing various records gathered in the course of the investigation, I have learned in substance and part that those customers did not receive Miners or the hash power that STOJANOVICH had agreed to and for which those customers had paid STOJANOVICH. Specifically, for example:

a.    One of STOJANOVICH's customers ("Customer-1") provided the FBI with an invoice dated April 24, 2019, in which STOJANOVICH billed Customer-1 approximately $188,637 for 912 S9 Miners (approximately $173,280), insurance, and tariffs.

6

i.    Based on a review of bank records and FBI interviews of Customer-1, I have learned in substance and part that on or about April 24 and April 29, 2019, Customer-1 issued two wire transfers to STOJANOVICH, through Chet Mining, for a total of approximately $173,280 in return for the 912 model S9 Miners (as invoiced above) from which Customer-1 was to receive a regular supply of hash power, convertible into cryptocurrency. Ultimately, Customer-1 received no Miners and no hash power, nor did STOJANOVICH ever refund any of Customer-1's payments for those Miners.

ii.    Based on interviews of Customer-1 and employees of Customer-1, and from email communications, I have learned in substance and part that, over the month following Customer-1's payments to STOJANOVICH, Customer-1 made repeated requests that STOJANOVICH provide proof that the Miners existed and had been acquired. Specifically, Customer-1 requested that STOJANOVICH provide such proof as serial numbers, insurance policy documents, or shipping documents. According to Customer-1, STOJANOVICH failed to provide any such proof, other than a photograph of a number of boxes, claiming that the photograph depicted some of Customer-1's purported Miners.

iii.    Based on an FBI interview of an employee of Customer-1, I have learned in substance and part that, in or about May 2019, when Customer-1 asked for a way to track the Miners that he had supposedly purchased from STOJANOVICH, STOJANOVICH provided login credentials to a Google suite that STOJANOVICH claimed would reflect the status of Customer-1's Miners and hash power output. However, upon logging in, the employee found the web address to contain no evidence of the existence of any Miners, or any other information.

iv.    Based on an FBI interview with Customer-1 and an email provided by Customer-1, I have learned in substance and part that, in or about May 2019, including by email dated May 20, 2019, STOJANOVICH represented to Customer-1 that Customer-1's Miners were located at a Miner-hosting facility in Goose Bay, Canada. Thereafter, in response to a demand from Customer-1, STOJANOVICH agreed to take Customer-1 to that Goose Bay facility, a 31-hour drive from New York City, to show him the Miners. Although the two of them set out from New York City in a rental car on or about Memorial Day weekend 2019, as corroborated by videos taken by Customer-1 during the trip, STOJANOVICH changed his representations during the trip and stated in substance and part that Customer-1 would not be able to see his own Miners upon arrival at the Goose Bay facility. The trip ended abruptly, in Buffalo, New York, where STOJANOVICH abandoned Customer-1 at the

7

airport and stated in substance and part that he would not pay any refund to Customer-1.

        b.    The FBI has also interviewed a second employee of STOJANOVICH, whom STOJANOVICH briefly employed in or about May and June 2019 ("Employee-2"). Employee-2 stated in substance and part that STOJANOVICH admitted, following his trip with Customer-1 to Buffalo, that STOJANOVICH had not in fact purchased the S9 Miners that Customer-1 had paid for.

        c.    Based on interviews of approximately six additional STOJANOVICH customers, as well as a review of text messages, bank records, cryptocurrency exchange records, and STOJANOVICH invoices to customers, I have learned in substance and part that, from in or about May 2019 through in or about July 2019, approximately nine additional customers (aside from Customer-1) made payments to STOJANOVICH totaling more than $1.4 million, based upon representations from STOJANOVICH that he, in return for those payments, would provide them with approximately 580 model S9 Miners and 1,543 model L3 and/or L3++ Miners,[1] as well as Miner-hosting services for those Miners that would purportedly lead to a steady supply of hash power, convertible into cryptocurrency. In or about summer 2019, some of those customers began receiving some cryptocurrency hash power (visible in their customer accounts on website applications of two mining pools). However, beginning in or about September 2019, certain of STOJANOVICH's customers observed that that they were receiving only a tiny fraction of the hash power to be expected based upon their agreements with and payments to STOJANOVICH, and that even that hash power was being provided intermittently and sometimes not at all. One customer also informed the FBI in substance and in part that the data on that website also did not appear to reflect multiple Miner outputs, as it should have had STOJANOVICH been providing the Miner-hosting services for multiple Miners that STOJANOVICH had promised and been paid for.

        i.    Based on FBI interviews with these six STOJANOVICH customers, I have learned in substance and part that, in or about August and September 2019, these customers communicated repeatedly with STOJANOVICH, seeking the missing Miners and missing hash power, and seeking proof of the Miners' existence, such as shipping documents. STOJANOVICH provided no such proof at

---

[1]  In contrast to the totals set forth in paragraph 13 above, the totals here do not include the 912 Model S9 Miners that STOJANOVICH agreed to provide to Customer-1.

the time,[2] other than a video and photographs of STOJANOVICH with a collection of a few dozen boxes, which STOJANOVICH provided to at least two of these customers.[3]

        ii.   Based on FBI interviews of at least four of these six STOJANOVICH customers, I have learned in substance and part that, in or about September 2019, STOJANOVICH stopped replying to any such communications from these customers, and that these customers were unable to reach STOJANOVICH for approximately two months. According to approximately three of these customers, when he resurfaced, STOJANOVICH told his customers that all of their purported Miners had been housed at a Miner-hosting facility in Goose Bay, Canada but that the owner of that facility had gone bankrupt and seized all of the purported Miners. STOJANOVICH provided no evidence that the Miners had ever existed (other than a video and photographs of STOJANOVICH with a number of Miners and boxes that he claimed contained some Miners), nor any explanation for his failure to provide the appropriate amounts of hash power from the customers' purported Miners (other than a claim that he had once had control of the Miners, but no longer did).

        d.   Other evidence also shows that, contrary to his false representations to his customers, STOJANOVICH was not obtaining Miner-hosting services during the relevant times in the summer and autumn of 2019 and was therefore not obtaining for those customers the hash power to which STOJANOVICH had agreed and for which he had been paid. For example:

        i.   A review of STOJANOVICH's bank and cryptocurrency exchange records reveals that, while STOJANOVICH made some modest rent payments to an individual associated with a Miner-hosting facility in Goose Bay, Canada between approximately mid-April and July 1, 2019, he made no rent payments thereafter. This is corroborated by Employee-2, who informed the FBI in substance and part that, while STOJANOVICH made some initial rent payments during the early summer of 2019, he soon stopped making such rent payments.

---

[2] Customer-2 also informed the FBI in substance and part that, later in 2019, STOJANOVICH sent Customer-2 a list of serial numbers and generic insurance documents, purportedly pertaining to Miners in STOJANOVICH's possession, without any evidence that these serial numbers pertained to Miners that had ever been shipped, utilized, or hosted for the benefit of any customer, or any indication that these numbers pertained to Miners at issue.

[3] The provision of such photos to these two customers was similar to STONJANOVICH's conduct with respect to Customer-1, described above in paragraph 15(a)(ii).

ii.     Employee-1, who briefly worked for STOJANOVICH in or about May and June 2019, and was familiar with Miner-hosting operations, reported to the FBI in substance and part that Employee-1 did not see any work directed toward maintaining Miner-hosting services.

16.     Based on interviews of certain customers of CHET STOJANOVICH, a/k/a "Chester J. Stojanovich," the defendant, I have learned in substance and part that throughout the summer and fall of 2019, STOJANOVICH continued to make false claims to the customers whom he was defrauding. For example:

a.     Based on interviews with approximately three STOJANOVICH customers, I have learned in substance and part that, in or about the autumn of 2019, after telling these customers that the owners of the facility in Goose Bay had seized all of the alleged Miners, STOJANOVICH falsely told these customers that their losses would be mitigated because he had filed insurance claims. However, in response to queries from the FBI, the insurance companies listed in STOJANOVICH's customer invoices report that they have no record of any such claims, and the customers have informed the FBI that they never received any proceeds from any such claims.

b.     Shortly thereafter, according one of STOJANOVICH's customers ("Customer-2"), STOJANOVICH told a number of his defrauded customers in substance and part that he was planning to purchase the entire Miner-hosting facility in Goose Bay, while telling other customers in substance and part that he had no funds. However, based on my own review of STOJANOVICH's bank and cryptocurrency records, I believe that the purchase of a Miner-hosting facility was far beyond STOJANOVICH's financial means.

17.     Regarding STOJANOVICH's use of deceptive practices to create the illusion that Miners had been acquired and were being properly hosted to provide hash power to the accounts of those customers, based on an FBI interview of Customer-2, as well as from bank and cryptocurrency exchange records and the records of vendors, I have learned in substance and part that, through the summer and autumn of 2019, a number of STOJANOVICH's customers became increasingly insistent with STOJANOVICH about the fact that they were not receiving hash power. Records of STOJANOVICH's cryptocurrency account and records of an online vendor that sold hash power show that, from in or about July 11, 2019, through in or about January 13, 2020, STOJANOVICH purchased hash power, and redirected that hash power to the accounts of multiple customers. As Customer-2 reported in substance and part to the FBI, STOJANOVICH did not initially reveal this deceptive arrangement to his customers. Instead, STOJANOVICH fraudulently represented to

the customers that he had in fact acquired Miners on their behalf, and that he was providing Miner-hosting services as contracted and was directing this hash power to the customers' accounts, although the aggregate amount of hash power being so redirected was far less than the customers had contracted and paid for.

B. Fraud Since Late 2021

18. Based on interviews of customers and prospective customers of CHET STOJANOVICH, a/k/a "Chester J. Stojanovich," the defendant, court documents, text messages and emails, invoices, purchase orders, and agreements, I have learned in substance and part that, in or about August and September 2021, STOJANOVICH induced at least three customers to pay a total of approximately $179,880, as payment for a total of 127 Miners. Ultimately, as detailed in the following paragraphs, those customers received a total of only three of the 127 Miners they had paid for, and were repaid only approximately $61,000 of the $179,880 they had paid to STOJANOVICH.

19. Based on interviews of customers and prospective customers of CHET STOJANOVICH, a/k/a "Chester J. Stojanovich," the defendant, as well as a review of court documents, text messages and emails, invoices, purchase orders, and agreements, I have learned in substance and part that in or about August 2021, STOJANOVICH told a broker who represented clients interested in obtaining Miners ("Broker-1") in substance and part that STOJANOVICH could provide Miners and related equipment at extremely favorable prices. STOJANOVICH further told Broker-1 in substance and part that STOJANOVICH was extremely wealthy, with approximately $220 million invested in cryptocurrency mining equipment and facilities, access to a $150 million line of credit, and access to extremely large cryptocurrency Miner-hosting capabilities. From a review of STOJANOVICH's bank and cryptocurrency records and other financial records that I have reviewed in this case, I believe that each of these statements to Broker-1 was false.

a. Broker-1 informed the FBI in substance and part that, based in part on these representations from STOJANOVICH, Broker-1 put STOJANOVICH in communication with two customers ("Customer-3" and "Customer-4"), partners who were seeking to purchase Miners. Shortly thereafter, STOJANOVICH presented Broker-1 with a Phoenix Data invoice dated September 3, 2021, to be paid by Customers-3 and -4, seeking approximately $108,630 in payment for 12 model S19 Miners. On or about September 3, 2021, cryptocurrency exchange records reflect that Customers-3 and -4 transferred to STOJANOVICH a quantity of cryptocurrency worth approximately $108,630. Customers-3 and -4 have informed the FBI,

11

in substance and part, that despite this payment, and repeated subsequent attempts to obtain the machines, neither they nor Broker-1 were ever provided by STOJANOVICH with the Miners that they had paid for; nor did STOJANOVICH ever return most of the money that Customers-3 and -4 had paid him, as detailed below in subparagraph (d). In addition, STOJANOVICH made a series of false statements to Customers-3 and -4, as detailed below in subparagraph (c).

b.    Also in or about early September 2021 -- according to Broker-1 and text messages -- STOJANOVICH told Broker-1 in substance and part that STOJANOVICH could obtain model L3 Miners at an extremely low price and provide them to Broker-1 at or below cost. Based upon these representations, Broker-1 paid STOJANOVICH approximately $71,250, between in or about September 7 and September 13, 2021 -- as evidenced by bank records obtained from a U.S. bank where STOJANOVICH held an account ("Bank-1") -- to purchase 115 model L3 Miners. Broker-1 informed the FBI in substance and part that, over the next few months, STOJANOVICH provided Broker-1 with only three Miners, and never provided the remaining 112 L3 Miners that Broker-1 had paid for; nor did STOJANOVICH ever return most of the money that Customers-3, -4, and Broker-1 had paid him, as detailed below in subparagraph (d). In addition, STOJANOVICH made a series of false statements to Broker-1, as detailed below in subparagraph (c).

c.    From in or about September 2021 through in or about November 2021, STOJANOVICH made a variety of false statements to Broker-1 and Customers-3 and -4. For example, based on text messages, file transfer records, and an interview of Broker-1, I have learned in substance and part the following:

i.    From on or about September 12 through on or about September 24, 2021, STOJANOVICH repeatedly represented in substance and part that he had already purchased the Miners for delivery, that they were delayed in shipment, and that he was taking steps to have them delivered.

ii.    STOJANOVICH also provided to Broker-1 and Customers-3 and -4 a series of purported "tracking numbers" (and screen shots of shipping labels) of shipping companies such as DHL and FedEx, a number of which Broker-1 and Customer-3 provided to the FBI. STOJANOVICH falsely stated that these tracking numbers would show the progress of the Miners scheduled for overnight delivery. However, when these tracking numbers were entered into the websites of the shipping companies—-both Broker-1 and the FBI learned that these tracking numbers were either entirely bogus (reflecting no package at all), or -- in only two instances -- pertained to the shipment of only one or two parcels.

12

iii.   On or about September 13, 2021, according to text messages, file transfer records, and based on the FBI's interview of Broker-1, STOJANOVICH represented to Broker-1 in substance and part that STOJANOVICH had S19 Miners in his possession, which he was using to replace Miners that had purportedly been delayed in shipping.

iv.   On another occasion, according to Broker-1, STOJANOVICH represented to Broker-1 in substance and part that Miners had been ordered but were delayed due to wildfires in Utah.

v.   In or about late September 2021, STOJANOVICH told Broker-1 in substance and part that he was reordering the 12 model S19 Miners. As purported proof of this supposed second purchase on or about September 30, 2021 –- as I have learned from internet messages and photographs, and an interview of Customer-3 –- STOJANOVICH produced an invoice purporting to reflect STOJANOVICH's purchase of 12 model S19 Miners. Nonetheless -- as confirmed by Broker-1, Customers-3 and -4, and text messages -- STOJANOVICH never produced such Miners. Based upon a review of STOJANOVICH's bank and cryptocurrency records, it appears that STOJANOVICH did not make any purchase of any substantial quantity of Miners in or after September 2021.

d.   Based on interview of Broker-1, Customers-3 and -4, and my review of other documents and records, I have learned in substance and part that STOJANOVICH never repaid Broker-1 or Customers-3 and -4 most of the money he owed them. In fact, the only repayments that STOJANOVICH provided were in or about late November and early December 2021, after his disputes with Broker-1 began to adversely affect other business endeavors with persons known to Broker-1, as follows:

i.   Based on bank records and an interview with Broker-1, I have learned in substance and part that, on or about November 26, 2021, in a purported effort to provide refunds, STOJANOVICH provided to Broker-1 three checks drawn on a Canadian bank, totaling approximately $193,000 Canadian dollars. Two of those checks bounced for insufficient funds. The third check cleared, for approximately $36,000 U.S. dollars.

ii.   In addition, based on bank records and an interview with Broker-1, I have learned in substance and part that, between in or about late November 2021 and early December 2021, STOJANOVICH caused three wire payments from a third party to be directed to Broker-1, totaling $25,000.

iii.   Thus,   in   total,   STOJANOVICH   refunded approximately $61,000 of the approximately $179,880 that he was paid by Broker-1 and Customers-3 and -4, but never refunded the remaining approximately $119,000 that he was paid.

13

iv.    Based on an interview of Customer-3 and my review of internet messages, I have learned in substance and part that in other communications on or about October 1, 2021, STOJANOVICH represented to Customers-3 and -4 that he would mitigate their lost income (*i.e.,* income anticipated from the missing Miners) by providing hash power (convertible to cryptocurrency) from Miners purportedly controlled by STOJANOVICH. According to Customer-3, however, STOJANOVICH ultimately provided such hash power only briefly and intermittently, and not in amounts remotely sufficient to cover the losses of Customers-3 and -4.

e.    Based on an analysis of STOJANOVICH's bank and cryptocurrency records, I have learned that STOJANOVICH misappropriated the funds that were provided to him by Broker-1 and Customers-3 and -4. Rather than directing those funds to the purchase of Miners, STOJANOVICH spent most of that money on personal expenses and expenses unrelated to the purchase of Miners. For example, bank and cryptocurrency records show that STOJANOVICH consolidated approximately $127,000 of the funds that he received from Customers-3 and -4 and Broker-1 into STOJANOVICH'S Bank-1 account,[4] from which his largest payments, totaling more than $80,000, went to pay for a pre-existing credit card bill, unrelated purchases of internet domain names, unrelated purchases of products of Apple, Inc. (which does not manufacture Miners), flights including chartered flights on private jets, hotels/restaurants, and payments to his wife/partner. In addition, with respect to the remaining approximately $52,000 in cryptocurrency that STOJANOVICH received from Customers-3 and -4 in a cryptocurrency exchange account, cryptocurrency records show that STOJANOVICH's expenditures shortly thereafter included payments of more than $33,000 to an online casino, and more than $31,000 to an unrelated Miner-hosting facility in Canada.[5]

C.    Furtherance of the Fraud through Deposition in March 2022

20.    Since on or about February 28, 2022, in compliance with a court order issued on or about February 25, 2022, the service provider (the "Service Provider") for the primary cellphone (the "STOJANOVICH Cellphone") of CHET STOJANOVICH, a/k/a "Chester J. Stojanovich," the defendant, has been providing the FBI with

---

[4] Customers-3 and -4 and Broker-1 paid a total of approximately $71,250 to STOJANOVICH by wire to the Bank-1 account, and approximately $108,630 in cryptocurrency.  Of the funds paid in cryptocurrency, STOJANOVICH transferred approximately $56,500 to the Bank-1 account.

[5] I believe that this payment for Miner-hosting services was unrelated to the purchase of Miners for Customers-3 and -4 and Broker-1, because, as described in paragraphs 18-19 above, those individuals were seeking only to purchase Miners, and not Miner-hosting services.

information pertaining to the STOJANOVICH Cellphone, including precision location information, GPS data, cell site data, historical location information, and pen register information. Based upon that information, I know that the STOJANOVICH Cellphone has been in Canada since late February 2022. From that information, as well as records of the U.S. Customs and Border Protection reflecting STOJANOVICH's exit from and entry into the United States, it appears that STOJANOVICH has —- throughout this period —- been in possession of, and using, the STOJANOVICH Cellphone.

21.  Based on a review of court documents, I know that CHET STOJANOVICH, a/k/a "Chester J. Stojanovich," the defendant, along with Chet Mining and Chet Mining Canada, are currently defendants in a civil lawsuit brought by several of the customer/victims whom STOJANOVICH defrauded in 2019, as described above. *See Holmes et al. v. Chet Mining, Chet Stojanovich, et ano.,* Case No. 1:20-CV-04448-LJL (S.D.N.Y.). Default judgments have been entered in that case, but the case remains active with respect to the plaintiffs' efforts at collection. On or about February 14, 2022, the Honorable Lewis J. Liman, United States District Judge for the Southern District of New York, issued a verbal, transcribed order in that case directing STOJANOVICH to appear in this District for a deposition on March 4, 2022 (the "Deposition").

22.  As described below, CHET STOJANOVICH, a/k/a "Chester J. Stojanovich," the defendant, appeared at the Deposition and gave false testimony during the Deposition, in an apparent attempt to obstruct the collection efforts of the plaintiffs in that case, who are among the victims from 2019 described in paragraphs 12-17, above. More specifically:

a.  On or about March 4, 2022, the date of the Deposition, other agents and I monitored the location information provided by the Service Provider pertaining to the STOJANOVICH Cellphone. Other agents and I also conducted surveillance of STOJANOVICH in New York City. From these sources, I learned that, on the morning of the Deposition, STOJANOVICH travelled by car to New York City from Canada. Throughout that trip, STOJANOVICH was in the immediate proximity of the STOJANOVICH Cellphone, presumably carrying it on his person. While under surveillance, STOJANOVICH parked his car several blocks from the Deposition, and walked to the building where the Deposition was scheduled to take place. He continued to have the STOJANOVICH Cellphone with him.

b.  Based upon a review of the transcript of that Deposition, I know that STOJANOVICH was placed under oath and gave false testimony. During the Deposition, STOJANOVICH was asked for various pieces of information, which he repeatedly testified that he could provide only by consulting his personal cellphone.

15

STOJANOVICH was further asked whether he was in possession of his personal cellphone and was asked to produce it. STOJANOVICH falsely testified that his cellphone "is either in the car or it is in storage." The Deposition was adjourned for a half-hour lunch break, during which STOJANOVICH was instructed to retrieve his cellphone from his car or storage and return with it to the Deposition. STOJANOVICH did not return to the Deposition as scheduled. The Deposition transcript indicates that STOJANOVICH's whereabouts remained unknown to the other parties to the Deposition until well after the scheduled time to reconvene and after failed efforts to call or locate STOJANOVICH, and that the Deposition was adjourned with no further testimony being taken.

c.      From the location information provided by the Service Provider, and from visual surveillance of STOJANOVICH on March 4, 2022, I know that STOJANOVICH at all times had the STOJANOVICH Cellphone on his person, and that he carried it with him into the building during the time when he falsely testified at the Deposition that his cellphone was in his car or in storage. After the Deposition was adjourned for a half-hour to allow STOJANOVICH time to retrieve his cellphone, I observed him leave the building where the Deposition had commenced, go to the vicinity of his car, and loiter in that vicinity for approximately an hour to an hour and a half. He did not return to the building until well after the time scheduled for the Deposition to resume, and -- according to the Deposition transcript -- after all other parties to the Deposition had left because STOJANOVICH could not be located.  He then left New York City and returned that day to Canada, where he has remained ever since.

d.      The Deposition transcript further reveals that, after evading questions about where he was currently living, STOJANOVICH also testified falsely that he had spent the previous night in upstate New York by the town of Chestertown. In fact, the STOJANOVICH Cellphone location information and pen register information provided by the Service Provider, as well as records of U.S. Customs and Border Protection, indicate that STOJANOVICH has spent every night in Canada since at least March 1, 2022. These sources further indicate that, on the date of the Deposition, STOJANOVICH drove down from Canada, participated in the Deposition, and then returned to Canada that night, where he has remained ever since.

WHEREFORE, I respectfully request that an arrest warrant be issued for CHET STOJANOVICH, a/k/a "Chester J. Stojanovich," the defendant, and that he be imprisoned or bailed, as the case may be.

_____
/s Blair R. Diel by Jenf 4 Willi
BLAIR R. DIEL
Special Agent
Federal Bureau of Investigation

Sworn to before me this
10th day of April, 2022

_____
JENNIFER E. WILLIS
United States Magistrate Judge

17